AO 91 (REV.5/85) Criminal Complaint

AUSA Diane Ryan (312) 886-7629
AUSA Monika Bickert (312) 886-7641
AUSA Valarie Hayes (312) 353-8709

# UNITED STATES DISTRICT COURT

_____NORTHERN_____ DISTRICT OF _____ILLINOIS, EASTERN DIVISION_____

UNITED STATES OF AMERICA

v.

JAMES AUSTIN, aka "Jaymo," and
the defendants on the attached list

**FILED**

JUN 2 0 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER: **06 CR    0451**

**MAGISTRATE JUDGE MASON**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief.  From in or about 1999 until the present, in Cook County, in the Northern District of Illinois,

Eastern Division, and elsewhere, defendants did

conspire with each other and with others known and unknown to the United States to knowingly and intentionally distribute and posses
with intent to distribute controlled substances, namely, in excess of 1 kilogram of heroin, 50 grams of mixtures containing cocaine base
in the form of crack cocaine, mixtures containing cocaine, marijuana, and fentanyl, in violation of Title 21, United States Code,
Section 841(a)(1).

in violation of Title 21 United States Code, Section 846.

I further state that I am a Task Force Officer with the Drug Enforcement Administration, United States Department of
Justice, and that this complaint is based on the following facts:

### See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes    ___ No

_____
William Svilar, TFO
Signature of Complainant

Sworn to before me and subscribed in my presence,

June 20, 2006                          at    Chicago, Illinois                          Date
                                              City and State

Martin Ashman
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

1.  James AUSTIN, a.k.a. "Jaymo"
2.  Johnny SHANNON, a.k.a. "Boo C" and "Boosie"
3.  Larry SMITH, a.k.a. "Lucky" and "Lujack"
4.  Lynn BARKSDALE, a.k.a. "Insane"
5.  Jerome JOHNSON, a.k.a. "Little Marcus"
6.  Antonio SHANNON, a.k.a. "Montana"
7.  Séan WINN
8.  Derrick CAMPBELL, a.k.a. "Dino"
9.  Tyrone WALLACE, a.k.a. "Taz" and "Juvie"
10. Kevin WILLIAMS, a.k.a. "Nickle Bag"
11. Marshall WOODEN, a.k.a. "Chuckwick"
12. Aaron SMITH, a.k.a. "Ace"
13. Duante FALLS, a.k.a. "Shitty" and "Doodoo" and "Dunate"
14. Robin JOHNSON, a.k.a. "Pathfinder" and "Path" and "Pierre"
15. Nick JONES, a.k.a. "Poohnannie"
16. Joseph CHESS, a.k.a. "Jo Jo"
17. Paul HATCHETT
18. Penorris BROWNRIDGE, a.k.a. "PJ"
19. Prince COLEMAN
20. Saundra FALLS, a.k.a. "Mama"
21. Johnny TIGER, a.k.a. "Tig"
22. Bernard HOWARD, a.k.a. "Trigg" and "Ru"
23. Lukas McGEE
24. Antwan PETERSON, a.k.a. "Droopy"
25. Antonio STIDHUM, a.k.a. "Psycho"
26. Robbie SYKES
27. Anthony SMITH, a.k.a. "Moo Maw"
28. Joseph BOONE, a.k.a. "Little Maurice"
29. Davone SHANNON
30. Rashad HAMILTON, a.k.a. "Ray Ray"
31. Anthony BINION, a.k.a. "BK" or "Doc"
32. Andre HASTINGS, a.k.a. "Dre"
33. Cynthia THOMAS, a.k.a. "Country"
34. Demetrius BROWNRIDGE, a.k.a. "Little Mickey" or "Cookie"
35. Arthur HEARON, a.k.a. "Little A" and "Little Art"
36. Tashika SLEDGE
37. Rasheed KESHIRO, a.k.a. "Sheed"
38. Stephen AKINGBA, a.k.a. "David"
39. Frank HARRIS, a.k.a. "Knuckles"
40. Freddie WESTMORELAND, a.k.a. "Stokes"
41. Charles HAMPTON, a.k.a. "Mo-Money"
42. Nicole FROEHLIG

43.    Mark FRANKLIN, a.k.a. "Marco"
44.    Israel MOORE, a.k.a. "Pretty Ricky" and "Lookout"
45.    Davarius SEATON, a.k.a. "Ugly Snake" and "D"
46.    Kevin THOMAS, a.k.a. "Money C"
47.    Joseph PEARSON

COMPLAINT AFFIDAVIT

Table of Contents

I.      Overview of Investigation and Gang (page 5)

II.    Facts Establishing Probable Cause (page 17, ¶ 1)

     A.     The Leadership of the Dearborn Homes Faction of the Mickey Cobras

          a.     CD1 (¶ 2)

          b.     CD2 (¶ 9)

          c.     CS1 (¶ 11)

          d.     CS2 (¶ 18)

          e.     Joseph Chess (¶ 21)

          f.     Individual C (¶ 25)

          g.     Cynthia Thomas (¶ 31)

          h.     Robin Johnson (¶ 34)

          i.     Duante Falls (¶ 40)

          j.     Antwan Peterson (¶ 46)

          k.     Rashad Hamilton (¶ 49)

          l.     Anthony Smith (¶ 52)

          m.    Jerome Johnson (¶ 57)

          n.     Antonio Stidhum (¶ 61)

          o.     Sean Winn (¶ 68)

          p.     Andre Hastings (¶ 74)

          q.     Freddie Westmoreland (¶ 77)

          r.     Israel Moore (¶ 79)

     B.     Mickey Cobra King James AUSTIN and His Key Assistant Johnny SHANNON (¶ 82)

          1.     Johnny SHANNON Calls BARKSDALE and Attempts to Borrow Heroin (¶ 83)

          2.     Calls over Target Phone 10 Which Confirm Johnny SHANNON's Role as Key Assistant to AUSTIN (¶ 86)

1

3. DEA Seizes $6000 in Intended Bond Money from Johnny SHANNON (¶ 90)

4. CS1 Discusses the Sale of Untraceable "Burn Out" Cell Phones With AUSTIN and then Delivers the Phones to Johnny SHANNON (¶ 95)

C. James AUSTIN and Johnny SHANNON's Workers (¶ 98)

    1. Defendant Jerome JOHNSON and the Seizure of More than 190 Grams of Fentanyl (¶ 98)

    2. Defendant Tyrone WALLACE (¶ 103)

    3. Defendant Kevin WILLIAMS (¶ 110)

    4. Defendant Antonio SHANNON (¶113)

    5. Defendant Sean WINN caught in DBs with 60 bags of Heroin (¶ 115)

D. Controlled Purchase of 4 ½ Ounces of Crack Cocaine from defendant Marshall WOODEN (¶ 118)

E. Defendant Larry SMITH (¶ 123)

    1. November 8, 2004, Seizure of Heroin and a Gun, Arrest of JOHNSON, and Escape by Larry SMITH (¶ 124)

    2. Larry SMITH sells 50.4 Grams of Heroin to CS1 (¶ 126)

    3. Intercepted Calls Showing Larry SMITH's Leadership Role in the Mickey Cobras (¶ 129)

    4. Defendant Nick JONES (¶ 136)

    5. Defendant Devarious SEATON (¶ 140)

    6. Defendant Duante FALLS (¶ 151)

    7. Defendant Sandra FALLS (¶ 160)

    8. Defendant Robin JOHNSON (¶ 163)

    9. Rashad HAMILTON (¶ 168)

    10. Davone SHANNON (¶ 171)

    11. Penorris BROWNRIDGE (¶ 175)

    12. Antwan PETERSON (¶ 178)

    13. Joseph CHESS (¶ 181)

    14. Paul HATCHETT (¶ 184)

15. Prince COLEMAN (¶ 188)

16. Aaron SMITH (¶ 193 )

17. Anthony SMITH (¶ 202)

18. Anthony BINION (¶ 206)

19. Robbie SYKES (¶ 214)

20. John TIGER (¶ 219)

21. Joseph BOONE (¶ 223)

F. Lukas McGEE (¶-228)

    1. Seizure from McGee of 431 Bags of Fentanyl Packaged for Sale in the 2910 Building of the DBs (¶ 228)

G. Antonio STIDHUM (¶ 230)

    1. April 13, 2006 Arrest of Antonio STIDHUM for Felon in Possession of a Firearm and Confession by STIDHUM (¶ 230)

H. Bernard HOWARD (¶ 234)

    1. Intercepted Calls Showing that Larry SMITH and Bernard HOWARD Engage in Narcotics Transactions (¶ 234)

    2. Recorded Conversation Between CS2 and Robin JOHNSON in Which JOHNSON States that He is Mixing for Bernard HOWARD's Heroin Lines (¶ 239)

I. Lynn BARKSDALE and his Trafficking Associates (¶ 241)

    1. Lynn BARKSDALE sells 50 Grams of Heroin to a Cooperating Defendant on January 27, 2006 (¶ 242)

    2. Intercepted Calls Show BARKSDALE's Drug Trafficking and Concern About Surveillance by Federal Agents (¶ 246)

    3. Intercepted Calls Corroborate Information that BARKSDALE and Individual A are High Ranking Members of the Mickey Cobras (¶ 250)

    4. Takisha SLEDGE's Assistance of BARKSDALE's Drug Trafficking (¶ 252)

3

5.    BARKSDALE's Trafficking Activities with Arthur HEARON (¶ 267)

6.    BARKSDALE's Trafficking Activities with Frank HARRIS (¶ 276)

J.    Defendant Demetrius BROWNRIDGE (¶ 283)

K.    Defendant Cynthia THOMAS (¶ 286)

L.    Defendant Freddie WESTMORELAND and his Drug Trafficking Associates (¶ 287)

    1.    November 21, 2003 Controlled Purchase of Heroin with WESTMORELAND and Mark FRANKLIN (¶ 288)

    2.    March 19, 2004, Controlled Purchase of Heroin from WESTMORELAND and FROEHLIG (¶ 293)

    3.    March 22, 2005, Controlled Purchase of Heroin from WESTMORELAND (¶ 297)

    4.    WESTMORELAND's Drug Trafficking With Charles HAMPTON (¶ 298)

    5.    Recovery of $3,275.00 from WESTMORELAND (¶ 304)

    6.    Andre HASTINGS' Trafficking For WESTMORELAND (¶ 305)

M.    Defendants Rasheed KESHIRO and Stephen AKINGBA, a.k.a. "David" (¶ 307)

N.    Defendant Israel MOORE (¶ 323)

    1.    Seizure of $2,180 from MOORE (¶ 323)

    2.    Search of MOORE's Residence Reveals Gun And Heroin (¶ 324)

    3.    MOORE's Post Arrest Statement (¶ 325)

    4.    MOORE's Drug Trafficking with Derrick CAMPBELL (¶ 328)

    5.    MOORE's Drug Trafficking with Joseph PEARSON (¶ 342)

    6.    Kevin THOMAS's Role of Heroin Supplier to MOORE (¶ 355)

III.    Conclusion

COUNTY OF COOK    )
                  )   SS              **UNDER SEAL**
STATE OF ILLINOIS  )

## AFFIDAVIT

William Svilar, being duly sworn, deposes and states as follows:

1.     I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been assigned to the DEA for approximately two years, and I am currently assigned to the DEA Chicago Field Division, Chicago, Illinois. In addition to my assignment to the Chicago Field Division, I am a Homicide Detective with the Chicago Police Department (CPD). I have worked for CPD for approximately 15 years. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have been involved in various types of electronic surveillance, including the interception of wire communications, the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking and the street gangs who participate in these illegal activities. As a result of these investigative activities, I have conducted and participated in hundreds of investigations that have resulted in the seizure of hundreds of pounds of marijuana, as well as multiple kilograms of cocaine and heroin. I have received special training in the enforcement of laws concerning controlled

1

substances as found in Title 21 of the United States Code. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering investigations and conspiracy and complex investigations.

2.     I am familiar with and have participated in all of the normal methods of investigation including, but not limited to visual surveillance, the general questioning of witnesses, the use of informants, the use of pen registers, and undercover operations. Based on my training and experience, I am familiar with the ways in which drug dealers and gang members conduct their drug-related business, including, but not limited to, their methods of distributing narcotics; use of telephone communication devices; use of numerical codes and code words to identify themselves, the nature of the communication, and to conduct their drug-related business; and common practices of registering and obtaining these communication devices under false names, or names of relatives and/or friends to avoid financial responsibilities and tracking of criminal activities by law enforcement entities.

3.     This Affidavit is made for the limited purpose of establishing probable cause submitted in support of the Criminal Complaint alleging a violation of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances, namely, in excess of 1 kilogram of heroin, 50 grams of mixtures containing cocaine base in the form of crack cocaine, mixtures containing

2

cocaine, marijuana, and fentanyl), and Title 18, United States Code, Section 2. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to support the Criminal Complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit. The following are the individuals charged in this Criminal Complaint:

1. James AUSTIN, a.k.a. "Jaymo"
2. Johnny SHANNON, a.k.a. "Boo C" and "Boosie"
3. Larry SMITH, a.k.a. "Lucky" and "Lujack"
4. Lynn BARKSDALE, a.k.a. "Insane"
5. Jerome JOHNSON, a.k.a. "Little Marcus"
6. Antonio SHANNON, a.k.a. "Montana"
7. Sean WINN
8. Derrick CAMPBELL, a.k.a. "Dino"
9. Tyrone WALLACE, a.k.a. "Taz" and "Juvie"
10. Kevin WILLIAMS, a.k.a. "Nickle Bag"
11. Marshall WOODEN, a.k.a. "Chuckwick"
12. Aaron SMITH, a.k.a. "Ace"
13. Duante FALLS, a.k.a. "Shitty" and "Doodoo" and "Dunate"
14. Robin JOHNSON, a.k.a. "Pathfinder" and "Path" and "Pierre"
15. Nick JONES, a.k.a. "Poohnannie"
16. Joseph CHESS, a.k.a. "Jo Jo"
17. Paul HATCHETT
18. Penorris BROWNRIDGE, a.k.a. "PJ"
19. Prince COLEMAN
20. Saundra FALLS, a.k.a. "Mama"
21. Johnny TIGER, a.k.a. "Tig"
22. Bernard HOWARD, a.k.a. "Trigg" and "Ru"
23. Lukas McGEE
24. Antwan PETERSON, a.k.a. "Droopy"
25. Antonio STIDHUM, a.k.a. "Psycho"
26. Robbie SYKES
27. Anthony SMITH, a.k.a. "Moo Maw"
28. Joseph BOONE, a.k.a. "Little Maurice"

3

29. Davone SHANNON
30. Rashad HAMILTON, a.k.a. "Ray Ray"
31. Anthony BINION, a.k.a. "BK" or "Doc"
32. Andre HASTINGS, a.k.a. "Dre"
33. Cynthia THOMAS, a.k.a. "Country"
34. Demetrius BROWNRIDGE, a.k.a. "Little Mickey" or "Cookie"
35. Arthur HEARON, a.k.a. "Little A" and "Little Art"
36. Tashika SLEDGE
37. Rasheed KESHIRO, a.k.a. "Sheed"
38. Stephen AKINGBA, a.k.a. "David"
39. Frank HARRIS, a.k.a. "Knuckles"
40. Freddie WESTMORELAND, a.k.a. "Stokes"
41. Charles HAMPTON, a.k.a. "Mo-Money"
42. Nicole FROEHLIG
43. Mark FRANKLIN, a.k.a. "Marco"
44. Israel MOORE, a.k.a. "Pretty Ricky" and "Lookout"
45. Davarius SEATON, a.k.a. "Ugly Snake" and "D"
46. Kevin THOMAS, a.k.a. "Money C"
47. Joseph PEARSON

4.     Since approximately 1999, agents of DEA, CPD, the Internal Revenue

Service (IRS), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF),

have been investigating the Mickey Cobras street gang (the "Mickey Cobras") and its

drug-trafficking operations. The Mickey Cobras operate principally on the South Side of

Chicago, including, but not limited to, the 2nd, 3rd, 7th, 9th, and 21st Chicago Police

Districts. I have participated in this investigation. The statements contained in this

Affidavit are based, in part, on: (a) my personal participation in this investigation; (b)

information provided by Special Agents of the DEA, officers of the CPD, agents of the

ATF and IRS, intelligence analysts of the DEA and CPD, and other law enforcement

agents; (c) information provided by cooperating individuals; (d) analysis of pen register

4

and trap and trace data; (e) review of consensually-recorded conversations and intercepted conversations recorded pursuant to court authorization; and (f) the training and experience of myself and other law enforcement agents. I have also reviewed, among others, the following reports: laboratory analysis reports; pen register, and trap and trace analyses; audiotapes of consensually-recorded conversations; and criminal history records maintained by CPD, Illinois State Police (ISP), and the National Crime Information Center (NCIC). To the extent that intercepted and recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was intercepted. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. As a result of my personal participation in this investigation, I am familiar with this investigation. On the basis of this familiarity, as well as my training, experience, the experience of other law enforcement officers, and on the basis of other information that I have reviewed and determined to be reliable, I allege the following:

## I. Overview of the Investigation & The Gang

5.      Based on this investigation and my experience, and the experience of other law enforcement agents who specialize in gang investigations, I know that the Mickey Cobras formed during the 1960's under the name "Cobrastones." In the late 1960's, the Cobrastones became part of the "Black P Stone Nation," a coalition of smaller street gangs. In the early 1970's, Mickey Cogwell, a Cobrastone, became a leader of the Black P Stone Nation. In

1976, a power struggle erupted between other gang members and Mickey Cogwell over control of the Black P Stone Nation. During the ensuing gang-war, Mickey Cogwell was shot and killed. Following Mickey Cogwell's death, the gang members loyal to the Cobrastones changed their gang's name to the "Mickey Cobras" to honor Cogwell.

6.    The Dearborn Homes housing project ("the DBs") is a Chicago Housing Authority (CHA) housing project located on the South Side of the City of Chicago immediately north of the Illinois Institute of Technology campus, between 27th and 30th Streets and State and Federal Streets. The Dearborn Homes housing project is comprised of 16 six-story and nine-story buildings, and it includes a total of 800 individual housing units. An aerial photograph of the DBs is attached as **Exhibit A**.

7.    The Mickey Cobras control narcotics trafficking in numerous buildings in the DBs. The Mickey Cobras control all the buildings located in the southern portion of the DBs. A rival gang, the Gangster Disciples, controls narcotics sales in the buildings located at the northern end of the DBs that are located along 27th Street.

8.    Numerous heroin "lines" are sold in the DBs. A line is a particular brand of heroin. Each heroin line has its own name and distinct packaging, such as "Penicillin," which is sold in the DBs in small green plastic zip lock bags. Another DB line, "Reaper", is packaged in small black bags. High ranking members of the Mickey Cobras own and control the various lines that are sold in the DBs.

9.    The following is a summary of the roles played by the charged individuals, as

6

well as citations to the paragraphs in the Affidavit that refer to each individual:

a. **James AUSTIN** (a.k.a. "Jaymo") is the overall leader and "King" of the set of Mickey Cobras that controls narcotics trafficking in the DBs, and is referred to throughout the affidavit, particularly in paragraphs 2-82, 88-130.

b. **Johnny SHANNON** (a.k.a. "Boo C" and "Boosie") is the chief assistant of Mickey Cobra King James AUSTIN. Johnny SHANNON assists AUSTIN in the day-to-day operations of drug trafficking in the DBs. Johnny SHANNON is referred to in Paragraphs 6, 10, 16, 20, 24, 27, 29, 33, 39, 42, 51, 54, 59, 60, 64-67, 69, 76, 78, 82-96, 101, 103, 114, 136, 260, 265.

c. **Larry SMITH** (a.k.a. "Lucky" and "Lujack") is a member of the board of directors of the set of Mickey Cobras that controls narcotics trafficking in the DBs. Larry SMITH is referred to in Paragraphs 7, 19, 22, 26, 30, 33, 35, 44-48, 56, 62, 66-67, 78-80, 123-163, 166, 167, 178, 180, 182-183, 185-196, 198-201, 207-208, 210-213, 219, 222, 233-238, 287, 292, 325, 327.

d. **Lynn BARKSDALE** (a.k.a. "Insane") is a member of the board of directors of the Mickey Cobra set that controls narcotics trafficking in the Dearborn Homes. BARKSDALE is referred to in Paragraphs 7, 19,

7

23-24, 27-29, 33, 37, 45, 56, 66, 69, 83-85, 90, 114, 241-273, 276-282, 307.

e.   **Jerome JOHNSON** (a.k.a. "Little Marcus") is the night-shift manager for James AUSTIN's heroin lines, "Penicillin" and "Reaper," paragraphs 57-60, 82, 98-103, 110, 177.

f.   **Antonio SHANNON** (a.k.a. "Montana") is a mixer, packager, and enforcer for two Mickey Cobra heroin lines, paragraphs 6, 66, 67, 73, 90-91, 113-115, 258-260, 268.

g.   **Sean WINN** is a seller for one of James AUSTIN's heroin lines, paragraphs 68-73, 82, 113, 115-117, 230, 241.

h.   **Derrick CAMPBELL** (a.k.a. "Dino") is a supplier of heroin to heroin lines run by James AUSTIN and Israel MOORE, paragraphs 48, 81, 309, 327-341.

i.   **Tyrone WALLACE** (a.k.a. "Taz" and "Juvie") is the day-shift manager for James AUSTIN's heroin lines, "Penicillin" and "Reaper," paragraphs 20, 59, 84, 100, 101, 103-109, 260.

j.   **Kevin WILLIAMS** (a.k.a. "Nickle Bag") is a mixer and transporter for James AUSTIN's heroin lines, paragraphs 14, 17, 20, 51, 55, 64, 102, 110-112.

k.   **Marshall WOODEN** (a.k.a. "Chuckwick") ran a Mickey Cobra heroin

8

line and sells crack cocaine in the DBs, paragraphs 63, 118-122.

l.  **Aaron SMITH** (a.k.a. "Ace") oversees distribution of Larry SMITH's heroin lines, paragraphs 80, 137, 155, 193-201, 210, 325.

m.  **Duante FALLS** (a.k.a. "Shitty" and "Doodoo") is the assistant manager and a mixer of heroin for Lucky SMITH's heroin lines, paragraphs 40-46, 50-51, 63, 80, 82, 123, 137, 151-161, 167-174, 193, 195, 207, 209, 218, 241, 325.

n.  **Robin JOHNSON** (a.k.a. "Pathfinder" and "Path" and "Pierre") is a mixer and distributor for Larry SMITH's heroin lines, paragraphs 34-39, 82, 123, 124, 163-167, 183, 204, 239.

o.  **Nick JONES** (a.k.a. "Poohnannie") is a mixer and courier for Larry SMITH's heroin lines, paragraphs 67, 136-139.

p.  **Joseph CHESS** (a.k.a. "Jo Jo") is a seller and part-time manager of Larry SMITH's heroin lines, paragraphs 21-24, 82, 124, 181-183, 241, 250.

q.  **Paul HATCHETT** is a redistributor of heroin from Larry SMITH's heroin lines, paragraphs 184-187.

r.  **Penorris BROWNRIDGE** (a.k.a. "PJ") is a manager and mixer for heroin lines, paragraphs 102, 175-177.

s.  **Prince COLEMAN** is a transporter for Larry SMITH's heroin lines,

9

paragraphs 188-192.

t. **Saundra FALLS** (a.k.a. "Mama") collects proceeds and maintains a stash house for heroin storage for Lucky SMITH's heroin lines, paragraphs 41, 155-160-162, 212.

u. **Johnny TIGER** (a.k.a. "Tig") is a mixer and deliverer for two Larry SMITH heroin lines, paragraphs 169, 208, 219-222.

v. **Bernard HOWARD** (a.k.a. "Trigg" and "Ru") runs a Mickey Cobra heroin line in the DBs, paragraphs 47, 63, 163, 180, 205, 207, 234-240.

w. **Lukas McGEE** transports heroin and fentanyl for Larry SMITH, paragraphs 228-229.

x. **Antwan PETERSON** (a.k.a. "Droopy") manages one of Larry SMITH's heroin lines, paragraphs 46-48, 123, 178-180, 227, 328.

y. **Antonio STIDHUM** (a.k.a. "Psycho") runs a Mickey Cobra heroin line in the DBs, paragraphs 61-69, 82, 90, 103, 110, 113, 114, 119, 123, 136, 230-233, 241, 250.

z. **Robbie SYKES** transports heroin for Larry SMITH's heroin lines, paragraphs 214-218.

aa. **Anthony SMITH** (a.k.a. "Moo Maw") manages Larry SMITH's heroin lines, paragraphs 52-56, 110, 119, 123, 164, 197, 202-205, 241, 250.

bb. **Joseph BOONE** (a.k.a. "Little Maurice") supplies Larry SMITH with

10

heroin and cocaine, paragraphs 47, 223-227.

cc. **Davone SHANNON** works for Larry SMITH's heroin lines under Duante FALLS' management, paragraphs 156, 168, 170-174.

dd. **Rashad HAMILTON** (a.k.a. "Ray Ray") works for Larry SMITH's heroin lines under Duante FALLS' management, paragraphs 49-51, 82, 110, 156, 168-171, 220.

ee. **Anthony BINION** (a.k.a. "BK" and "Doc") is a mixer and courier for Larry SMITH's heroin lines, paragraphs 153, 206-218.

ff. **Andre HASTINGS** (a.k.a. "Dre") is a distributor of heroin for Larry SMITH's heroin lines, paragraphs 74-76, 82, 228, 305, 306.

gg. **Cynthia THOMAS** (a.k.a. "Country") provides countersurveillance security for heroin lines in the DBs, paragraphs 31-33, 82, 123, 241, 250, 284, 286.

hh. **Demetrius BROWNRIDGE** (a.k.a. "Little Mickey" or "Cookie") is a manager for heroin lines "Penicillin" and "Pipeline," paragraphs 63, 283-285.

ii. **Arthur HEARON** (a.k.a. "Little A" and "Little Art") is a courier and assistant manager for heroin lines "Weewee" and "Enterprise," paragraphs 267-274.

jj. **Tashika SLEDGE** is a Chicago Police officer who assists Lynn

11

BARKSDALE and others in their Mickey Cobra drug trafficking activities, paragraphs 114, 252-266, 277.

kk.  **Rasheed KESHIRO** (a.k.a. "Sheed") is a supplier of heroin to Lynn BARKSDALE's heroin lines, paragraphs 10, 45, 242, 245, 249, 307-322.

ll.  **Stephen AKINGBA** (a.k.a. "David") is a supplier of heroin to Lynn BARKSDALE's heroin lines, paragraphs 307, 311-322.

mm.  **Frank HARRIS** (a.k.a. "Knuckles") is a mid-level redistributor of Lynn BARKSDALE's heroin, paragraphs 276-282.

nn.  **Freddie WESTMORELAND** (a.k.a. "Stokes") ran "Stars" and "Demon" heroin lines in the DBs, paragraphs 14, 37, 47, 75, 77-82, 123, 180, 287-306.

oo.  **Charles HAMPTON** (a.k.a. "Mo-Money") ran the "TKO" heroin line in the DBs, paragraphs 63, 136, 298-302.

pp.  **Nicole FROEHLIG** assists WESTMORELAND in the distribution of heroin, paragraphs 293-296, 299.

qq.  **Mark FRANKLIN** (a.k.a. "Marco") is a mixer and courier of heroin for WESTMORELAND, paragraphs 179, 288-292.

rr.  **Israel MOORE** (a.k.a. "Pretty Ricky" and "Lookout") is a supplier of heroin to Larry SMITH's heroin lines, paragraphs 79-81, 123, 131-134,

139, 143, 149, 198, 210, 323-361.

ss.   **Davarius SEATON** (a.k.a. "Ugly Snake" and "D") transports heroin
      for MOORE, paragraphs 140-150, 325.

tt.   **Kévin THOMAS** (a.k.a. "Money C") supplies heroin to MOORE,
      paragraphs 81, 326, 355-364.

uu.   **Joseph PEARSON** redistributes MOORE's heroin, paragraphs 325,
      342-354.

10.   The investigation employed Title III wiretap interceptions, confidential
sources, surveillance, and undercover purchases of controlled substances, among other
investigative techniques. Pursuant to court orders issued by the United States District Court
for the Northern District of Illinois, the following are the cellular telephones that were
intercepted:

a.   (773) 557-5320, UMFI 183*811*1043, IMSI 316010101754607
     (**Target Phone 1**), used by Freddie WESTMORELAND, intercepted
     from September 14, 2005 through October 13, 2005;

b.   (773) 406-5284 and (773) 410-3310, IMSI 316010034417387 (**Target
     Phone 2**), used by Larry SMITH, intercepted during various periods
     from September 14, 2005 through December 17, 2005;

c.   (773) 206-3917, ESN 06111703126 (**Target Phone 3**), used by Israel
     MOORE, interception authorized on November 10, 2005, but no calls
     intercepted;[1]

---

[1] Shortly after the Court authorized the interception of **Target Phone 3**, the service
provider, Cingular Wireless, advised agents that cellular service on **Target Phone 3** had been
suspended. Based on that suspension, no calls were intercepted over **Target Phone 3**.

d.      (773) 858-9538, UMFI 109*243558*16, IMSI 316010034434352 (**Target Phone 4**), used by Freddie WESTMORELAND, intercepted from November 11, 2005 through December 10, 2005;

e.      (773) 209-1283, ESN 08116643958 (**Target Phone 5**), used by Israel MOORE, intercepted during various periods from December 5, 2005 through February 8, 2006;

f.      (773) 837-8029, IMSI 310260212745247 (**Target Phone 6**), used by Israel MOORE, intercepted from January 24, 2006 through February 22, 2006;

g.      (773) 596-8520, IMSI 316010101838031 (**Target Phone 7**), used by Derrick CAMPBELL, intercepted from January 24, 2006 through February 2, 2006;[2]

h.      (773) 858-4399, IMSI 316010034369452 (**Target Phone 8**), used by Lynn BARKSDALE, intercepted during various periods from March 6, 2006 to May 12, 2006; and

i.      (773) 269-9921, UFMI 109*167652*1, IMSI 316010026747265, (**Target Phone 10**),[3] used by Johnny SHANNON, intercepted from April 3, 2006 through June 3, 2006.

11.      During the course of this investigation and the court-authorized interceptions described above, monitoring agents and I, as well as other investigators, became aware of certain slang terms and code words being used by the participants in the conversations. The terms were analyzed to their meaning through the use of confidential informants, surveillance, and contact with other gang and drug investigators. The following is a list of

---

[2] After the Court authorized the interception of wire communications over **Target Phone 7**, agents did not intercept any audio conversations. Instead, agents intercepted only incoming voicemail calls, but none were deemed pertinent.

[3] The Application to intercept **Target Phone 9** was never presented to the district court.

a number of these terms and their meanings as I have interpreted them in the recorded conversations in this case. Some of the words listed below have additional meanings that are not listed and may be used to mean other things when used by other individuals. The following list is not meant to be all-inclusive of all the slang terms or code words used by the persons intercepted.

bag: package narcotics for distribution

blow: heroin

brick breakers: assault rifles

bundle: a bag of narcotics, containing smaller individually-wrapped bags of narcotics

"c": cocaine

choppers: assault rifles

cook: processing cocaine into crack cocaine

cut: substance, e.g., dormin or lactose, added to heroin to dilute the purity and increase the quantity of narcotics

"d": dope, which means heroin

DBs: the Dearborn Homes housing projects

demo: a quantity of heroin or a hand gun

deuce: a quantity of narcotics, typically two ounces or two kilograms

dime: a quantity of narcotics for individual use, sold in a bag for $10

dope: heroin

15

dub: a quantity of narcotics for individual use, sold in a bag for $20

girl: cocaine

heat or heater: a gun

holler: talk, typically to sell or buy narcotics, or to discuss gang business

jab: a bag of heroin packaged for individual sale

land: the Dearborn Homes housing projects

line: a brand of heroin sold in the Dearborn Homes with distinctive packaging and name

mix: prepare narcotics for street sale, often by adding morphine, fentanyl, or other narcotics

pack: a group of bags of narcotics, which in turn also contain individually packaged baggies of narcotics

pj's: the Dearborn Homes housing projects

rock: crack cocaine

rooster: person working on a heroin line who calls out to buyers the name of the line

shake: cutting agent placed inside narcotics

shorties: workers at drug spots who sell drugs to individual customers

split: ½ ounce or ½ kilogram of heroin/cocaine

stack: $1,000 in cash

u-dig: a hand gun or a quantity of narcotics

16

work: drugs for sale; selling drugs

## II. Facts Establishing Probable Cause

### A. The Leadership of the Dearborn Homes Faction of the Mickey Cobras

1.      Several individuals have provided information regarding the hierarchy of the Mickey Cobras in the DBs as well as Mickey Cobra drug trafficking. These individuals include: cooperating defendants, confidential sources, and individual defendants named in this Affidavit who provided statements. The circumstances under which the cooperating defendants and the confidential sources provided information on the Mickey Cobras is described in subsequent paragraphs. As to the named defendants who provided statements, unless stated otherwise in the Affidavit, the agents and officers advised the named defendant that there was a pending investigation into drug trafficking and that the named defendant's cooperation would be brought to the attention of the United States Attorney's office. In each case, the named defendants provided information to law enforcement in hopes that their cooperation would be considered in the event they were prosecuted.

#### a. CD1

2.      In or about 2001, Cooperating Defendant 1 (CD1) entered into a plea agreement and agreed to cooperate with the government in exchange for a reduced sentence. CD1 pled guilty to a federal drug charge and was sentenced to 120 months in the Bureau of Prisons (BOP).

3.      In or about 2001, CD1 made a series of statements to DEA agents. CD1 stated

17

that he grew up in the DBs and is a Mickey Cobra. CD1 stated that he started selling narcotics in the DBs when he was 12 years old, and that at the time of his arrest for his federal drug charge, his rank in the Mickey Cobras allowed him to control heroin sales in the DB building located at 2900 South State Street.

4.     CD1 said he has known defendant James AUSTIN, a.k.a. "Jaymo," since he and James AUSTIN were children, and that James AUSTIN has the rank of "King" in the Mickey Cobras. As "King," James AUSTIN controls who is allowed to sell narcotics in the DBs and collects money from the other heroin sellers he allows to sell in the DBs. CD1 stated that James AUSTIN has stockpiled numerous weapons such as handguns and assault rifles in the DBs to use against rival gangs and law enforcement if they attempt to interfere with Mickey Cobra heroin sales.

5.     CD1 stated that he and James AUSTIN used the threat of violence on at least one occasion to force another Mickey Cobra who had been selling heroin in the DBs to pay them for permission to sell in the DBs. Specifically, CD1 heard that another Mickey Cobra had been selling heroin in the 2900 South State Street building that CD1 controlled. CD1 said that after he heard this, he (CD1) and James AUSTIN pulled "brick breakers" (which CD1 stated were assault rifles) on the other Mickey Cobra and forced him to pay CD1 money for selling heroin in the building CD1 controlled.

6.     CD1 said that James AUSTIN personally owns and controls heroin lines that are sold in the DBs. James AUSTIN is assisted in this heroin trafficking by, among other

18

people, two of his cousins: defendants Johnny SHANNON, a.k.a. "Boo C," and Antonio SHANNON, a.k.a. "Montana." CD1 said that at one point while James AUSTIN was in prison, Johnny SHANNON ran James AUSTIN's heroin lines.

7.     CD1 said that other high-ranking members of the Mickey Cobras also run heroin lines in the DBs, including defendants Lynn BARKSDALE, a.k.a. "Insane," and Larry SMITH, a.k.a. "Lucky." CD1 said that BARKSDALE and Individual A are partners in running heroin lines from the buildings located at 2940 South State Street and 2961 South Dearborn Street. CD1 said that Larry SMITH sells heroin from the 2940 South State Street building.

8.     CD1 said that in 2001, the Mickey Cobras were at war with the Gangster Disciples. The Mickey Cobras were attempting to take control of the narcotics sales in the buildings in the DBs controlled by the Gangster Disciples.

        b.  CD2

9.     On January 26, 2006, CPD officers arrested CD2 for attempting to possess approximately three kilograms of cocaine. Following his arrest, CD2 was given Miranda warnings, waived the warnings via a written waiver, and agreed to speak with law enforcement officers assigned to this investigation.

10.    CD2 denied being a member of the Mickey Cobras, but admitted he was a former member of the Black P Stones. CD2 stated he has known numerous members of the Mickey Cobras that operated in the DBs for many years. CD2 stated that James AUSTIN,

a.k.a. "Jaymo," is the leader of the Mickey Cobras. He also stated that the Mickey Cobras control the DBs and run several heroin lines in the DBs. CD2 related that he knew an African supplier of heroin named "Rasheed," later identified as defendant Rasheed KESHIRO, a.k.a. "Sheed." (CS2, among others, has stated that "Sheed" is Rasheed KESHIRO) who supplies heroin to a large number of Mickey Cobras, including defendants James AUSTIN and Johnny SHANNON, a.k.a. "Boo C."

### c. CS1

11.    Cooperating Source 1 (CS1) has provided timely and reliable information concerning, among other things, the leadership of the Mickey Cobras and their drug trafficking activities. CS1 has been an informant for DEA and CPD since 2001, and he has provided useful and reliable information as part of this and other investigations. Much of the information provided by CS1 has been corroborated by telephone toll records, physical surveillance, consensually-recorded telephone calls, and meetings with various members of the Mickey Cobras (including high ranking members of the Mickey Cobras) as well as other investigative techniques.[2]

12.    CS1 said that although he is not a member of the Mickey Cobras, he is familiar with the organizational structure of the Mickey Cobras from his association and friendship

---

[2] CS1 has been paid more than $80,000.00 by DEA since 2001 for information in this and other cases that have resulted in successful prosecutions and seizures of narcotics, weapons, and moneys obtained through illegal means. CS1's criminal history consists of approximately 18 arrests for murder, kidnaping, and narcotics offenses. CS1 has been convicted of (1) Robbery and sentenced to 7 years in the Illinois Department of Corrections and (2) Conspiracy to Commit Kidnaping and sentenced to 5 years in the Illinois Department of Corrections.

20

with numerous Mickey Cobras. CS1 explained that the top leader of the Mickey Cobras is known as "The Emperor" and immediately below "The Emperor" is the "King of Kings" who is nearly equal to "The Emperor" and runs the gang in "The Emperor's" absence. Beneath the "King of Kings" are the "Kings," who have authority in a particular part of the city and the "Princes," who have roving authority throughout the entire city-wide gang. Beneath the "Kings" and "Princes" are "Supreme Sultans," "Sultans," "Dons" and "Soldiers."

13.    CS1 said that in about 1999, James AUSTIN declared himself "King" of the Mickey Cobras in the DBs. As a "King," James AUSTIN controls which Mickey Cobras are allowed to run heroin lines in the DBs. CS1 said that once James AUSTIN grants permission to run a line from the DBs, the owner of the line must pay a tax to James AUSTIN.

14.    CS1 said that he has known defendant Freddie WESTMORELAND, a.k.a. "Stokes," for many years. CS1 said that WESTMORELAND introduced him (CS1) to James AUSTIN in early 1999. At the time, James AUSTIN owned and controlled two heroin lines that were sold in the DBs called "Reaper" and "Eagle." CS1 stated that defendant Kevin WILLIAMS, a.k.a. "Nicklebag," ran the day-to-day operations on the "Eagle" heroin line.

15.    CS1 stated that after he met James AUSTIN, James AUSTIN asked CS1 to run the day-to-day operations of the "Reaper" line. James AUSTIN offered to pay CS1 $2,500.00 per week to run the line. James AUSTIN advised CS1 that he wanted CS1 to run the line even though he was not a member of the Mickey Cobras because if CS1 stole money or drugs, James AUSTIN could kill him without having to suffer repercussions from other

21

Mickey Cobras since CS1 was not affiliated with the Mickey Cobras. Notwithstanding these threats, CS1 agreed to work for James AUSTIN running James AUSTIN's "Reaper" heroin line.

16.    CS1 stated that he worked for James AUSTIN running the "Reaper" line from about April 1999 to February 2000. During that time, CS1 had contact with James AUSTIN almost every day. The "Reaper" line was packaged in small black plastic bags and was sold from an upper floor hallway in the 2961 South Dearborn Street building in the DBs. CS1 stated that James AUSTIN, defendant Johnny SHANNON, a.k.a. "Boo C," and Individual B mixed and packaged the heroin for individual street sales at apartments in the DBs where the girlfriends of various Mickey Cobra leaders resided. CS1 stated that the morning shift started at 8:00 a.m. and ended at 4:00 p.m. Each morning, CS1 would obtain one bundle of heroin (approximately $1,000 worth of cocaine) from Johnny SHANNON's girlfriend. CS1 would then give the bundle to the first shift seller on the line, or if the seller was late, start selling the heroin himself until another seller could be found to sell the heroin. CS1 stated that while he was running the "Reaper" line for James AUSTIN, James AUSTIN had a Chief of Security for the line, responsible for making sure that 7-8 people were available to work at various locations to protect heroin sales from police and individuals seeking to rob the heroin sellers. CS1 stated that individuals working security were positioned as follows: (1) two individuals would stand in front of the 2961 building; (2) two individuals would stand in the rear of the building; (3) one individual would stand in the first-floor stairwell and pat

22

down heroin buyers for weapons; (4) one individual would stand in the third-floor stairwell with a gun to protect the drugs and money held by the heroin seller; and (5) one individual would work as a rover and walk around all the buildings in the DBs and then report to the individuals working the "Reaper" line on law enforcement activities in the entire DB housing project. In addition, the rover would report to CS1 when the heroin seller was running out of heroin, and then CS1 would resupply the line with heroin. At the end of most days, CS1 would give the proceeds from the heroin sales to James AUSTIN. During the time that CS1 worked for James AUSTIN running the "Reaper" line, the line sold an average of approximately $20,000-25,000 in heroin per day.

17.     CS1 stated that even after he stopped working for James AUSTIN, he continued to see and speak with members of the Mickey Cobras who trafficked narcotics in the DBs. In early 2003, James AUSTIN owned and controlled a heroin line in the DBs called "Penicillin." In 2003, "Penicillin" was sold from the building in the DBs located at 2910 South Dearborn Street. CS1 stated that "Penicillin" was run by defendant Kevin WILLIAMS, a.k.a. "Nickle Bag."

d. CS2

18.     Confidential Source 2 (CS2) has provided timely and reliable information concerning, among other things, the leadership of the Mickey Cobras and the gang's drug trafficking activities.[*] Since in or about March 2006, CS2 has assisted agents in making

---

[*]CS2 is a member of a set of the Mickey Cobras in the DBs. During the course of this investigation, CS2 obtained information about the existence of the investigation from another

23

numerous recorded telephone calls and conversations with high ranking members of the Mickey Cobras that sell heroin in the DBs. Much of the information provided by CS2 has been corroborated by telephone toll records, physical surveillance, consensually-recorded telephone calls, and meetings with various members of the Mickey Cobras (including high ranking members of the Mickey Cobras) as well as other investigative techniques.

19. During his initial debriefing, CS2 advised agents that narcotics trafficking in the DBs is controlled by the ranking members of the Mickey Cobras. Defendant James AUSTIN, a.k.a. "Jaymo," is the "King" of the Mickey Cobras in the DBs. Defendants Larry SMITH, a.k.a. "Lucky," Lynn BARKSDALE, a.k.a. "Insane, " and Individual A are members of the Mickey Cobra board of directors. CS2 stated that if an individual wants to sell heroin in the DBs, the sale has to be sanctioned by a member of the board of directors and approved by James AUSTIN. James AUSTIN and the members of the Mickey Cobra board of directors will "shut down" any unauthorized heroin lines running in the DBs. CS2 stated that James AUSTIN and other high ranking members of the Mickey Cobras have used violence or the threat of violence to shut down the heroin lines of other lower ranking members who failed to pay street tax to James AUSTIN in a timely fashion.

20. CS2 said that James AUSTIN owns and controls two heroin lines in the DBs

Mickey Cobra who is a cooperating witness. Based on this, CS2 approached DEA agents assigned to this investigation and offered to cooperate with the government in hopes that such cooperation would be considered by the government if CS2 was charged in a criminal case stemming from the investigation. CS2 understands that he will be charged criminally. CS2's criminal history includes approximately 19 arrests and 2 convictions including two narcotics convictions.

24

which are called "Reaper" and "Penicillin" and are packaged in black and green plastic bags, respectively. James AUSTIN is assisted in running the lines by defendants Johnny SHANNON, a.k.a. "Boo C," who runs the lines when James AUSTIN is out of town; Tyrone WALLACE, a.k.a. "Táz"; and Kevin WILLIAMS, a.k.a. "Nicklebag."

### e. Defendant Joseph CHESS, a.k.a. "Jo Jo"

21. On March 6, 2004, CPD officers arrested defendant Joseph CHESS, a.k.a. "Jo Jo," in the DBs for possessing approximately 80 grams of heroin. CHESS waived his Miranda rights and agreed to speak with law officers assigned to this investigation.

22. CHESS stated that he had been working in the DBs for various heroin lines owned and controlled by high ranking members of the Mickey Cobras since about October 2003. CHESS began working for defendant Larry SMITH, a.k.a. "Lucky," in about January 2004. CHESS stated that Larry SMITH owned and controlled heroin lines sold in the DBs called "Network" and "Max Payne." CHESS stated that he sold $10.00 and $20.00 bags of heroin seven days a week from 7:00 a.m. to 9:00 p.m.

23. CHESS stated that James AUSTIN, a.k.a. "Jaymo," has the rank of "King" in the Mickey Cobras. James AUSTIN and other high ranking members of the Mickey Cobras control who is allowed to sell heroin in the DBs. CHESS stated that approximately one month ago, James AUSTIN, defendant Lynn BARKSDALE, a.k.a. "Insane," and Individual A, went into the 2930 South State Street building in the DBs and told the workers on heroin lines called "Network," "Max Payne," "Dynasty," and "Second to None" that these lines

25

were "shut down." A short time later, AUSTIN, BARKSDALE, and Individual A allowed workers on the "Network" heroin line to return to selling the line.

24. CHESS stated that James AUSTIN owns and controls a heroin line that is sold in the 2940 South State Street building in the DBs with the assistance of his cousin, defendant Johnny SHANNON, a.k.a. "Boo C." BARKSDALE and Individual A own and control heroin lines called "8-Ball" and "Kingpin," which are also sold in the DBs.

### f. Individual C

25. On March 9, 2004, CPD officers arrested Individual C in the DBs for possessing approximately 101 grams of heroin. Following his arrest, Individual C waived his *Miranda* rights in writing and agreed to speak to officers assigned to this investigation.

26. Individual C has been a member of the Mickey Cobras for more than thirty (30) years, and at the time he provided the statement, he had been living in the DBs for approximately 6-7 years. Individual C related that he had been working for various Mickey Cobra leaders, including defendant James AUSTIN, a.k.a. "Jaymo," and Larry SMITH, a.k.a. "Lucky," at various jobs on their heroin lines in the DBs for the past several years.

27. Individual C stated that James AUSTIN has the rank of "King" in the Mickey Cobras and therefore makes the final decision on who is allowed to sell heroin in the DBs. Defendant Johnny SHANNON, a.k.a. "Boo C." is James AUSTIN's cousin and his closest associate in Mickey Cobra narcotics trafficking. Individual C also stated that Individual A and defendant Lynn BARKSDALE, a.k.a. "Insane," are high ranking members of the Mickey

26

Cobras, and Individual A and BARKSDALE also have influence as to who is allowed to sell narcotics in the DBs. James AUSTIN collects tax on all the heroin lines sold in the DBs except the lines controlled by the highest ranking Mickey Cobras. Individual C said that Individual A and BARKSDALE are not required to pay tax to James AUSTIN because of their rank in the gang.

28. Individual C stated that James AUSTIN and other high ranking Mickey Cobra leaders use violence and intimidation to control narcotics sales in the DBs. For example, James AUSTIN, Individual A, and BARKSDALE had recently shut down a heroin line called "Dynasty" that was controlled by defendant Antonio STIDHUM, a.k.a. "Psycho," because STIDHUM had refused to pay tax to James AUSTIN and had supplied the line with heroin purchased from members of a rival gang, the Black Disciples. James AUSTIN, Individual A, and BARKSDALE went to the 2931 building in the DBs where "Dynasty" was being sold by STIDHUM's workers, and threatened to use the handguns they had brought if any of the workers continued to sell "Dynasty." Similarly, James AUSTIN, Individual A, and BARKSDALE barred a high ranking Mickey Cobra from selling narcotics in the DBs because he did not take actions that James AUSTIN directed him to take with regards to hiring and paying for attorneys when Individual A and BARKSDALE were incarcerated. Individual C related that the high ranking Mickey Cobra that was barred from selling in the DBs then started selling narcotics in another part of Chicago.

29. Individual C stated that James AUSTIN and Johnny SHANNON control heroin

27

lines called "Penicillin" and "Reaper." BARKSDALE and Individual A control "8-Ball" and "Kingpin." All these heroin lines are sold in the DBs.

30.    Individual C stated that Larry SMITH has the rank of "Don" in the Mickey Cobras and is responsible for overseeing the day-to-day operations of the Mickey Cobras and narcotics sales in the DBs. Since Larry SMITH is a Mickey Cobra "Don," he does not have to pay tax to James AUSTIN in order to sell the heroin lines he controls in the DBs. Larry SMITH's heroin lines are called "Network" and "Max Payne."

### g. Defendant Cynthia THOMAS, a.k.a. "Country"

31.    On March 26, 2004, CPD officers arrested defendant Cynthia THOMAS, a.k.a. "Country," in the DBs for possession of cocaine and heroin. Following her arrest, Cynthia THOMAS waived her *Miranda* rights in writing and agreed to speak with law enforcement officers assigned to this investigation.

32.    Cynthia THOMAS said she works security for various heroin lines run by the Mickey Cobras in the DBs, and that her job is to alert the narcotics sellers if police enter the area. At the time she was arrested, Cynthia THOMAS was providing security for the DB buildings located at 2930 South Dearborn Street, 2940 South State Street, and 2964 South Dearborn Street. Cynthia THOMAS was paid approximately $60.00 per day as well as a $10.00 bag of heroin in the morning and another $10.00 bag of heroin in the evening.

33.    Cynthia THOMAS stated that defendant James AUSTIN, a.k.a. "Jaymo," is the leader of the Mickey Cobras in the DBs. James AUSTIN decides who is allowed to sell

28

heroin in the DBs. Cynthia THOMAS stated that James AUSTIN recently had various heroin lines shut down in the DBs because another gang was supplying the heroin. Cynthia THOMAS said that James AUSTIN sells various heroin lines with the assistance of his cousin, Johnny SHANNON, a.k.a. "Boo C," from the 2940 South State Street building. She said that other high ranking members of the Mickey Cobras also run heroin lines, including defendants Lynn BARKSDALE, a.k.a. "Insane", Individual A, and Larry SMITH, a.k.a. "Lucky."

## h. Defendant Robin JOHNSON, a.k.a. "Pathfinder"

34.    On April 3, 2004, CPD officers arrested defendant Robin JOHNSON, a.k.a. "Pathfinder," near the DBs for possession of approximately 97.5 grams of heroin. Following his arrest, Robin JOHNSON waived his Miranda rights in writing and agreed to speak with law enforcement officers assigned to this investigation.

35.    Robin JOHNSON denied being a member of the Mickey Cobras, but said he was a friend of many of the DBs set of the Mickey Cobras. Robin JOHNSON stated that the Mickey Cobras call him "Pathfinder." Robin JOHNSON admitted that he works for defendant Larry SMITH, a.k.a. "Lucky," who has the rank of "Don" in the Mickey Cobras and controls two different heroin lines sold in the DBs, "Network" and "Max Payne." Robin JOHNSON delivers heroin each morning to the sellers of Larry SMITH's lines in the DBs, and picks up money in the evening. Robin JOHNSON also mixes the heroin for Larry SMITH's lines. Robin JOHNSON said the amount he is paid each day is determined by the

29

amount of heroin sold on the lines.

36.     Robin JOHNSON stated that defendant James AUSTIN, a.k.a. "Jaymo," has the rank of "King" in the Mickey Cobras and decides who may sell heroin in the DBs. Robin JOHNSON said a high ranking member of the Mickey Cobras used to control multiple heroin lines in the DBs until James AUSTIN banned the high ranking member from selling heroin in the DBs.

37.     Robin JOHNSON stated that other high ranking members of the Mickey Cobras also run heroin lines, including defendants Lynn BARKSDALE, a.k.a. "Insane," and Freddie WESTMORELAND, a.k.a. "Stokes." BARKSDALE's heroin line was called "Candyline," and WESTMORELAND's line was called "Stars."

38.     Robin JOHNSON made a second statement after CPD arrested him again, on or about October 5, 2005, for possession of heroin. Following his arrest, Robin JOHNSON waived his Miranda rights in writing and agreed to speak with law enforcement officers assigned to this investigation.

39.     Robin JOHNSON stated that the Mickey Cobras control narcotics sales in the DBs. Robin JOHNSON said that "Jaymo" (identified by agents as James AUSTIN) is a "King" in the Mickey Cobras, and that James AUSTIN owns ands controls heroin lines in the DBs called "Penicillin" and "Girls Gone Wild." Robin JOHNSON stated that James AUSTIN previously owned and controlled a line called "Reaper." Robin JOHNSON stated that James AUSTIN's cousin, "Boo C," (identified by agents as defendant Johnny

SHANNON) is James AUSTIN's partner in the narcotics trafficking business. Robin JOHNSON stated that James AUSTIN has a lot of guns stored in the DBs and that whenever there is a problem, James AUSTIN retrieves the guns.

### i. Defendant Duante FALLS, a.k.a. "Doodoo" and "Shitty"

40.     On October 24, 2005, CPD officers and DEA agents assigned to this investigation arrested defendant Duante FALLS, a.k.a. "Doodoo" and "Shitty," in the DBs for possession of approximately 54.8 grams of heroin. Duante FALLS waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

41.     Duante FALLS is a member of the Mickey Cobras and grew up in the DBs. Duante FALLS's mother, defendant Saundra FALLS, still lives in the DBs. Duante FALLS said he controlled a heroin line sold in the DBs called "One Stop" and used juveniles to sell the line.

42.     Duante FALLS said the Mickey Cobras control the DBs, and James AUSTIN, a.k.a. "Jaymo," is the "King" of the Mickey Cobras. James AUSTIN, with the assistance of defendant Johnny SHANNON, a.k.a. "Boo C," controls two heroin lines sold in the DBs: "Reaper" and "Penicillin."

43.     Duante FALLS was arrested again on or about February 6, 2006, for conspiring to distribute narcotics. Following his arrest, Duante FALLS waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

44.     Duante FALLS said he is a member of the Mickey Cobras and is called

31

"Doodoo" and "Shitty" by other Mickey Cobras. Duante FALLS said he grew up in the DBs, has never had a legitimate job for any significant period of time, and has worked on various heroin lines in the DBs. Duante FALLS said he controlled a heroin line called "Undertaker" for approximately one month prior to his arrest. Before that, he worked for defendant Larry SMITH, a.k.a. "Lucky," as a mixer on various heroin lines Larry SMITH controlled that were sold in the DBs.

45.    Duante FALLS said defendant James AUSTIN, a.k.a. "Jaymo," is a "King" in the Mickey Cobras and therefore determines who is allowed to sell heroin in the DBs. Since Duante FALLS started running his own heroin line called "Undertaker," Duante FALLS has paid James AUSTIN $500.00 per week for permission to sell the line. Duante FALLS said the "Undertaker" line and Larry SMITH's lines are supplied with heroin that Duante FALLS purchases from a Nigerian named "Rasheed" (identified by agents as defendant Rasheed KESHIRO). Duante FALLS stated that defendant Lynn BARKSDALE, a.k.a. "Insane," also runs a heroin line in the DBs.

### j. Defendant Antwan PETERSON, a.k.a. "Droopy"

46.    On May 16, 2006, CPD officers arrested defendant Antwan PETERSON, a.k.a. "Droopy," near the DBs for possession of approximately 70 grams of cocaine. Following his arrest, PETERSON waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

47.    PETERSON said he used to work for defendant WESTMORELAND, a.k.a.

32

"Stokes," until he and WESTMORELAND were arrested for possession of narcotics. PETERSON said he now assists defendants Larry SMITH and Bernard HOWARD, a.k.a. "Trigg," in narcotics trafficking in the DBs. PETERSON stated that Larry SMITH and HOWARD are being supplied heroin by defendant Joseph BOONE, a.k.a. "Little Maurice."

48.     PETERSON stated that defendant James AUSTIN, a.k.a. "Jaymo," is the "King" of the Mickey Cobras, and the Mickey Cobras control drug trafficking in the DBs. PETERSON said Larry SMITH is unhappy with the way that James AUSTIN is running the Mickey Cobras, and is considering taking action to assume the leadership of the gang. Specifically, PETERSON stated that "'Lucky' is trying to override 'Jaymo' and take 'Jaymo' out." PETERSON said James AUSTIN is assisted in his narcotics trafficking by numerous Mickey Cobras. PETERSON also said defendant Derrick CAMPBELL, a.k.a. "Dino," grew up with James AUSTIN and is a member of the Fuller Park Avenue faction of the Mickey Cobras.

### k. Defendant Rashad HAMILTON, a.k.a. "Ray Ray"

49.     On February 6, 2006, CPD officers and DEA agents assigned to this investigation conducted a voluntary, non-custodial interview of defendant Rashad HAMILTON, a.k.a. "Ray Ray," regarding his distribution of narcotics.

50.     HAMILTON stated that he was a member of the Dearborn Homes set of the Mickey Cobras, and he resides in the DBs in the 2961 South Dearborn Street building. HAMILTON stated that he assists defendant Duante FALLS, a.k.a. "Doodoo" and "Shitty,"

33

in running the "Undertaker" heroin line. HAMILTON transports heroin and narcotics proceeds from the "Undertaker" heroin line for Duante FALLS.

51. HAMILTON said Duante FALLS pays defendant James AUSTIN, a.k.a. "Jaymo," a total of $500.00 per week to sell heroin in the DBs. Defendant Johnny SHANNON, a.k.a. "Boo C," normally picks up the money for James AUSTIN. HAMILTON also stated that James AUSTIN and Johnny SHANNON run lines of heroin called "Reaper" and "Penicillin" in the DBs. James AUSTIN and Johnny SHANNON have lower level Mickey Cobras sell "Penicillin" and "Reaper" from the building located at 2961 South Dearborn Street in the DBs. HAMILTON stated that one of James AUSTIN's and Johnny SHANNON's key workers, defendant Kevin WILLIAMS, a.k.a. "Nicklebag," brings the heroin to the 2961 South Dearborn Street building after it is mixed and packaged for individual street sale. The heroin is packaged in green plastic bags.

### I. Defendant Anthony SMITH, a.k.a. "Moo Maw"

52. On February 7, 2006, CPD officers arrested defendant Anthony SMITH, a.k.a. "Moo Maw," for possession of cocaine. Following his arrest. Anthony SMITH was given Miranda warnings, waived the warnings via a written waiver, and agreed to speak with law enforcement officers assigned to this investigation.

53. Anthony SMITH said he was released from prison in November 2005 and had been selling crack cocaine in the DBs for the past three weeks. Anthony SMITH said he sold approximately $2,000.00 worth of crack cocaine per day. Since Anthony SMITH sells crack

34

cocaine in the DBs, he is familiar with the Mickey Cobras who sell heroin in the DBs.

54.     Anthony SMITH stated that anyone who operates a heroin line in the DBs has
to have approval to do so, and must pay a tax to the "King" of the Mickey Cobras. Anthony
SMITH stated that defendant James AUSTIN, a.k.a. "Jaymo" is the "King." Anthony
SMITH also stated that James AUSTIN and his associate, defendant Johnny SHANNON,
a.k.a. "Boo C." collect tax money from the different heroin lines.

55.     Anthony SMITH said James AUSTIN has his heroin lines sold from the 2961
South Dearborn Street building in the DBs. Anthony SMITH stated that "Nicklebag,"
identified by agents as defendant Kevin WILLIAMS, runs the day-to-day operations of James
AUSTIN's heroin lines. Specifically, "Nicklebag" makes sure that the money from the lines
is picked up and that the line is supplied with heroin. James AUSTIN's heroin lines are
called "Penicillin" and "Reaper."

56.     Anthony SMITH stated that other high ranking members of the Mickey Cobras
also run heroin lines, including defendants Larry SMITH, a.k.a. "Lucky," Duante FALLS,
a.k.a. "Doodoo" and "Shitty," and Lynn BARKSDALE, a.k.a. "Insane." Anthony SMITH
also stated that Individual A used to sell a heroin line. Larry SMITH's heroin lines are called
"Incredible Hulk" and "Tsunami." Anthony SMITH stated that Larry SMITH recently
changed the names of these two heroin lines from "Lethal Injection" and "Drop Dead."

### m. Defendant Jerome JOHNSON, a.k.a. "Little Marcus"

57.     On April 25, 2006, CPD officers and DEA agents assigned to this investigation

35

arrested defendant Jerome JOHNSON, a.k.a. "Little Marcus," for conspiring to distribute narcotics. Following his arrest, Jerome JOHNSON waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

58.     Jerome JOHNSON said he is a member of the Mickey Cobras and goes by the nickname, "Marcus." He said he does not have a legitimate job and supports himself by working on heroin lines in the DBs.

59.     Jerome JOHNSON stated that defendant James AUSTIN, a.k.a. "Jaymo," has the rank of "King" in the Mickey Cobras, and as "King" decides who is allowed to sell heroin in the DBs. He said that James AUSTIN and "Boo C," identified by agents as defendant Johnny SHANNON, own and control heroin lines called "Reaper" and "Penicillin." Jerome JOHNSON stated that "Reaper" is packaged in black plastic bags and "Penicillin" is packaged in green plastic bags. Jerome JOHNSON stated that he "runs" the night shift on the heroin lines "Reaper" and "Penicillin," and has worked for James AUSTIN on the "Reaper" and "Penicillin" lines for approximately six months. Jerome JOHNSON stated that "Taz," identified as Tyrone WALLACE, runs the day shift on the "Reaper" and "Penicillin" lines. As night shift manager on "Reaper" and "Penicillin," Jerome JOHNSON begins his shift at about 10:00 p.m. and ends at about 7:00 a.m. He explained that "running" the shift means supplying the sellers on the two heroin lines with bags of heroin for street sale. Jerome JOHNSON explained that he is paid at the end of the week by WALLACE.

60.     Jerome JOHNSON stated that he also mixes the heroin for the "Reaper" and

36

"Penicillin" lines and then packages it for street sale. Jerome JOHNSON stated that he often mixes the heroin with WALLACE in Apartment 505 in the 2964 South State building in the DBs. James AUSTIN's girlfriend, Individual A, resides in Apartment 505, and allows James AUSTIN's workers to use the apartment to mix heroin for his heroin lines. Jerome JOHNSON stated that Individual U and "Boo C," identified as Johnny SHANNON, also assisted in mixing heroin for "Reaper" and "Penicillin."

## n. Defendant Antonio STIDHUM, a.k.a. "Psycho"

61. On April 13, 2006, CPD officers and DEA agents assigned to this investigation arrested defendant Antonio STIDHUM, a.k.a. "Psycho," in the DBs for unlawful use of a weapon. Following his arrest, STIDHUM waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

62. STIDHUM advised officers that he joined the Mickey Cobras when he was 12 years old and has supported himself by selling narcotics in the DBs for the last several years. STIDHUM said he operates a heroin line in the DBs called "Fear Factor," which is sold in small peach-colored bags. STIDHUM said he has purchased heroin from defendant Larry SMITH, a.k.a. "Lucky," for the past eight months to supply the "Fear Factor" line.

63. STIDHUM stated that defendant James AUSTIN, a.k.a. "Jaymo," has the rank of "King" in the Mickey Cobras, and collects "tax" from numerous Mickey Cobras that run heroin lines in the DBs, including the following defendants: (1) Bernard HOWARD, a.k.a. "Trigg;" (2) Duante FALLS, a.k.a. "Doodoo" and "Shitty;" (3) Marshall WOODEN, a.k.a.

37

"Chuckwick;" (4) Charles HAMPTON, a.k.a. "Mo Money;" (5) Demetrius BROWNRIDGE, a.k.a. "Mickey;" and (6) Individual U. STIDHUM said James AUSTIN forces each of these Mickey Cobras to pay him (James AUSTIN) $500.00 a week to sell their heroin lines in the DBs.

64.     STIDHUM stated that in addition to collecting tax from the Mickey Cobras listed above, James AUSTIN owns and controls the "Penicillin" and "Reaper" heroin lines which are sold in the DBs. STIDHUM said he worked for James AUSTIN from about June 2005 to December 2005 managing the day shift on the "Penicillin" and "Reaper" heroin lines. STIDHUM said the "Penicillin" and "Reaper" heroin lines were sold in green and black plastic bags. STIDHUM said James AUSTIN had many other people assisting him on the "Penicillin" and "Reaper" lines, including the following defendants: Johnny SHANNON, a.k.a. "Boo C," Kevin WILLIAMS, a.k.a. "Nickle Bag," Tyrone WALLACE, a.k.a. "Taz," Jermaine JOHNSON, a.k.a. "Little Marcus," and Individual U. James AUSTIN sold "Penicillin" and "Reaper" from the 2940 South State Street building and the 2961 South Dearborn Street building in the DBs. STIDHUM said defendant WALLACE ran the night shift while he (STIDHUM) was running the day shift. Now, however, WALLACE runs the day shift, and Jermaine JOHNSON runs the night shift for James AUSTIN on "Penicillin" and "Reaper."

65.     STIDHUM said when he was running James AUSTIN's heroin lines, he provided the proceeds from the line directly to James AUSTIN or to his cousin and "right

38

hand man," Johnny SHANNON. STIDHUM said James AUSTIN's lines would produce approximately $30,000 per day. James AUSTIN required that the proceeds be transferred out of the DBs no later than 9:00 p.m. STIDHUM said on several occasions, he (STIDHUM) observed defendants Johnny SHANNON and WILLIAMS "mixing" heroin and preparing it for street sales while utilizing blenders. According to STIDHUM, James AUSTIN's drug trafficking organization (DTO) mixed the heroin and prepared it for street sale inside a fifth floor apartment (Apartment 505) in the 2964 South State building of the DBs, where Individual D lives.

66.     STIDHUM said other high ranking members of the Mickey Cobras also run heroin lines, including defendants Antonio SHANNON, a.k.a. "Montana," Larry SMITH, a.k.a. "Lucky," and Lynn BARKSDALE, a.k.a. "Insane." STIDHUM said Individual A and BARKSDALE used to be partners in owning and controlling a heroin line in the DBs until they had a disagreement over money. As a result of the disagreement, Individual A moved out and BARKSDALE started selling heroin with Mickey Cobra "King" James AUSTIN.

67.     STIDHUM said James AUSTIN used to run a heroin line with defendant Nick JONES, a.k.a. "Poohnannie," until James AUSTIN and JONES had a dispute over money. About this same time, JONES physically beat James AUSTIN's key assistant, Johnny SHANNON, which further angered James AUSTIN. As a result, James AUSTIN and Antonio SHANNON, a.k.a. "Montana," shot JONES in the area of 31st and Michigan Avenue. Since the shooting, JONES works for defendant Larry SMITH, a.k.a. "Lucky," on

Larry SMITH's narcotics operation.

### o. Defendant Sean WINN

68.     On April 7, 2006, law enforcement interviewed defendant Sean WINN. WINN was incarcerated in the Cook County Jail on pending unlawful use of a weapon (UUW) charges, and WINN initiated the interview by advising an officer that he wanted to speak to investigators. The interview of WINN did not address WINN's pending UUW charges.

69.     WINN said he is a member of the Mickey Cobras in the DBs and lived in the DBs before his arrest on the UUW charge. WINN said defendant James AUSTIN, a.k.a. "Jaymo," is the leader of the Mickey Cobras in the DBs, above other Mickey Cobra leaders, including defendants Lynn BARKSDALE, a.k.a. "Insane," Johnny SHANNON, a.k.a. "Boo C," and Antonio STIDHUM, a.k.a. "Psycho." WINN said BARKSDALE and Johnny SHANNON are considered enforcers for the Mickey Cobras. STIDHUM runs his own heroin line. WINN said Individual U is considered the treasurer of the Mickey Cobras and holds money and drugs for James AUSTIN. Individual U lives in the DBs, and sells crack cocaine from his apartment in the 2951 building on the fifth floor.

70.     WINN said James AUSTIN controls all heroin sales by Mickey Cobras in the DBs. James AUSTIN allows Mickey Cobras to sell their own cocaine and marijuana, but James AUSTIN controls all heroin sales. James AUSTIN and the Mickey Cobras have devised a system in which every heroin line is packaged in a particular type of plastic bag. WINN said at the time of his arrest, the following lines were packaged in the following types

40

of plastic bag:

| Heroin Line | Bag Color/Design |
|---|---|
| "Penicillin" | green |
| "Reaper" | black |
| "Fight Club" | star design |
| "Skyrocket" | gray with star design |
| "Final Call" | clear with basketball design |
| "Girls Gone Wild" | red |

WINN said if a certain heroin line runs out of bags, it will substitute bags from another heroin line.

71. WINN said the Mickey Cobras run the heroin lines from various buildings in the DBs. There are individuals working security all around the buildings in the DBs when the lines are running. When a heroin buyer approaches the DBs, individuals working security will search the buyer and then direct the buyer to the upper floors of a building where the heroin sellers hand out the bags of heroin and collect the money. Heroin sales usually occur on the third floor. The primary buildings that are used for drug sales are the 2961 building, the 2940 building, the 2910 building, and the 2931 building. WINN said if police approach a building where the Mickey Cobras are actively running a heroin line, the buyer is sent to another building. In this way, the disruption to heroin sales is minimized and profits are not affected.

72. WINN said the Mickey Cobras run approximately 12 different heroin lines in

the DBs. The Mickey Cobra heroin lines operate 24 hours a day, seven days a week. The day shift runs from 9:00 a.m. to 7:00 p.m. The night shift runs from 7:00 p.m. to 9:00 a.m. The Mickey Cobras make the majority of their profits during the night shift. WINN said a heroin seller can make approximately $300-400 per night. There are approximately 7-8 workers per line. WINN said the individuals working on the heroin lines are as young as approximately 13 years old.

73. WINN said the Mickey Cobras periodically engage in gang wars with the Gangster Disciples who control narcotics sales on the north end of the DBs housing project at 27th Street. WINN said when the Mickey Cobras and the Gangster Disciples are at war, that members bring out weapons and leave them on the street in the event they are needed. The weapons most commonly used by the Mickey Cobras are .40's, 9 mm's, choppers, .380's, and .45's. WINN said Mickey Cobras are prohibited from initiating violence unless it is specifically authorized by James AUSTIN or Antonio SHANNON, a.k.a. "Montana."

### p. Defendant Andre HASTINGS, a.k.a. "Dre"

74. On October 23, 2001. DEA agents assigned to this investigation interviewed defendant Andre HASTINGS, a.k.a. "Dre," at the Cook County Jail in the presence of his attorney. HASTINGS was read his Miranda rights and waived them.

75. HASTINGS said he is a member of the Mickey Cobras and advised agents that he resided in the DBs. HASTINGS said he formerly worked for defendant Freddie WESTMORELAND, who he called "Stokes," by assisting him in the mixing of heroin that

42

was sold in the DBs. WESTMORELAND's heroin line was called "Demon." HASTINGS described the mixing process that WESTMORELAND used.

76. HASTINGS said "Jaymo" (James AUSTIN) and "Boosie" (Johnny SHANNON) run the DBs and have a heroin line called "Reaper." HASTINGS then described the hours that "Reaper" was sold in the DBs and several of the individuals who worked on the "Reaper" line. HASTINGS said "Reaper" was sold in black bags. HASTINGS said he has seen "Jaymo" and "Boosie" shut down buildings in the DBs from selling heroin if the sellers failed to pay dues to "Jaymo."

### q. Defendant Freddie WESTMORELAND

77. On November 21, 2003, DEA agents assigned to this investigation interviewed defendant Freddie WESTMORELAND, a.k.a. "Stokes," after he was arrested for possession of heroin. WESTMORELAND waived his Miranda rights in writing and agreed to speak with officers assigned to this investigation.

78. WESTMORELAND said his nickname is "Stokes," and he is a member of the Mickey Cobras gang. WESTMORELAND stated he has been selling narcotics in the DBs for several years. According to WESTMORELAND, James AUSTIN and Larry SMITH control Mickey Cobra membership and the narcotics sales in the DBs. James AUSTIN is a "King" in the Mickey Cobras street gang, and Larry SMITH is a "Don." WESTMORELAND said James AUSTIN and his cousin Johnny SHANNON control the lines of heroin referred to as "Reaper" and "Penicillin" that are sold in the DBs and earn

43

approximately $20,000-$30,000 per day from the sale of narcotics.

### r. Defendant Israel MOORE, a.k.a. "Pretty Ricky" and "Lookout"

79.     On February 21, 2006, DEA agents assigned to this investigation arrested defendant Israel MOORE, a.k.a. "Pretty Ricky" and "Lookout," for conspiring to distribute narcotics. Following his arrest, MOORE was given Miranda warnings, which he waived via a written waiver, and agreed to speak with law enforcement officers assigned to this investigation.

80.     MOORE said he had been supplying heroin to various members of the Mickey Cobras for approximately one year. MOORE said he supplied defendant Larry SMITH with 100 grams of heroin at least twice a week. MOORE said he charged Larry SMITH $8,000 per 100 grams of heroin. MOORE said if Larry SMITH did not personally pick up the heroin from him, Larry SMITH would send defendants Duante FALLS or Aaron SMITH to pick up the heroin.

81.     MOORE said he obtained the heroin he sold to other Mickey Cobras from, among others, defendants Kevin THOMAS and "Dino," who has been identified by agents as Derrick CAMPBELL. MOORE related CAMPBELL was a Mickey Cobra from the Fuller Park faction of the Mickey Cobras. MOORE said he would obtain up to 100 grams of heroin from CAMPBELL at a time. MOORE said he was not able to mix very much cut into the heroin he purchased from CAMPBELL, because the quality of the heroin was not very good.

44

**B.    Mickey Cobra King James AUSTIN and His Key Assistant Johnny SHANNON**

82.    As discussed in paragraphs 2-81, CD1, CD2, CS1, CS2, Joseph CHESS,

Individual C, Cynthia THOMAS, Robin JOHNSON, Duante FALLS, Rashad

HAMILTON, Anthony SMITH, Jerome JOHNSON, Antonio STIDHUM, Sean WINN,

Andre HASTINGS, and Freddie WESTMORELAND, stated that James AUSTIN is the

King of the Mickey Cobras in the DBs and his cousin Johnny SHANNON is his key

assistant as well as a high ranking member of the gang. James AUSTIN and Johnny

SHANNON own and control various heroin lines in the DBs. In addition to the

information provided by confidential sources and the statements by various defendants in

this case, additional information described below reflects that James AUSTIN is the King

and Johnny SHANNON is a high ranking member of the Mickey Cobras in the DBs.

**1.    Johnny SHANNON Calls BARKSDALE and Attempts to Borrow Heroin**

83.    On March 26, 2006 at approximately 6:51 p.m., agents intercepted an

incoming voicemail message from Johnny SHANNON using **Target Phone 10** to Lynn

BARKSDALE on **Target Phone 8.**[6] During this call, Johnny SHANNON asked

---

[6]The identity of Johnny SHANNON as the caller was established based on, among other things, the following: The telephone number of **Target Phone 10**, (773) 269-9921, direct connect number 109*167652*1 and IMSI # 316010026747265, is subscribed to Johnny SHANNON and James AUSTON, at 10551 Corliss Avenue in Chicago, Illinois. As described below, James AUSTIN was intercepted speaking with Johnny SHANNON using telephone

45

BARKDALE to call him back and indicated that it was very important.[7] Johnny
SHANNON stated: "This Boo C, won't you call me at 992-8215. I appreciate it, it's very
important."

84. The following day, on March 27, 2006 at approximately 10:53 a.m., an
incoming voicemail message was intercepted from **Target Phone 10** to **Target Phone 8**.
During this call, Johnny SHANNON asked BARKSDALE if he could borrow 20 grams
of heroin from him. Johnny SHANNON stated: "Hey what's up Cuz? This is Boosie and
I was just trying to see could I borrow $20 from you. Call me at 992-8215 when you get
this message." It has been your affiant's experience that when drug dealers are engaged
in conversation about narcotics, they will frequently refer to the narcotics as small
quantities of cash.

85. On March 27, 2006 at approximately 8:30 p.m., agents intercepted an
outgoing call from **Target Phone 8** to **Target Phone 10**. During this call, Johnny
SHANNON reiterated his desire to borrow a quantity of heroin. During this call, Johnny
SHANNON asked BARKSDALE if he could borrow 30 or 40 grams of heroin from him
so he could "do something." I believe based on my training and experience that when
Johnny SHANNON told BARKSDALE he need to do something, he meant make money
from the sale of heroin that he was trying to get from BARKSDALE. Johnny

number (773) 269-0473.

[7] Throughout the affidavit, I have made interpretations of the intercepted calls which are
based on my training, experience, and my knowledge of the history of this investigation.

46

SHANNON stated: "Not much, I uh, man I'm trying to see could I get a few dollars out you that's all." BARKSDALE: "What you need?" Johnny SHANNON: "Just a couple dollars, so I could do something." BARKSDALE: "I don't know what you're saying, what you mean?" Johnny SHANNON: "Just a few dollars man, you know what I'm saying, like thirty, forty dollars." BARKSDALE: "Alright, I'll be back in the city in about two hours, so just hit me up in about 2 hours." Johnny SHANNON: "OK." I know from my experience in this investigation, including information I have obtained about the very large quantities of weekly drug proceeds obtained by Johnny SHANNON (discussed in the preceding paragraphs), that Johnny SHANNON is not asking to borrow "thirty, forty dollars" from BARKSDALE but is instead asking to borrow some narcotics for resale. Johnny SHANNON's variation of the amount he requests to borrow (he initially asked for $20, then $30 or $40) further suggests that Johnny SHANNON is talking about heroin, and Johnny SHANNON's insistence on borrowing from BARKSDALE, another high ranking member of the Mickey Cobras, rather than another associate, demonstrates that Johnny SHANNON believes BARKSDALE can obtain a large quantity of heroin.

### 2. Calls over Target Phone 10 Which Confirm Johnny SHANNON's Role as Key Assistant to AUSTIN

86.     Pursuant to court authorizations, DEA intercepted communications over **Target Phone 10**, used by Johnny SHANNON. Below are examples of intercepted communications and other facts learned in the investigation

87.     On or about April 4, 2006, at approximately 10:44 p.m. (Call No. 204),

47

agents intercepted an outgoing call on **Target Phone 10** to (773) 557-0383. During this call, a UM was advising Johnny SHANNON as to purchasing real estate ("Have you file taxes for the last two years? . . . Ok, what about last year, did you file last year? . . . Ok, yea see that's the only thing that's going to hurt you, other then that we could, we could of, we could a, we still could work it out. . . . Yea, you see we need to ascertain your income."). Johnny SHANNON then told the UM that he was involved in a cash business and did not pay income taxes ("And my income is so tricky because a lot of stuff that I do, you know what I'm saying, I do it, you know like cash.").

88.     On or about April 10, 2006, at approximately 10:32 p.m. (Call No. 944), agents intercepted an incoming push to talk (PTT) call over **Target Phone 10** from IMSI 316010026747266, a telephone used by Mickey Cobra King James AUSTIN.[8] During the call, James AUSTIN advised Johnny SHANNON that he (James AUSTIN) had been followed by police ("Hey, you remember how, how, the motherfuckers did me in [Individual Y's] car right? . . . Ya, don't tell me. . . . Yes sir."). Johnny SHANNON then asked James AUSTIN if he (James AUSTIN) had defeated law enforcement surveillance

_____

The identity of James AUSTIN as the caller was established based on, among other things, the following: Telephone number (773) 269-0473 is subscribed to James AUSTIN. As described in the paragraphs immediately below, agents intercepted calls between Johnny SHANNON using **Target Phone 10** and James AUSTIN using (773) 269-0473. Further, agents intercepted a call over **Target Phone 2** in which an individual identified himself to Larry SMITH as "Jaymo." Agents compared the voice on these calls to the voice in the instant call and determined that all the calls involved the same person, James AUSTIN. Additionally, agents have observed AUSTIN on several occasions leaving an apartment where a female named [Individual Y] resides–the same name that the individual refers to in the intercepted call.

("Oh. you shook em?"), and James AUSTIN answered that he did not know but that he changed his plans as a result of surveillance ("Man, I don't know, I wasn't even on that, I'm, I'm fitting to have me a drink. I ain't even going over there no more, man I changed my motherfucking mind completely.").

89.     On or about April 13, 2006, at approximately 12:29 a.m. (Call No. 1252), agents intercepted an outgoing call from **Target Phone 10** to a UM at (312) 217-6669. During this call, Johnny SHANNON inquired about buying a quantity of narcotics from the UM ("Hey, I am trying to find you some business real quick, I ain't going nowhere. . . . You ready to work, right."). The UM then advised Johnny SHANNON that he (the UM) was trying to obtain the narcotics, but that he (the UM) only had two units of narcotics ("I know, I am just looking out, you know. . . . Yeah, only two of em, . . . you know what I mean, good other one just [UI] shot."). The two men then agreed to meet to complete the narcotics transaction ("I'm on my way back there . . ." "Alright.").

### 3.     DEA Seizes $6000 in Intended Bond Money from Johnny SHANNON

90.     On or about April 13, 2006, agents assigned to this investigation received information from Antonio STIDHUM that resulted in the execution of a search warrant at the residence of defendant Antonio SHANNON, a.k.a. "Montana," a ranking member of the Mickey Cobras that traffics narcotics in the Dearborn Homes and is discussed in paragraph 114. STIDHUM indicated, among other things, that Antonio SHANNON was an associate of Johnny SHANNON and James AUSTIN in the illegal narcotics trafficking

49

business. During the execution of the search warrant, agents and officers recovered a loaded 9 millimeter handgun, a large quantity of packaging materials for heroin, and numerous photographs of the ranking members of the Dearborn Homes Mickey Cobras, including Johnny SHANNON, James AUSTIN, Lynn BARKSDALE, a.k.a. "Insane," and Antonio SHANNON. In many of these photographs, the individuals depicted were "flashing" what I believe to be Mickey Cobras "gang signs." The results of the search are further described in paragraphs 114 and 258. Antonio SHANNON was arrested and placed in state custody pending state charges.

91. The following day, on or about April 14, 2006 (Call No. 1537), agents intercepted an outgoing call over **Target Phone 10** from Johnny SHANNON to James AUSTIN at (773) 269-0473. During the call, Johnny SHANNON advised James AUSTIN as to the status of Antonio SHANNON's court case ("I just left court for him. . . . They um...they charged him with a gun and say his bond is uh...six. . . . Say his bond is going to be six. . . . they might not violate him."). James AUSTIN then directed Johnny SHANNON to meet him in the DBs to discuss Antonio SHANNON's status further in order to avoid law enforcement scrutiny ("Meet me in the projects, man." . . . "I'm down here already." . . . "Alright, I'll be there in a few minutes.").

92. Later that evening, on or about April 14, 2006, at approximately 7:25 p.m., agents effected a traffic stop on Johnny SHANNON. During the stop, agents seized $6,000 in cash from Johnny SHANNON.

93.    Almost immediately after agents seized the $6,000 from Johnny

SHANNON (on April 14, 2006, at approximately 7:39 p.m.(Call No. 1594)), agents

intercepted an outgoing call on **Target Phone 10** to James AUSTIN. During the call,

Johnny SHANNON asked James AUSTIN: "Hey, tell me why the police just pulled me

over in front of the county." James AUSTIN responded: "Yeah?" Johnny SHANNON

then stated: "Yeah, trying to bond, uh . . . where you at?" James AUSTIN responded:

"I'm in the projects." Johnny SHANNON then stated: "Meet me here . . . somewhere."

James AUSTIN responded: "Meet up somewhere?" Johnny SHANNON then stated:

"Meet me somewhere man, where can you meet me at?", and James AUSTIN responded:

"I don't know, come this way." Johnny SHANNON then stated: "I'm not . . . you want me

to come all the way down there. . . I'm in front of the county right now." James AUSTIN

then stated: "Alright, you gotta come past this way to go home or wherever you going."

Johnny SHANNON then stated: "Meet me at the White Grill," and James AUSTIN

responded: "Alright."

94.    After agents intercepted this call, on or about April 14, 2006, at

approximately 7:45 p.m., agents drove to the area of the White Palace Grill and surveilled

Johnny SHANNON sitting in a purple Eagle Vision, Illinois license plate [number]

parked in the parking lot of a Walgreen's drug store located at 1201 South Canal Street.

That Walgreen's is located next to the White Palace Grill. Approximately five minutes

later, at about 7:50 p.m., agents observed James AUSTIN nearby sitting in a black Chevy

51

Tahoe bearing Illinois license plate number [license plate number] parked in the parking lot at a Staples store located at 1130 South Canal Street. Approximately three minutes later, at about 7:53 p.m., agents observed Johnny SHANNON exit the Eagle Vision and walk into the Staples store. Agents and officers then observed James AUSTIN exit the Chevy Tahoe at the same time Johnny SHANNON walked past him. Agents then observed James AUSTIN and Johnny SHANNON meet inside the Staples store. At about 8:04 p.m., agents observed James AUSTIN and Johnny SHANNON exit the Staples store. Agents then observed AUSTIN enter the black Chevy Tahoe and drive to 2940 South State Street, a building in the Dearborn Homes.

## 4. CS1 Discusses the Sale of Untraceable "Burn Out" Cell Phones With AUSTIN and then Delivers the Phones to Johnny SHANNON

95. On or about April 24, 2006, CS1 contacted James AUSTIN at the direction of agents and advised James AUSTIN that he (CS1) had untraceable Nextel telephones that he would sell to James AUSTIN. (Based on my training and experience in drug investigations, this type of telephone is commonly used by drug dealers to conduct drug sales in an effort to avoid detection by law enforcement.) James AUSTIN advised CS1 to contact Johnny SHANNON and give the phones to him.

96. That same day, on April 24, 2006, at approximately 4:01 p.m., agents intercepted an incoming call on **Target Phone 10** from CS1. During the call, CS1 and Johnny SHANNON engaged in the following conversation:

CS1: . . . Hey, Jay just told me hit you. See if you want to these horns because he

52

say he at the crib.

JS: Who?

CS1: Jay. Damn. yeah he say he was the crib, he wasn't in the area. He said to get at you and...

JS: What horns you got?

CS1: I got some burn outs, Nextels.

JS: What you want for em?

CS1: A couple of bucks, like 250, 3 bucks.

JS: For what?

CS1: For the horns. They unlimited, unlimited. Ain't none of that, getting shut off or none of that. It's unlimited.

JS: Which ones is it?

CS1: Uh. now. Thing about it is it's here. I'm trying to get the 930, the new ones. Just told me come back in about 20 minutes but I was getting that C making sure that C was in the area so that I could go ahead and bring it to him. But he said he ain't in the area.

JS: Which phones you got though then?

CS1: They flips. No I got them, they gonna be flips. He said don't worry about it they gonna be the new flips. That's what he said, they gonna be the new flips. Guaranteed the new flips.

JS: You talking about 20 minutes?

CS1: Yep.

97. That same day, under the direction and surveillance of agents assigned to

this investigation, CS1 delivered two Nextel telephones to Johnny SHANNON pursuant

to the above conversations.

## C. James AUSTIN's and Johnny SHANNON's Workers

### 1. Defendant Jerome JOHNSON and the Seizure of More than 190 Grams of Fentanyl

98. In or about April 2006, DEA agents assigned to this investigation received

information from CS2 that James AUSTIN and his associates were using Apartment 505

in the 2964 South State Street building in the DBs to mix heroin for the "Penicillin" and

"Reaper" heroin lines. Based on this and other information, on April 25, 2006, at approximately 3:30 a.m., DEA agents and CPD officers assigned to this investigation initiated surveillance in the 2964 South State Street building near Apartment 505. At approximately 7:40 a.m., DEA agents observed defendant Jerome JOHNSON, a.k.a. "Marcus," exit Apartment 505 while carrying two clear plastic bags that contained smaller black and green tinted plastic bags in his right hand as he turned to begin closing an iron gate to Apartment 505. DEA agents and officers approached Jerome JOHNSON while announcing, "Police, put your hands in the air." Jerome JOHNSON then looked in the direction of agents and ran towards an open window in the hallway. Jerome JOHNSON then threw the clear plastic bags out the window of the building to the sidewalk and attempted to resist arrest. After a brief struggle, agents arrested and handcuffed Jerome JOHNSON. Immediately after Jerome JOHNSON threw the clear plastic bags out the window, a CPD officer went down the stairs to the sidewalk and retrieved the bags.

99.     After Jerome JOHNSON was arrested, DEA agents observed that the front door of Apartment 505 was open and the keys to the apartment were in the locked gate. After obtaining verbal consent to enter the apartment from Jerome JOHNSON, agents and officers visually checked the inside of the apartment for officer safety. After agents and officers determined that no one else was inside the apartment and that no threat existed, they began the interview of Jerome JOHNSON. Agents Mirandized Jerome JOHNSON, and Jerome JOHNSON then verbally waived his rights and signed a written waiver form.

54

Jerome JOHNSON also gave agents verbal consent to search Apartment 505 and the two cellular telephones he was carrying, and then Jerome JOHNSON executed a written waiver as to the apartment and the cellular telephones.

100.    As discussed more fully in paragraphs 57-60, Jerome JOHNSON admitted that he "runs" the night shift on the heroin lines "Reaper" and "Penicillin" for James AUSTIN and that "Taz," identified as Tyrone WALLACE, runs the day shift on the "Reaper" and "Penicillin" lines. Jerome JOHNSON stated that he often mixes heroin with WALLACE in Apartment 505 where James AUSTIN's girlfriend, Individual D, resides. DEA agents then asked Jerome JOHNSON if there was any additional heroin inside the apartment, and he related there was more heroin stored inside the "north closet." Jerome JOHNSON also stated that there were mixing supplies in the other closet inside the apartment. Agents then opened the door to the north hall closet in Apartment 505 and discovered five clear plastic sandwich bags containing miscellaneous blue, green, and black smaller plastic bags containing beige powder substances that appeared to be heroin. Next, agents opened the door to the south hall closet and discovered the following items: (1) two clear plastic bags containing a beige powder substance; (2) miscellaneous plastic bags and staples; the plastic bags are green, blue, clear, and black in color; (3) heroin mixing equipment, including four scales, two blenders, several blender cups, and one clear plastic bag containing miscellaneous silver spoons, one lighter, staples, cards and plastic bags; and (4) various heroin cutting agents. Agents then

discovered two more clear plastic bags that appeared to contain heroin on the top shelf of the bedroom closet. Agents also discovered in a backpack in the south hall closet a plastic bag which contained identification cards and spoons. The items in the plastic bag appeared, based on my training and experience, to be covered with the residue of narcotics. One of the identification cards was a Sam's Club card with the name "James AUSTIN" and James AUSTIN's photograph. I have compared the photograph on the Sam's Club card to an arrest photograph of James AUSTIN and determined that they are the same person.

101.    After agents searched the apartment, Jerome JOHNSON explained the manner in which he, WALLACE, and James AUSTIN's other workers mixed the heroin for AUSTIN's heroin lines. Jerome JOHNSON related that they utilized different mixtures for the various heroin lines. JOHNSON related for the "Reaper" line, they normally utilized approximately 7 grams of heroin, mixed with 35 grams of Dormin, 10 grams of Quinine, and 2 ½ grams of Lactose and then blended it together and prepared it for street sales in black bags. Jerome JOHNSON related that for the "Penicillin" line, they normally utilized approximately 7 grams of heroin, mixed with 30 grams of Dormin, 10 grams of Quinine, and 3 ½ grams of Lactose and then blended it together and prepared it for street sales in green bags. Jerome JOHNSON stated that James AUSTIN and Johnny SHANNON recently started selling the "Bass Ale" heroin line in blue plastic bags and that they started mixing in various ways with different ingredients and amounts.

56

Jerome JOHNSON stated that he assists in the mixing of heroin approximately five or six times a week, depending on heroin sales. Jerome JOHNSON related he often mixes as much as 10 - 15 grams of heroin for each line when the heroin sales are good. Jerome JOHNSON related that the "Reaper" heroin line normally sells approximately 300 bags of heroin priced at $10.00 each on a daily basis. The "Penicillin" line sells approximately 200 bags of heroin each day, and the "Bass Ale" line sells approximately 100 or more bags of heroin each day.

102.    Agents and officers later sent the items seized from Jerome JOHNSON and discovered in Apartment 505 that appeared to be illegal narcotics to the Illinois State Police Laboratory and the DEA North Central Laboratory. The Illinois State Police Laboratory determined by testing a random sample that the clear plastic bags that Jerome JOHNSON threw out the window contained approximately 102 smaller black (50) and green (52) tinted plastic bags. These small black, green, and blue plastic bags contained approximately 30.5 grams of fentanyl, a Schedule II narcotic controlled substance. The DEA North Central Laboratory determined that the five clear plastic sandwich bags which contained 440 miscellaneous blue, green, and black smaller plastic bags that agents discovered in the north hall closet contained approximately 162.6 grams of fentanyl, a Schedule II narcotic controlled substance. On or about June 5, 2006, the DEA North Central Laboratory also identified the fingerprints of defendants Kevin WILLIAMS and Penorris BROWNRIDGE on the small plastic bags. Kevin WILLIAMS is described in

57

paragraphs 355-364. Penorris BROWNRIDGE is further discussed in paragraphs 175-177.

## 2. Defendant Tyrone WALLACE

103. As discussed in paragraphs 18-20 and 57-69, CS2, Jerome JOHNSON, and Antonio STIDHUM stated that Tyrone WALLACE assists James AUSTIN and Johnny SHANNON is running AUSTIN's heroin lines. In addition to the information provided by confidential sources and the statements by various defendants in this case, additional information described below reflects that Tyrone WALLACE assists the Mickey Cobras in trafficking narcotics in the DBs.

### a. Tyrone WALLACE and CS2 Discuss WALLACE's Work for James AUSTIN on the "Reaper" and "Penicillin" Heroin Lines and WALLACE's Plans to Open Up His Own Heroin Lines

104. On or about May 25, 2006, at the direction of DEA agents, CS2 met with defendant Tyrone WALLACE in the DBs. Prior to the meeting, DEA agents equipped CS2 with a recording device. The meeting occurred shortly after DEA agents and officers assigned to this investigation seized a large quantity of fentanyl as well as narcotics mixing devices and packaging from an apartment that James AUSTIN was using to mix and store narcotics for his heroin lines, "Penicillin" and "Reaper." At the time of the seizure, one of James AUSTIN's key workers, Jerome JOHNSON, described to agents the day-to-day workings of James AUSTIN's heroin trafficking operation.

58

According to CS2, as a result of the seizure from the apartment and Jerome JOHNSON's statements to agents, James AUSTIN and his associates temporarily shut down the "Penicillin" and "Reaper" heroin lines because of fear of law enforcement activities.

105.    At the start of the meeting, CS2 asked WALLACE if he was no longer working for James AUSTIN as James AUSTIN was not selling drugs at that time ("So what, 'Jaymo' just left you all out, 'Jaymo' quit or something?"). WALLACE answered that it was correct that James AUSTIN's lines were shut down, but that he was not concerned because he was selling heroin on his own. WALLACE explained that if James AUSTIN re-opened the lines, WALLACE would continue selling on his own because he did not want to go back to making small amounts of money every week ("Yeah, . . . No, if he was to come back shit, I'm decent. . . If he was to come back I'm decent. I'm, I'm not fitting to go back to making this pussy ass weekly ass shit right, when I got my own shit.").

106.    CS2 replied that WALLACE had been working for James AUSTIN for a long time, and Wallace agreed. (CS2: "Right, right, right, right. . .I'm like, oh man, ok, I'm saying like I know 'Taz' [Tyrone WALLACE] been working for this man for so long, would if, if he, if 'Jaymo' say he going to quit, he quit every fucking four or five, three months and then what happens, you know what I'm saying he come right back") and WALLACE agreed with CS2. CS2 then asked WALLACE from which building in the DBs WALLACE intended to sell heroin and whether WALLACE would consider being

59

CS2's partner ("we could do something . . .what building you going to go in?").

WALLACE then described his plan to open a new heroin line called "Eat Shit" and his

intention to give out free samples to heroin users to start the new heroin line ("Oh, shit

right now we was going, I was going to try to working the castle, but (Inaudible) my dope

is going to be "Eat Shit. . . the name of the line's going to be "Eat Shit," what I was going

to go like . . whatever you was going to give me. . .I gotta do samples like goddamn it,

buy one get, so these mother fuckers can taste what we got (Inaudible) I say at least put

five grams on samples, bout ten on buy one get one or maybe twenty, and after that then

shit everything else should be a boat. . . Shit five grams, that's like two days of shit

samples.").

107.    CS2 then asked WALLACE about James AUSTIN's profit margins per 10

grams of heroin ("I ain't trying to get in all your business . . what the rumor was . .

'Jaymo' and them was making three thousand or four thousand off ten grams, off some

type of fucking licks."). WALLACE answered that CS2's estimate was correct and then

described the heroin mixing process that allowed James AUSTIN to earn this type of

profits ("Yeah . . .it's like some brown shit that, uh, [Individual Z] was selling. It's some

shit that all those store sell even on 31st & Ashland, (Inaudible) it's, it's a nice price to it. .

. .and then shit, the diesel can take five or six's mother fuckers. . . I mean it was like they

would mix the diesel with your shake."). CS2 then explained that when he (CS2) was

selling heroin, he was not earning those types of profits ("I wasn't making no, I wasn't no

60

fucking three or four thousand on ten grams."). WALLACE then asked CS2: "You using lactose and shit too?" CS2 replied, "No."

108. CS2 and WALLACE then discussed the proposition that WALLACE and CS2 would start selling two new heroin lines, one that was strictly owned and controlled by WALLACE, and one that was owned and controlled by CS2 but run by WALLACE (CS2: "You just wanna, ok, I wanna say just open up two right, yours, know what I'm saying . . . and then one yours, you know what I'm saying, you, you, I got nothing to do with that, you know what I'm saying and then another, I wanted to open up one."). WALLACE agreed with CS2 and stated that they could do that. CS2 then asked WALLACE if he had a place to store the heroin, and WALLACE stated: "Yeah." CS2 then told WALLACE: "We going to get it popping man, it got to be before the first, on the first. before the first, on the thirty first, the first, I just got to load up." WALLACE then stated he had a place to store the heroin and that he would focus his efforts on finding people to sell heroin and figuring out which building in the DBs would constitute the best sales spot ("I'll just working on getting the sellers . . . if we can't get in the castle, we'll gang bang in forty, so I can get some shit started.").

109. CS2 and WALLACE then discussed what would happen if James AUSTIN returned and re-opened the "Penicillin" and "Reaper" lines (CS2: "I just don't want to start and get into it with 'Jaymo' and them ass." WALLACE: "I ain't going back to that petty ass gangster or salary for one mother fucking week man, can't do it."). WALLACE

and CS2 then discussed WALLACE's complaints about working for James AUSTIN and his decision that he would not return to working for James AUSTIN (CS2: "[A]nd you doing all the damn work." WALLACE: "Only thing motherfucker ain't doing is going to pick the shit up, motherfucker doing everything else.").

### 3.    Defendant Kevin WILLIAMS

110.    As discussed in paragraphs 11-20 and 49-69 earlier in this affidavit, CS1, CS2, Rashad HAMILTON, Anthony SMITH, Antonio STIDHUM, and Jerome JOHNSON all stated that defendant Kevin WILLIAMS assists James AUSTIN in running his heroin lines in the DBs. In addition to the information provided by confidential sources and the statements by various defendants in this case, additional information described below reflects that Kevin WILLIAMS is a close associate of James AUSTIN and assists the Mickey Cobras in trafficking heroin in the DBs.

### a.    Kevin WILLIAMS Caught Selling Heroin Packaged in Green Plastic Bags on March 10, 2004

111.    On or about March 10, 2003, CPD officers from CPD's public housing unit were on patrol in the DBs in the area of the building located at 2910 South State Street. One of the officers was working undercover and dressed in civilian attire with no police identification visible. The officer walked into the lobby of the 2910 building, and Kevin WILLIAMS asked the officer: "Rocks or Blows." Based on my training and experience, "Rocks or Blows" means that the speaker is soliciting the sale of crack cocaine (Rocks) and heroin (Blows). After hearing this solicitation from Kevin WILLIAMS, the officer

responded: "Give me two blows." Kevin WILLIAMS then took a clear plastic bag from his pocket which contained numerous smaller green plastic bags. Each green plastic bag contained a white powder that appeared to be heroin. The officer then advised Kevin WILLIAMS that he was a police officer and placed Kevin WILLIAMS under arrest.

112. After officers arrested Kevin WILLIAMS, they inventoried 58 green plastic bags and sent the items to the Illinois State Police Crime Laboratory for analysis. The Laboratory tested a random sample of the substance in the green plastic bags and concluded that the substance inside the bags was approximately 13.9 grams of heroin. As a result of this conduct, WILLIAMS pleaded guilty to Possession of a Controlled Substance on or about March 24, 2004, and was sentenced to two years in IDOC. Notably, the "Penicillin" heroin line owned and controlled by James AUSTIN is packaged in green plastic bags.

### 4.    Defendant Antonio SHANNON

113. As discussed in paragraphs 2-8 and 61-73 earlier in this affidavit, CD1, Antonio STIDHUM, and Sean WINN all described Antonio SHANNON as a high ranking Mickey Cobra who assists James AUSTIN in James AUSTIN's heroin trafficking operation in the DBs. Additionally, CS2 has also advised agents that Antonio SHANNON is one of James AUSTIN's key assistants in running his heroin lines. In addition to the information from CD1, CS2, STIDHUM, and WINN, additional information described below reflects that Antonio SHANNON is a close associate of

63

James AUSTIN and assists him in trafficking heroin in the DBs.

> a. **Search of Antonio SHANNON's Residence Reveals a Gun, Packaging Materials for "Reaper", a Drug Ledger, and Photographs of Anontio SHANNON, James AUSTIN, Johnny SHANNON, and other High Ranking Mickey Cobras Flashing Mickey Cobra Gang Signs**

114. On April 13, 2006, DEA agents and CPD officers received information from defendant Antonio STIDHUM that Antonio SHANNON was storing weapons in his apartment on the second floor of 7307 South Emerald in the City of Chicago. Officers and agents obtained a search warrant and executed it at 7307 South Emerald at Antonio SHANNON's second floor apartment. During the search of the apartment, a loaded 9 mm handgun was recovered from the closet of SHANNON'S bedroom. Also recovered from the bedroom were several documents addressed to Antonio SHANNON at 7307 South Emerald and several empty black plastic bag used for the packaging of narcotics. Notably,"Reaper" is packaged in black bags. Agents and officers also recovered several confidential and proprietary CPD computer generated documents from SHANNON's bedroom which contained defendant CPD Officer Tashika SLEDGE's CPD log-in information. (These documents are more completely described in paragraphs 258-259.) Agents also discovered numerous photographs of the ranking members of the Dearborn Homes Mickey Cobras, including Johnny SHANNON, James AUSTIN, Individual A, Lynn BARKSDALE, aka "Insane," and Antonio SHANNON. In many of these photographs, the individuals depicted were "flashing" what I believe to be Mickey Cobras

64

"gang signs." Agents also seized several letters written by BARKSDALE to Antonio
SHANNON while BARKSDALE that are postmarked in or about late 2001 at a time
when BARKSDALE incarcerated. I have reviewed these letters and based on my training
and experience in this investigation, I interpret the letters to mean the following:
BARKSDALE advises Antonio SHANNON about how to keep control of the DBs for the
Mickey Cobras while BARKSDALE and other high ranking members are incarcerated or
avoiding the DBs because of law enforcement activities. BARKSDALE also directs
Antonio SHANNON to provide money to him and to other Mickey Cobras for their
prison commissary and for their attorneys. Additionally, another document was also
recovered which I interpret based on my training and experience to be a drug ledger. The
ledger, seized in April 2006 only 8 months after Antonio SHANNON was released from
prison on an Aggravated Battery conviction, reflects either receipts or payment due to
several different individuals in the amounts of several thousand dollars. Based on the fact
that the figures in the ledger are so high only 8 months after Antonio SHANNON was
released from prison, I believe the document reflects that Antonio SHANNON was
involved in large scale drug trafficking.

### 5.   Defendant Sean WINN Caught in DBs with 60 bags of Heroin

115.   On or about December 21, 2005, CPD officers assigned to the 21st District
were patrolling in the DBs in the area of the building located at 2910 South Dearborn
Street. One of the officers entered the lobby area of the 2910 building and observed

WINN standing in the south stairwell holding a clear plastic bag which contained numerous smaller plastic zip lock bags. After seeing the bag, the officer approached WINN and advised WINN that he was a Chicago Police officer. WINN immediately dropped the plastic bag to the ground and attempted to flee up the stairs. The officer initiated a chase of WINN and after a short foot chase, the officer arrested WINN. The officer then recovered the plastic bag. The officer then Mirandized WINN and performed a custodial search of WINN which revealed that WINN possessed $357 in U.S. currency. Officers then transported WINN to the 21st District.

116. After WINN was arrested, officers inventoried the contents of the plastic bag that WINN had dropped and determined that it contained approximately 60 smaller plastic zip lock bags that each contained a white powdery substance. Officers sent the items to the Illinois State Police Laboratory for testing. The Laboratory tested 23 of the smaller bags and concluded that these smaller bags contained approximately 5.4 grams of heroin. The remaining 37 bags contained approximately 8.8 grams of powder which was not tested. WINN was subsequently tried and convicted of Possession of a Controlled Substance and sentenced to 1 year in the Illinois Department of Corrections.

117. On or about April 7, 2006, a CPD detective and a DEA analyst assigned to this investigation as well as a Cook County Sheriff's Police (CCSP) Deputy interviewed defendant Sean WINN after he advised a CCSP Deputy that he wanted to speak to with investigators. As discussed at length in paragraphs 68-71, WINN laid out the hierarchy of

66

Mickey Cobras in the DBs and the manner in which the Mickey Cobras run their heroin lines in the DBs.

## D. Controlled Purchase of 4 ½ Ounces of Crack Cocaine from defendant Marshall WOODEN

118.    Marshall WOODEN, a.k.a. "Chuckwick," sells heroin and crack cocaine and is a high ranking member of the Mickey Cobras in the DBs. Additionally, WOODEN has owned and controlled a heroin line in the DBs.

119.    CD1, CS1, CS2, Anthony SMITH, and Antonio STIDHUM have advised officers and agents that Marhsall WOODEN, a.k.a. "Chuckwick," is a high ranking Mickey Cobra. CS1, CS2, and STIDHUM stated that WOODEN owned and controlled a heroin lines in the DBs. Specifically, CD1 related that in or about 2001, WOODEN sold heroin from the building located at 2931 South Federal in the DBs. WOODEN's line at the time was called "Rockafeller." CD related that WOODEN and a partner also sold large amounts of cocaine in the DBs. STIDHUM stated that WOODEN paid tax to James AUSTIN when he was running a heroin line in the DBs.

120.    On December 7, 2005, agents and officers met with CS1, for the purpose of purchasing 4 ½ ounces of crack cocaine from WOODEN. At approximately 6:02 p.m., CS1 made a consensually-recorded telephone call to WOODEN at (773) 412-2781. During this call, CS1 and WOODEN agreed to meet at a movie theater parking lot near 200 West 87th Street. CS1 and CS1's vehicle were searched for contraband by agents with negative results. CS1 was then equipped with a personal recording and transmitting

67

device and given $3,000 in recorded funds to purchase the crack cocaine.

121. At approximately 6:19 p.m., CS1 departed the location where he and officers planned the operation and drove to the theater parking lot where he and WOODEN had discussed meeting to conduct the transaction. At the time, he was being surveilled by agents. At approximately 6:30 p.m., agents overheard a telephone conversation between WOODEN and CS1 (over the transmitting device they had earlier equipped CS1 with) in which WOODEN told CS1 he was cleaning up and would be at the place where the two planned to meet shortly. At approximately 6:34 p.m., agents observed WOODEN arrive at the theater parking lot driving a blue Chevy Cavalier. Agents then observed WOODEN exit his vehicle and enter CS1's vehicle. Agents monitored the conversation between CS1 and WOODEN over the transmitting device. After WOODEN entered CS'1 car, he (WOODEN) told CS1 that he had just gotten off work and would be back with the narcotics in an hour. WOODEN then left the location.

122. At approximately 7:47 p.m., agents observed the blue Chevy Cavalier return to the lot along with a brown Pontiac. Both vehicles parked next to CS1's vehicle. Agents then observed WOODEN exit the passenger side of the Pontiac and enter the passenger side of CS1's vehicle. At approximately 7:51 p.m., agents observed WOODEN exit CS1's vehicle and get back into the drivers side seat of the blue Chevy Cavalier and depart the parking lot. CS1 was then followed by agents back to the location where they originally planned the operation. Once at the planing location, CS1 tendered a clear

68

plastic bag containing approximately 119 grams of a beige rock-like substance that DEA laboratory testing subsequently confirmed was crack cocaine. Agents then searched CS1 and CS1's vehicle for contraband with negative results.

### E. Defendant Larry SMITH and his Drug Trafficking Associates

123. As discussed in paragraphs 21-81, Joseph CHESS, Individual C, Cynthia THOMAS, Robin JOHNSON, Duante FALLS, Antwan PETERSON, Anthony SMITH, Antonio STIDHUM, Freddie WESTMORELAND, and Israel MOORE stated that Larry SMITH is a high ranking member of the Mickey Cobras in the DBs who owns and controls various heroin lines in the DBs. In addition to the information provided by confidential sources and the statements by various defendants in this case, additional information described below reflects that Larry SMITH is high ranking member of Mickey Cobras in the DBs.

### 1. November 8, 2004, Seizure of Heroin and a Gun, Arrest of Robin JOHNSON, and Escape by Larry SMITH

124. On or about November 8, 2004, CPD officers responded to an anonymous complaint about narcotics trafficking in an unoccupied apartment (605) in the 2840 South State Street building in the DBs. When CPD officers knocked on the door of Apartment 605, defendants Larry SMITH (whom the officers were able to positively identify) and Robin JOHNSON opened the door and allowed the officers to enter the apartment. Neither Larry SMITH nor Robin JOHNSON could give an adequate explanation as to

69

why they were inside the empty, unrented apartment. CPD officers then arrested Robin JOHNSON for trespass. Larry SMITH, however, resisted arrest and fled from the residence while being chased by officers. Following his arrest, Robin JOHNSON positively identified Larry SMITH as the man who fled the building and eluded arrest.

125.    During a subsequent search of the vacant apartment, CPD officers recovered approximately 100 grams of heroin, $2,621, plastic bags, and other narcotics mixing paraphernalia, and a handgun.

## 2.    Larry SMITH sells 50.4 Grams of Heroin to CS1

126.    At approximately 6:50 p.m. on or about April 11, 2005, at the direction and in the presence of DEA agents, CS1 called Larry SMITH.[9] During the call, Larry SMITH agreed to sell CS1 approximately 50 grams of heroin at the price of $100 per gram, for a total of $5,000. SMITH and CS1 agreed to meet in the area of 48th and Langley to conduct the narcotics transaction.

127.    Just prior to the planned transaction, agents searched CS1 and CS1's car and ensured that no contraband was present. Then at approximately 7:10 p.m., DEA surveillance agents observed CS1 arrive in CS1's vehicle and park in front of 4820 South Langley. At approximately 7:18 p.m., DEA surveillance saw a silver Hyundai with two

_____

[9]At the time of the call, CS1 advised the officers that he was calling Larry SMITH. Agents later obtained authorization to intercept Larry SMITH's communications over **Target Phone 2**. Since receiving that authorization, an agent assigned to this investigation who listened to Larry SMITH's calls over **Target Phone 2** also listened to the April 11, 2005 communications between CS1 and Larry SMITH and determined that Larry SMITH was the individual who agreed to sell the heroin to CS1.

black males inside arrive and park in front of 4815 South Langley. At approximately 7:19 p.m., Larry SMITH called CS1 and told CS1 he was in front of 4815 South Langley. CS1 got out of his vehicle and entered the silver Hyundai. In the car, Larry SMITH handed CS1 a clear plastic bag containing a tan powder that appeared to be heroin and CS1 gave Larry SMITH $5,000 in recorded funds to pay for the heroin. CS1 then got out of the Hyundai, which then immediately departed. CS1 then met with DEA agents and turned over the bag, and agents searched CS1 and CS1's car and ensured that no further contraband was present.

128. The bag was subsequently sent to the DEA's North Central Laboratory and tested. Lab results indicated the sample tested positive for the presence of heroin with a net weight of 27.3 grams.

### 3. Intercepted Calls Showing Larry SMITH's Leadership Role in the Mickey Cobras

129. Pursuant to court authorizations, DEA intercepted communications over **Target Phone 2**, used by Larry SMITH. Below are examples of intercepted communications and other facts learned in the investigation.

130. On or about September 17, 2005 at approximately 1:14 a.m. an outgoing call from **Target Phone 2** to (773) 315-9360 was intercepted (Call No. 1216). During this call, Larry SMITH had an angry conversation with an unidentified male that Larry SMITH referred to as "Lil Anthony." During the call, Larry SMITH angrily stated: "Why the fuck nigger, why you keep ducking me?" The UM responded: "I ain't ducking you

71

man." Larry SMITH then stated: "Nigger on some, nigger want his act now, and now you playing in your ass huh?" The UM replied: "Nigger come holler at me." Larry SMITH stated: "Nigger come holler at me. What the fuck you mean, you come holler at me." The UM responded: "Nigger I just called you, nigger, I just called you, What's good?" Larry SMITH then stated: "I'm just saying nigger, it's always good nigger get at me." The UM replied: "What you fittin' to slide down on a nigger tonight?" Larry SMITH stated: "You act like you want to grow up to be something spectacular nigger. I'm trying to spread this game out to a young punk. You want it?", and the UM replied: "Yeah." Larry SMITH responded: "Alright then, holler at me tomorrow or something, one." During this call Larry SMITH and the individual referred to as Individual V were discussing Larry SMITH giving his permission to "Li'l Anthony" to sell narcotics at the Dearborn Homes.

131. On or about September 18, 2005, at 12:17 p.m. (Call No. 1792), Larry SMITH received a call on **Target Phone 2** and spoke with a then-unidentified individual using telephone number (773) 206-3917. (Agents later determined that this unidentified individual was defendant Israel MOORE and obtained court authorization to intercept MOORE's communications over **Target Phone 3** and **Target Phone 5**. Agents further confirmed MOORE's identity by comparing the voice of ths caller with the voice of MOORE whom agents interviewed on February 21, 2006. During that interview which is further described in paragraphs 78-81, MOORE admitted, among other things, that he

72

was supplying Larry SMITH with heroin.) During this call, Larry SMITH advised MOORE: "Alright, uh last night right, you know what I am saying, uh before he came . . . to pick up . . . them Bull Tickets, . . . my shorty, . . . Little Shitty [Duante FALLS] . . . You know what I'm saying, when he came and hollered at me, . . . he went straight and he counted the tickets up . . . And when he counted them, there's like two tickets in each rubber band . . . which it was full. There was four rubber bands all total. . . . And I'm like man did you count it last night, and he ain't count it because he was too bent." Intermittently, throughout this part of the conversation, MOORE acknowledged what Larry SMITH was saying. Larry SMITH then stated: "But, I'm like damn, that shit's wrong. . . . And I can't really politic it really because I sent my man out there to holler at him, wake his ass up, and I'm like man them tickets was 63 points. . . . And he's like hell no "B," I counted them up, no it was eight. MOORE responded: "Let me, let me . . . See where he put em at, and I'll call you right back." During the call, Larry SMITH was speaking with MOORE about drug trafficking. In particular, the two individuals were discussing a shortage in the proceeds from daily drug sales ("And I can't really politic it really because I sent my man out there to holler at him, wake his ass up, and I'm like man them tickets was 63 points. . . . And he's like hell no "B," I counted them up, no it was eight.") and their suspicions about one of the drug workers ("my shorty") losing or stealing the money, possibly because he was intoxicated or under the influence of drugs ("he ain't count it because he was too bent").

132.    Approximately two minutes later, MOORE called Larry SMITH back on **Target Phone 2** using (773) 206-3917 (Call No. 1795) and stated: "Yeah, he put it in the place where it always be "B" at his crib, the only motherfuckers in there is his mommy and daddy. You know what I mean . . . So I don't know." Larry SMITH responded: "Right, I can't question either of them neither, and I'm mad because under the strength, normally." MOORE then interrupted Larry SMITH and stated: "Alright, we just gonna split it though, it was fifteen shy, man we just split it man . . . " A little later in the conversation, Larry SMITH advised MOORE that "I'm trying to bounce back you know I ain't trying to pay no mother fuckers for no tickets no more than what I got to pay . . ." MOORE responded: "Yeah, that's cool," and advised Larry SMITH he would call him back. During the call, Larry SMITH was speaking with Israel MOORE about drug trafficking. In particular, the two individuals continued to discuss the shortage in drug proceeds.

133.    Approximately eighteen minutes later (Call No. 1800), MOORE called Larry SMITH back on **Target Phone 2** using (773) 206-3917 and stated: "I mean, it's all love, we a family, but shit I mean a motherfucker can't call the next day and say that was half a buck, you know what I mean?" Larry SMITH responded: "Fo sho." During this call, Larry SMITH was speaking with MOORE about drug trafficking. In particular, the two individuals continued to discuss the shortage in drug proceeds.

134.    On October 20, 2005, at approximately 12:24 a.m., an incoming telephone

74

call was intercepted from (773) 512-8415 to **Target Phone 2** (Call No. 13841). During this call, Larry SMITH had a conversation with two UMs who complained to Larry SMITH about the weight and quality of heroin they had received from Larry SMITH. The first UM intercepted on the call told Larry SMITH that the weight was off for 100 grams of heroin, "We got to 88th and 86th Street." Larry SMITH acknowledged, "Damn, that, look whatever it is, you know what I'm saying. It's dollar for dollar you feel me? Just mark off the differences from that, you feel me." The first UM responded, "I hear you alright." A second UM then got on the phone and complained to Larry SMITH about the quality and color of the heroin, "This is a muddy thing right?" Larry SMITH replied, "Hell no." The UM then told Larry SMITH, "It ain't snow white, that's how it is. It's just different coloring you know what I mean?" Larry SMITH replied, "I feel you, but I ain't got no control over that Joe." Larry SMITH went on to assure the UM that the heroin was of good quality. Larry SMITH said, "You know I ain't got no control over that part B. You know the only thing I know it's decent. It won't fuck up the industry or nothing, it only be better." During this call, Larry SMITH discussed supplying heroin to the unidentified subjects he was speaking with, and the fact that he (Larry SMITH) is getting the heroin from another source.

135. On October 24, 2005, at approximately 1:06 p.m., an outgoing PTT from **Target Phone 2** to 183*699*7770 was intercepted. (Call No. 15797) During this call, Larry SMITH and a UM discussed heroin and how much the unidentified subject had to

pay for the heroin. The UM complained to Larry SMITH that heroin Larry SMITH had previously provided had "fucked up our lines." UM asked, "They still got the same shit?" Larry SMITH responded, "Yep. You ain't ready yet? You know you 95 right?" UM said, "Why the fuck I got to give 95?" Larry SMITH responded, "Cuz that what the fuck it goes. You didn't give up the last 5 last rip B." UM said, "You should have gave us a discount cause you gave us the bullshit and fucked up our lines." Larry SMITH said, "Well I'll holler at him B, you know what I'm saying, but he fast as McGready man."

### 4. Defendant Nick JONES

#### a. STIDHUM Implicates JONES as Heroin Supplier

136. On April 13, 2006, CPD officers and DEA agents, after a brief foot chase, arrested Antonio STIDHUM, a.k.a. "Psycho," for being in possession of a handgun, as discussed in paragraphs 61-69. In his post-arrest statement, STIDHUM related that Charles HAMPTON was being supplied with heroin by "Poohnannie," identified by law enforcement as Nick JONES.[10] He further said Nick JONES is selling a heroin line with another individual from 2951 South Federal Street and that JONES sometimes has heroin stored inside the other individual's apartment at 2901 South Federal, Apartment # 305. According to STIDHUM, James AUSTIN and Nick JONES did not get along. STIDHUM explained that Nick JONES and Johnny SHANNON used to be partners in selling heroin but had an argument over money, which resulted in Nick JONES beating

---

[10] A DEA agent interviewed Nick JONES on December 15, 2005, and JONES said he goes by the name "Poohnannie."

up Johnny SHANNON. James AUSTIN and Antonio SHANNON then saw Nick JONES in the area of 31ˢᵗ and Michigan and began shooting at him (JONES). STIDHUM related that Nick JONES was shot during the altercation. According to STIDHUM, Nick JONES is friends with Larry SMITH, a.k.a. "Lucky," who provides protection for JONES from James AUSTIN.

### b.   Intercepted Call Showing Nick JONES' and Larry SMITH's Drug Trafficking

137.   On or about October 20, 2005, at approximately 7:27 p.m. (Call No. 14097), Larry SMITH, a.k.a. "Lucky," received a call on **Target Phone 2** from Nick JONES, a.k.a. "Poohnannie," at (773)567-5055.[11]   In this call, Larry SMITH asked Nick JONES what was going on ("What's the deal with your Buster ass man?"). Nick JONES told Larry SMITH that he had to stop his heroin mixing operation ("Shit, I had to stop everything."). Larry SMITH asked JONES if he had to stop the operation again ("Again?"). Nick JONES informed SMITH that the police have been around ("The police was wacking that motherfucker."). Larry SMITH asked Nick JONES if he was talking about what he (JONES) and Aaron SMITH talked about before ("Are you talking

---

[11]Nick JONES was identified as the user of this phone on October 3, 2005. On this date, JONES was stopped by the police after he was surveilled leaving Larry SMITH's residence. About 20 minutes after he was stopped by the police, JONES used this phone number to call Larry SMITH and inform him that he (JONES) was just stopped after leaving SMITH's residence. The caller's voice on October 20, 2005 was the same as the voice identified as Nick JONES' voice on October 3ʳᵈ.

about as far as when me, you and Bro[12] talked?"). Nick JONES explained that he was not taking any chances by mixing heroin with the police around the area. Nick JONES related that if he started and stopped the mixing process, the heroin would become old and could not be used ("Hell yeah, the police was wacking that motherfucker. I wasn't finna take no chance at doing anything and that shit sit and then that shit old, then that shit dead."). Larry SMITH said that he understood why JONES stopped mixing the heroin but wanted to know what they were going to do ("Ah I feel you, so what"?). Nick JONES said police had been around lately ("The police was wacking the motherfucker, just the other day they were like eight cars deep in front, five cars deep on the side."). Larry SMITH asked what they were supposed to do ("So what now, ah Brains, what do we got to do now?"). Nick JONES informed Larry SMITH that he was just waiting for the police to leave, and once they did, he would start the mixing operation again the next morning ("I'm waiting for shit cool off that's all, you know what I'm saying, we supposed to jump back down tomorrow morning.") and that he would rather be safe than sorry ("Shit I better safe, I better cautious then sorry."). Larry SMITH said he did not have a problem with Nick JONES being cautious, but he needed the operation to start back as soon as possible ("I ain't tripping off your cautious ass, I need to take care of that business… shit, what you talk about, I don't give a fuck about no cautious shit, I'm

---

[12] On February 6, 2006, during a post-arrest statement, Duante FALLS stated that he had been mixing heroin for Larry SMITH and Larry SMITH's brother, whose name was Aaron SMITH.

talking about. . . . I understand how, [UI] but I need to address that business man"). Nick
JONES said he understood and would not let Larry SMITH down ("I got you…you know
I'm not going to let you down."). Larry SMITH said an unknown male was a problem
and he was stopping the growth of the heroin operation ("Yeah, I feel you man, but the
nigger on something man, he's stopping our growth."). Nick JONES said he talked to
Duante FALLS, a.k.a. "Shitty," and heard that they got a new thing in [UI] ("I know that,
nigger I ain't stopping your growth, I just talked to Shitty nigger and you all just got a
new thing in."). Larry SMITH responded that the new thing did not matter because he
had to pay it back to someone. He then said Duante FALLS should concentrate on the
drug operation instead of talking to Nick JONES ("That don't mean shit, I got to pay that
back man, what the fuck you mean, I don't give a fuck what he talking about, he got to
take care of his business while he talking that shit to you."). Larry SMITH said he was
serious about what he said, and if JONES could not deal with his responsibilities, Larry
SMITH would do them himself ("For real man , I just need…man, if you can't dress it
man, I'll dress it man, you know what I'm saying."). Nick JONES informed Larry
SMITH not to worry and said he would take care of the business ("You know I'm going
to take care of that business.").

138.    On November 12, 2005, at approximately 11:31 a.m. (Call No. 21853),
Larry SMITH, a.k.a. "Lucky," used **Target Phone 2** to call Nick JONES at (773)567-
5055. In this call, Nick JONES told Larry SMITH to give a female nine bags of

marijuana for $40.00 ("Yeah, give her nine for forty"). He then told Larry SMITH that she was on the way and that she was going to walk up to the store ("She on her way, she coming down now…she gonna walk up to the store.").

139. On or about November 22, 2005, at approximately 7:18 p.m. (Call No. 1060), Larry SMITH, a.k.a. "Lucky," received a call on **Target Phone 2** from Nick JONES, a.k.a. "Poohnannie," at (773) 567-5055. In this call, Nick JONES told Larry SMITH that he was on his way to the DBs to pick up the rest of the heroin ("I'm on my way to the Dearborns to pick up the rest the girls.") Larry SMITH told JONES that he would be at the apartment ("The rest of the girls…alright man, well I'll be at the joint man…what the fuck, man."). Nick JONES indicated that he did not know to which apartment Larry SMITH was referring ("What joint?"). Nick JONES asked if Larry SMITH was talking about the apartment on 44th street ("On 44th?"). Larry SMITH responded that it was a different apartment ("No man, at the U-Dig.").

### 5. Defendant Davarius SEATON

140. According to CS2, Davarius SEATON is a Mickey Cobra gang member. According to intercepted telephone calls involving SEATON, SEATON is often called "Ugly Snake." Intercepted communications from Larry SMITH's phone indicate that SEATON's role in the Mickey Cobras is the transportation of heroin from MOORE to Larry SMITH and heroin proceeds from Larry SMITH to MOORE. In addition to the intercepted communications, SEATON was stopped by CPD while driving with Israel

MOORE. At that time, SEATON provided his driver's license to CPD officers, confirming his identity.

### a. Seizure of $8,060 from SEATON

141. On October 8, 2005 at approximately 9:46 p.m. agents monitored an outgoing PTT communication between Larry SMITH (**Target Phone 2**) and an unidentified male (Call No. 10228). During this call Larry SMITH told the UM that he wanted him to come give Larry SMITH money for heroin.

| Larry SMITH: | " Hey yeah, I'm ready B." |
|---|---|
| UM: | " Alright" |
| Larry SMITH: | " Just come holler at me so I give you these tickets." |

142. Pursuant to that call, surveillance was set up near Larry SMITH's residence at 48th and Champlain in Chicago. At approximately 10:35 p.m. Chicago Police Officers observed a tan Buick park in front of Larry SMITH's residence. Officers observed the driver, later identified as SEATON, exit the car and walk to the front of Larry SMITH's residence. A short time later, officers saw SEATON walk back to the car carrying a small bag. At approximately 10:45 p.m., officers pulled the car over and at that time noticed a strong odor of marijuana coming from the interior of the car. SEATON identified himself with his driver's license and gave officers consent to search the car. Officers found a tan plastic tan on the passenger seat of the car containing $8,060. Officers informed SEATON that the money was being seized as suspected drug money, and told him to come to the CPD 21st District to get a receipt for his money. SEATON did not go to the

station or seek a receipt.

143.    At approximately 10:51 p.m., agents intercepted an incoming telephone call

from Israel MOORE (using **Target Phone 3**) to Larry SMITH (using **Target Phone 2**)

(Call No. 10249). During this call, MOORE told Larry SMITH that he needed to clean

his house out because the police were watching him, and that SEATON had just been

stopped.

| | |
|---|---|
| MOORE: | "Hey B you better god damn it, clean up your crib out, cause they watching you B, they just pulled up as soon as they turned." |
| Larry SMITH: | "Right, that's what I was trying to tell you B, that's why I told him [SEATON] he couldn't come like that man." |
| MOORE: | "Say what?" |
| Larry SMITH: | "That's what I was trying to tell you to tell him don't even come like that over there, you feel me?" |
| MOORE: | "Yeah, yeah, I mean, but shit, you didn't tell me no where else to go, shit." |
| Larry SMITH: | "Alright, I was, I was gonna just tell him that he could just, that's why I was saying, could of just came and pick up them tickets, B, and I could have got with y'all in the morning or whatever, B, cause I was trying to holler at you anyway, you know what I mean?" |
| MOORE: | "Right, shit, well you, you need to clean the crib, man. I'm gonna just come kick it with you in the morning, man. Yeah, clean, clean, clean up, B, cause they watching you, B, they hit them as soon as soon as they turned the corner." |
| Larry SMITH: | "I already know, B, alright man, one." |

## b.    Calls Between SEATON and Larry SMITH Concerning SEATON's drug trafficking.

144.    Court authorized interception of calls on **Target Phone 2**, used by Larry

SMITH, show numerous conversations between Larry SMITH and SEATON, using the

82

phone number (773) 268-4247, and its associated PTT number 183*698*16987.[13] The calls included the following:

145. On or about September 17, 2005, at approximately 11:44 p.m. Larry SMITH called SEATON and SEATON asked if Larry SMITH had any newly acquired money ("shirts") for SEATON to pick up. SEATON asked Larry SMITH, "Hey you got some more shirts man?" Larry SMITH replied, "Yeah, I got some, B." SEATON said, "I'm talking about some new shit, man." Larry SMITH replied, "I, yeah, new shirts."

146. On or about September 18, 2005, at approximately 10:42 a.m. (Call No. 1760), Larry SMITH called SEATON and asked how much money SEATON had given Larry SMITH the previous night ("What up, B? What was that, B?") SEATON said it was $6,300 ("That was like, like 63, B.") Larry SMITH then told SEATON that he is going to call his supplier ("Let me hit this nigger back, man.").

147. On or about October 8, 2005, at approximately 9:46 p.m., Larry SMITH called SEATON and said, "Hey yeah, I'm ready, B." SEATON replied, "Alright." Larry SMITH then stated, "Just come holler at me, so I give you these tickets [money]."

148. On or about November 10th, 2005, at approximately 5:59 p.m., Larry SMITH called SEATON. SEATON asked Larry SMITH for $1,000 right away ("Hey I need a buck, B, I need a buck real, real, real fast, B." and "Just a grand, one grand.")

---

[13]SEATON was identified as the user of the numbers when intercepted phone calls placed to (773) 268-4247 led to the traffic stop of SEATON discussed above, following which stop, officers were then able to make voice identification between SEATON and the user of the number.

Larry SMITH stated, "I can't get to it right now man, shit."

149.   On or about November 24, 2005, at approximately 5:57 p.m., Larry SMITH called SEATON and asked him to have MOORE call Larry SMITH so that Larry SMITH can get heroin from MOORE. Larry SMITH asked SEATON, "Won't you call Pretty Ricky, man? Tell him I said call me, Joe. We need to get up." SEATON replied, "Alright."

150.   On or about December 1, 2005, Larry SMITH called SEATON and asked when SEATON would be bringing 100 grams of heroin to Larry SMITH ("Hey, how long this gonna be on that hundred dollars, B?"). SEATON explained that the supplier has the kilogram of heroin and would bring the heroin to Larry SMITH directly ("Uh, well shit, man, [Individual W] got the key, he coming from out there, man, out in the suburbs, he got the key, he gonna bring it over there.") Larry SMITH responded, "He gonna bring it over here to me?" and SEATON responded affirmatively.

### 6. Defendant Duante FALLS

#### a. Duante FALLS' Sale of Heroin to Cooperating Source

151.   On October 10, 2005, CS1 met with and purchased heroin from Duante FALLS, a.k.a. "Doodoo" or "Shitty." Specifically, at approximately 5:15 p.m., CS1 made a consensually recorded telephone call to Duante FALLS at (312) 217-3702.[14] Duante FALLS told CS1 that he would call him/her right back. At approximately 5:40 p.m., a

---

[14]During the call, FALLS' voice was identified by CS1.

second consensually recorded telephone call was made to Duante FALLS at (312) 217-3702. Duante FALLS told CS1 he would call him back in 15 or 20 minutes. Immediately following the second call, Duante FALLS, at approximately 5:55 p.m. (Call No. 11568), utilizing (312) 217-3702, called Larry SMITH, a.k.a. "Lucky," at **Target Phone 2.** During the call, Duante FALLS asked Larry SMITH if he could proceed with the sale of heroin to CS1. Larry SMITH confirmed that Duante FALLS could proceed with the sale.

152.    At approximately 6:15 p.m., the CS1 made a third consensually recorded call to Duante FALLS at (312) 217-3702. Duante FALLS told CS1 that he would be ready in 30 minutes. CS1 and Duante FALLS agreed to meet in the area of Roosevelt and Ashland at a shopping center. Prior to the meeting, CS1 was searched for contraband with negative results. CS1 was then given $5,000 and fitted with electronic recording equipment. Surveillance was initiated in and around the Jewel Food Store at Ashland Avenue and Roosevelt Road.

153.    At approximately 7:14 p.m., CS1 departed the meet location en route to the Jewel Parking lot. CS1's vehicle was followed to the lot by a special agent. At approximately 7:20 p.m., surveillance officers and agents observed CS1's vehicle enter the parking lot. At approximately 7:45 p.m., a silver Chevy Impala bearing Illinois License Plate [license plate number] entered the parking lot and parked next to CS1's vehicle. A surveillance agent observed that the Impala was driven by Anthony BINION, a.k.a. "Doc" or "BK." The front seat passenger was Duante FALLS. There were no

85

other occupants in the Impala. At approximately 7:51 p.m., surveillance observed Duante FALLS exit the Impala and enter CS1's vehicle. At approximately 7:54 p.m., surveillance observed Duante FALLS exit the CS1's vehicle, get back into the Impala, and drive out of the lot. At approximately 7:55 p.m., Duante FALLS, utilizing (312) 217-3702 (Call No. 11691), placed a telephone call to Larry SMITH. During this call, Duante FALLS advised Larry SMITH that the deal was done and he was sending someone to Larry SMITH's house with the money.

154.    CS1 subsequently returned to the meet location. Law enforcement recovered a clear plastic bag containing a tan powder, believed to be heroin, that Duante FALLS had given CS1. CS1 was then searched for contraband with negative results. A field test of the powder recovered from CS1 revealed a positive indication for the presence of heroin. The substance was subsequently sent to the DEA North Central Lab for analysis. Testing revealed that the substance was heroin and weighed 49.5 grams.

### b.    FALLS' Post-Arrest Confession

155.    On February 6, 2006, during a post-arrest statement, discussed in paragraphs 40-46, Duante FALLS, a.k.a. "Shitty" or "Doodoo," said Larry SMITH, a.k.a. "Lucky," had been controlling heroin lines that were named "Lethal Injection" and "Drop Dead" for an undisclosed period of time. Duante FALLS further explained that Larry SMITH recently changed the names of the heroin lines to "Tsunami" and "Incredible Hulk." Duante FALLS said Larry SMITH was selling the "Drop Dead" heroin line and

86

packaging it for street sale in small black plastic bags. Duante FALLS further said he was working with Larry SMITH until approximately one month ago when they had an argument over how much Duante FALLS was getting paid for selling heroin for Larry SMITH. According to Duante FALLS, for approximately 2- 3 months, Larry SMITH was paying him $3,000- $4,000 a week to work for Larry SMITH's heroin distribution organization. Duante FALLS said his duties included mixing heroin for Larry SMITH and Larry SMITH's assistant, namely, his brother Aaron SMITH, a.k.a. "Acc." Duante FALLS explained that he would mix the heroin for Larry SMITH while utilizing Dormin, Quinine and other cutting agents to dilute the heroin. Duante FALLS further explained that Larry SMITH would give pills to Duante FALLS to grind up with the heroin and powder while mixing. Duante FALLS said he knew the pills were pain relievers because he looked up the markings on the pills and figured out for what they were used. Duante FALLS further said Larry SMITH would instruct Duante FALLS to go to the "1st floor," meaning take 50 grams of heroin and mix it with 50 grams of cut. Larry SMITH would also instruct Duante FALLS to take it to the "2nd level," meaning taking 100 grams of heroin and mix it with 100 grams of cut, and to the "3rd level," meaning mixing 150 grams of heroin with 150 grams of cut. Duante FALLS explained that Larry SMITH used pain killer pills to give his (Larry SMITH's) heroin line a specific taste for the heroin users. Duante FALLS further explained that he would pick up the money from Larry SMITH's heroin line and deliver the money to Larry SMITH or to Duante FALLS' mother, Saundra

87

FALLS, who would store the money for Larry SMITH inside her apartment in the DBs. Duante FALLS related his duties also often included watching over the heroin line and making sure the heroin sales were steady.

156. Duante FALLS also said he had currently been selling his own heroin line and was calling it "Undertaker." He explained that he was packaging his heroin line in red and purple bags for street sale. Duante FALLS further explained that "Davone," identified by Duante FALLS through photographic identification as Davone SHANNON, and "Ray Ray," identified by Duante FALLS through photographic lineup as Rashad HAMILTON, assisted him in the sale of his "Undertaker" heroin line. According to Duante FALLS, HAMILTON drove Duante FALLS around when he was delivering narcotics. HAMILTON also assisted in overseeing Duante FALLS' heroin line. Duante FALLS further said he has had HAMILTON and Davone SHANNON pick up narcotics proceeds and deliver narcotics under his (Duante FALLS') direction on numerous occasions. Duante FALLS explained that he paid "hypes" (heroin users) about $150 per day to sell his heroin. Duante FALLS further said he had been purchasing 50 grams of heroin a day for approximately the last three months from a Nigerian. Duante FALLS also explained that he purchased his heroin mixing ingredients from two stores located in the areas of North and Laramie and 31st and Ashland.

### c. Intercepted Calls Between Duante FALLS and Larry SMITH

157. On or about September 18, 2005, at approximately 7:01 p.m. (Call No.

1928). Larry SMITH used **Target Phone 2** to call Duante FALLS a.k.a. "Shitty or Doodoo," at (312) 217-3702. In this call, Duante FALLS asked Larry SMITH when he was going to replenish the supply of heroin ("Hey uh…what about that candy for them kids for the party, man."). Duante FALLS further specified that it was the new heroin, not some other line, that they were talking about ("No, hell no them envelopes [UI] we gonna [UI] up, I'm talking about the candy…the candy bags, you know what we been talking about, man."). Larry SMITH responded that he would call his supplier ("Uh, I'm finna call him in a minute, alright.").

158. On or about October 24, 2005, at approximately 2:49 p.m. (Call No. 15858), Larry SMITH used **Target Phone 2** to call Duate FALLS at (312) 217-3702. During the call, Duante FALLS informed Larry SMITH that the source was out of Quinine ("What up, you know they ain't had the green…they ain't had the Quincy with the green coats."). Larry SMITH said that they could get some on 71st Street ("We got to go on 71st then B."). Duante FALLS then said that he still had 15 grams of Quinine left ("I got…look I got like 15 right here though."). Larry SMITH then told Duante FALLS to mix 37.5 grams of the 75 grams of heroin that they had ("Do half of 75, which is what…37.5?"). He further directed Duante FALLS to mix the 37.5 grams of heroin with 12.5 grams of the mixing agent, which would come out to 50 grams ("And then um…do 12 ½ and then it comes out to 50."). Duante FALLS asked if Larry SMITH wanted him to cut everything in half ("Ok, so take everything in half basically?"). Larry SMITH said

yes and then said something about his other line of heroin ("Right, and then as far as Scooby Snacks…"). Duante FALLS questioned whether he was supposed to mix heroin with 2½ grams of the mixing agent ("2 ½?"). Larry SMITH said yes ("2 ½, right."). Duante FALLS further said he had two four packs of the mixing agent left ("Alright, I got 2 four packs, G."). Larry SMITH said he was out of mixing agent and that he would pick up more. He then questioned whether there was any mix in stock ("Ok, that's cool B, I'm out and about right now, so I just grabbed that other shit…did they have it up there?"). Duante FALLS said that the source of the mixing agent did not have more of the one that they wanted, only the blue mix. Duante FALLS said the mixing agent source told him that everyone was saying that the blue mix was better, but Duante FALLS assured the source that the green mix was the better one ("No, she's gonna get the green, she said a lot of people are telling…Blue is better, and I said no, the Green was cracking. So she said she would order it, and she got my number and shit.").

159.    On or about November 3, 2005, at approximately 2:03 p.m. (Call No. 19078), Larry SMITH used **Target Phone 2** to call PTT 183*696*5284, a phone used by Duante FALLS a.k.a. "Shitty or Doodoo."[15]  In this call, Duante FALLS informed Larry SMITH that another group of rival drug dealers just started a new line of narcotics in the DBs ("Today was the grand opening for those guys…you hear me."). Duante FALLS then said these dealers were using packaging for their line of heroin that was similar to

---

[15]This PTT number is assigned to (312) 217-3702.  As discussed above, CS1 identified FALLS as the user of this phone on October 10, 2005.

the packaging for Duante FALLS and Larry SMITH's line. Duante FALLS went on to say that they were also selling in the same area that Duante FALLS and Larry SMITH's crew sold ("Okay, they came out with the same color coats [UI], got a motherfucker standing in front of the neighborhood we in…you know what I'm saying… directing their motherfuckers over there, then they motherfuckers UI…out and shit."). Larry SMITH told Duante FALLS to inform them that they were using the same packaging and selling in a location that had been designated for Larry SMITH and Duante FALLS' crew ("Tell them I say what's happening."). Duante FALLS again said the other dealers were using the same packaging ("Alright, they have the same color jackets."). Larry SMITH directed FALLS to tell these dealers that they could not use the same packaging ("Yeah, I feel you, but shit, we have those jackets…tell them what's up."). Duante FALLS told SMITH to talk to someone to solve this issue ("Alright, holler at dude."). Larry SMITH asked Duante FALLS if it was the person referred to herein as Individual E. Duante FALLS said, "Yeah." Larry SMITH then told FALLS to tell "[Individual E]" to sell in his own area ("Yeah, tell him I said what's happening…you know [UI]…own area."). Duante FALLS then said Individual E was in their neighborhood ("He is in our neighborhood."). Larry SMITH responded that someone else was selling in their area too ("Our…they in our neighborhood, too."). Duante FALLS said that the rival crew was selling out there right then like they owned the place and that if FALLS and SMITH were doing that, the rival crew would be angry ("No shit, but they got a motherfucker standing there carte

91

blanche...cracking G, right now. If we were cracking, and the cracker you know what I am saying motherfucker standing in front of their store, they would be pissed off.").

### 7. Defendant Saundra FALLS

#### a: Intercepted Calls Between Saundra FALLS and Larry SMITH Show FALLS Holds Narcotics and Proceeds for Larry SMITH

160. On or about September 19, 2005, at approximately 10:46 a.m. (Call No. 2098), Larry SMITH used **Target Phone 2** to call Saundra FALLS, a.k.a. "Mama," at 773 499-3490.[16] In this call, Larry SMITH told Saundra FALLS that he needed to buy some mixing agents ("I need some school supplies, Mama."). Saundra FALLS asked how much money Larry SMITH needed to buy the mixing agents ("OK, what you need?"). Larry SMITH replied that he needed $350.00 ("Ah, I see like ah, I don't know let me see, about 350."). Saundra FALLS then asked Larry SMITH who was going to come get the money ("OK, I got it, who's gonna come and get it?"). Larry SMITH replied that he was going to call [Individual F] and see if she could pick it up ("Ah shit, let me call Individual F to see where she's at, alright?"). Saundra FALLS then said that she could also give Individual F the heroin ("And I could give her the stuff too."). Larry SMITH then asked Saundra FALLS if she had the heroin too ("Ah you got the stuff

---

[16] The identity of Saundra FALLS as the user of this phone was established based on intercepted communications where Larry SMITH referred to Saundra FALLS as "Mama" and "Saundra" in the same conversation. The investigation also established that the user of this phone is the mother of Duante FALLS. Specifically, Larry SMITH made several intercepted telephone calls to Saundra FALLS at this number and asked to speak with her son "Shitty."

92

too?"). Saundra FALLS responded that she got the heroin that morning ("Yea, [UI] this morning."). Larry SMITH asked Saundra FALLS if his line of heroin, "Denise" was still selling slowly ("Is she, Denise, still acting slow?"). Saundra FALLS replied that it was and that she was going to go out and check how the line of heroin was selling ("Ah huh, I was about to go out there and look.").

161. On or about September 22, 2005, at approximately 8:22 a.m. (Call No. 3272), Larry SMITH used **Target Phone 2** to call Saundra FALLS at 773 499-3490. In this call, Larry SMITH asked Saundra FALLS that at the time Anthony BINION ("BK")[17] dropped off heroin from the "Denise" heroin line to Saundra FALLS whether it was the third time that week that the heroin line did not sell out ("When "BK" brought Denise, this was her third time sleeping over this week right?"). Saundra FALLS told Larry SMITH that she did not hear Larry SMITH ("Now what you say, go head I ain't hear you."). Larry SMITH repeated to Saundra FALLS that it was the third time that week that "Denise" did not sell out ("I said this her third time sleeping over this week, right."). Larry SMITH again asked Saundra FALLS if it was the third time that week "Denise" did not sell out ("I said was this Denise third time spending the night this week?"). Saundra FALLS replied that it was the third time ("Third time? Yeah."). Larry SMITH then asked Saundra FALLS if the heroin line "Denise" made at least $15,000 each day that it did not sell out ("Okay... and each one of them times right...did she at least reach fifteen dollars

---

[17]On December 8, 2005, during a post-arrest statement, Anthony BINION admitted that he goes by the name "BK."

for school, like school for lunch each time?"). Saundra FALLS confirmed that it did.
Larry SMITH then asked Saundra FALLS if the security/lookouts for the heroin line got
paid ("Okay, and then okay as far like them people that be watching her in the morning
and watching her night...did they um, did they get they little pay too?"). Saundra FALLS
confirmed that they did get paid. Larry SMITH then told Saundra FALLS that they did
not owe anyone money for taking care of the heroin line other then Saundra FALLS
herself ("So basically, we own...we don't owe anybody for babysitting, but you, basically
right?"). Saundra FALLS replied that no one needed to be paid other then herself and
mentioned that someone else did not get paid until yesterday ("Right, nobody but me, and
whatchamacallit didn't get his until yesterday."). Larry SMITH asked whether it was
Duante FALLS that did not get paid until yesterday. Saundra FALLS confirmed that this
was correct. Larry SMITH then asked whether everything was going the way it was
suppose to be going ("Okay then that's all I needed to know. But basically everything is
on track?"). Saundra FALLS confirmed that everything was going fine. Saundra FALLS
then said "Shitty" (*i.e.*, Duante FALLS) had just woken up and that she was going to talk
to "Shitty" and call Larry SMITH back. ("Oh wow, Shitty woke! I can't believe it. Okay
let me talk to him, and I'm going to call you back after I talk to him.").

**b.    Intercepted Calls Between Saundra FALLS and Larry SMITH Show FALLS Holds Narcotics and Proceeds for Larry SMITH**

162.    On or about October 1, 2005, at approximately 1:07 a.m. (Call No. 6503), Larry SMITH used **Target Phone 2** to call Saundra FALLS at 773 499-3490. In this call, Larry SMITH asked Saundra FALLS how the heroin lines were doing ("What up Ma?"). Saundra FALLS replied that the last bundle of heroin packets had gone out on the street for sale ("Last one went out."). Larry SMITH asked to which line of heroin was Saundra FALLS referring ("On what? Tony?"). Saundra FALLS replied yes ("Yep."). Saundra FALLS then told Larry SMITH that the "Denise" line of heroin was sold out ("You know Denise been out."). Larry SMITH replied that since the "Denise" line of heroin was sold out, they were going to sell the "Tony" line of heroin ("OK, Denise over with, we on Tony"). Saundra FALLS agreed ("OK.").

**8.    Defendant Robin JOHNSON**

163.    On April 23, 2006, CS2 informed law enforcement that Robin JOHNSON is an active member of the Mickey Cobras street gang. Robin JOHNSON mixes heroin for distribution in the DBs for Larry SMITH, a.k.a. " Lucky" and Benard HOWARD a.k.a. "Trigg" and "RU," and has been doing so for several years. Robin JOHNSON has used his residence, 1916 West 78th Street, among other locations, to mix Larry SMITH's heroin. CS2 further said Robin JOHNSON would bring the heroin to the DBs already packed in the early morning hours.

95

a.   **Recovery of Heroin, Cocaine, Mixing Equipment, Money, and a Gun from JOHNSON and JOHNSON's Apartment**

164.   On April 24, 2006, CPD officers received information that narcotics were being processed and packaged for street sale by Robin JOHNSON at 5723 North Clark Street. Officers set up surveillance at this location and observed Robin JOHNSON and Anthony SMITH exit the location and drive off in Anthony SMITH's vehicle. The vehicle was curbed for traffic violations. CPD officers asked Anthony SMITH and Robin JOHNSON to exit the vehicle and during a protective pat down of Anthony SMITH, officers felt a large bulge in Anthony SMITH's front left pants pocket. CPD officers recovered from Anthony SMITH's pants pocket a large black plastic bag containing one clear plastic bag, which contained a white powder (suspect heroin), one clear sandwich bag containing 150 red-tinted zip lock bags each containing a white powder (suspect heroin), a clear plastic bag containing a large white rock-like substance (suspect cocaine), one clear bag containing 132 black tinted zip lock bags each containing a white powder (suspect heroin) and one clear plastic bag containing large white rock-like substances ( suspect cocaine). Robin JOHNSON, a.k.a. "Pathfinder" and Anthony SMITH were arrested for possession of narcotics. The substances obtained during the traffic stop were submitted to the Illinois State Police Crime Lab for testing. Testing revealed that the substances were 87.6 grams of heroin and 78.1 grams of cocaine. Believing additional narcotics were in Robin JOHNSON's apartment, officers relocated to apartment 203, where officers obtained a consent to search and recovered additional suspect narcotics,

mixing equipment, cutting agents/narcotics mix, a .40 caliber semi-automatic pistol and approximately $23,000. The suspect narcotics were subsequently sent to the Illinois State Police Crime Lab for processing. Testing revealed that the substances were 95.1 grams of heroin, 198 grams of cocaine, and 21 tablets of Alprazolam, a prescription drug. After his arrest, Robin JOHNSON stated to the CPD officers that he "cabs" (meaning transports) the heroin from the packaging/mixing locations to the selling locations, usually in the DBs.

### b.    Seizure of Heroin from JOHNSON During Traffic Stop

165.   On October 5, 2005, Robin JOHNSON was stopped by CPD officers for traffic violations. During the traffic stop, CPD officers found Robin JOHNSON to be in possession of two small zip-lock bags containing suspect heroin. The substance was subsequently sent to the Illinois State Police Crime Lab for analysis. Testing confirmed that the substance was heroin and weighed .1 gram.

### c. Intercepted Calls Between JOHNSON and Larry SMITH

166.   On or about September 30, 2005, at approximately 7:53 p.m. (Call No. 6376), Larry SMITH used **Target Phone 2** to call/ ptt FMI 183*699*2046, a phone used by Robin JOHNSON.[18]  A few minutes later, at approximately 7:56 p.m. (Call No. 6381), Larry SMITH called Robin JOHNSON back, using **Target Phone 2** to PTT Robin

---

[18]On October 5, 2005, Robin JOHNSON was arrested and found to be in possession of a cell phone with the above PTT number registered to the phone. JOHNSON consented to the search of the cell phone.

JOHNSON. In the first call (Call No. 6376), Larry SMITH asked Robin JOHNSON if he was by himself, and Robin JOHNSON replied that he was by himself and was mixing some heroin ("Cooking me some Chili."). Larry SMITH then said that he was talking about raw heroin (meaning heroin before being mixed) and asked Robin JOHNSON how he rated the heroin ("I'm talking about the naked B. How do you rate it?"). Robin JOHNSON then replied that it was raw ("On the naked side."). Larry SMITH asked whether the heroin was good ("Yeah, is it with that business?"). In the second call (Call No. 6381), Larry SMITH questioned Robin JOHNSON about the quality of his line of heroin. ("You know what I'm thinking B, like, I think I'm just have to look [(UI]."). Robin JOHNSON replied that he was basically mixing the heroin the same way and went on to explain the amount of mix used to make the final product. ("Cause that's like um, we doing like basically the same thing you know, you basically did it a half and then we're coming right back and then we're putting you know, um 50, and then we're putting, you know, 15."). Larry SMITH then said that he understood but said the quality of the heroin could not have been that different ("Right, I feel that B, but I'm just saying like, it couldn't of been that motherfucking crazy B, you feel me B, because that ain't really shit B. you feel me?"). Larry SMITH then spoke about the amount of mixing agent that was being used to cut the heroin ("[UI] one thing, you know with 10, listen B, a 10, what a motherfucker going to the first floor with this, the block B and that's only 5 of that, to go, that's 15 on 10, you feel me B.").

98

167.    On October 24, 2005, CPD arrested Duante FALLS, a.k.a. "Shitty." After being arrested, Duante FALLS said he could make a phone call and obtains some guns in exchange for his release. Duante FALLS then called Larry SMITH at **Target Phone 2** for the purpose of obtaining the guns. After receiving the call from Duante FALLS, Larry SMITH called Robin JOHNSON for his assistance in obtaining the guns for FALLS. Specifically, on October 24, 2005 at approximately 7:42 p.m. (Call No. 16232), Larry SMITH used **Target Phone 2** to PTT call Robin JOHNSON at FMI 183*699*2046.[19] In this call Larry SMITH told Robin JOHNSON that he thought Robin JOHNSON was supposed to obtain two guns ("Hey Pierre, I thought it was two B, they said, they said it's only one right there."). Robin JOHNSON replied that there were two guns ("It's two."). Larry SMITH then asked where the second gun was located ("Where the second one at then?"). Robin JOHNSON replied that the guns were together, wrapped in a towel, inside a bag ("They with each other. They in the same bag, they wrapped in a towel in the same bag."). After this initial conversation, Larry SMITH and Robin JOHNSON had several additional conversations that night in which they discussed the guns.

---

[19] Robin JOHNSON's identity in this call was established based on, among other things, Larry SMITH referring to Robin JOHNSON in this call by Robin JOHNSON's alias, "Pierre." On October 5, 2005, affiant interviewed Robin JOHNSON, who said he goes by "Pierre" and "Pathfinder."

9. **Defendant Rashad HAMILTON**

a. **Recovery of Drug Money from HAMILTON, Duante FALLS, and Davone SHANNON**

168. On or about February 6, 2006, at approximately 7:45 p.m., CPD surveillance observed three unknown black males, later identified as Duante FALLS a.k.a. "Shitty," Rashad HAMILTON, a.k.a. "Ray Ray," and Davone SHANNON, and one unknown black female exit 2132 West Crystal Street. Davone SHANNON entered one vehicle and the other individuals entered a second vehicle. Surveillance was conducted on both vehicles. A short time later, DEA task force officers stopped the second vehicle for a minor traffic offense in the area of 35th Street and Michigan Avenue. Officers approached the vehicle and observed a bundle of money on the console of the vehicle in plain view, later determined to total $2,360. Duante FALLS, HAMILTON and another individual (Individual G) agreed to go and did go to a CPD facility for further questioning. A CPD canine trained to detect the odor of narcotics had a positive alert to the money.

b. **HAMILTON's Confession**

169. During a voluntary non-custodial statement, discussed in part above in paragraphs 49-51, HAMILTON said he goes by the nickname of "Ray Ray." According to HAMILTON, he often drives Duante FALLS, a.k.a. "Doodoo" around the DBs and to various locations, including the Amber Inn, located at 3901 South Michigan. HAMILTON said he is paid by Duante FALLS on a regular basis and the amounts vary.

100

HAMILTON said Duante FALLS often meets him at 2920 South State Street. In regard to the events earlier that day, HAMILTON said he drove Duante FALLS to an address on Crystal at approximately 4:00 p.m. Duante FALLS and Individual G mixed heroin and put the heroin inside plastic bags for street sale. HAMILTON said he then counted the bags of heroin and believed there was a total of 368 bags. HAMILTON said Duante FALLS paid him a total of $100 to count the bags of heroin. HAMILTON further said an individual he knew as "Tiger" (*i.e.*, Johnny TIGER) and another male came to the residence on Crystal and purchased heroin from Duante FALLS during the time that they were there. HAMILTON further said he was holding approximately $2,000 from narcotics proceeds that Duante FALLS had given him to hold earlier that day.

170.    HAMILTON further said he is aware that Davone SHANNON works with Duante FALLS and that Davone SHANNON was also arrested at the same time he (HAMILTON) was arrested. He said the heroin with which Davone SHANNON was arrested came from Duante FALLS' heroin line, namely the "Undertaker" line. HAMILTON said he has transported heroin and picked up narcotics proceeds for this heroin line on numerous occasions over the past two or three months.

### 10.    Defendant Davone SHANNON

171.    On or about February 6, 2006, CPD surveilled Davone SHANNON, Duante FALLS. Rashad HAMILTON, and one unknown black female, as discussed in paragraphs 168-170. At approximately 8:15 p.m., surveillance observed Davone

SHANNON drive into the Amber Inn parking lot at 3901 South Michigan Avenue and park his vehicle. Surveillance subsequently observed Davone SHANNON exit the vehicle and enter room number 222. At approximately 8:20 p.m., Davone SHANNON exited room number 222 and entered room number 230. Davone SHANNON then exited room number 230 and returned to his vehicle. Shortly thereafter, he re-entered room number 230. At approximately 8:25 p.m., a task force officer observed Davone SHANNON exit room number 230 and enter his vehicle. Davone SHANNON was detained at this time during a stop of his car for a traffic violation.

172. A consent search of Room 230 was subsequently conducted by law enforcement. During the search, law enforcement seized approximately 375 purple zip lock bags and one clear plastic bag containing purported heroin, along with $1,460. Davone SHANNON was arrested at this time. The bags were later sent to the Illinois State Police Forensic Lab for analysis. Testing revealed that the substance in the bags was heroin and weighed 101.4 grams.

173. During his post-arrest statement, Davone SHANNON said his brother lived in the DBs at 2920 South State Street, 1st Floor. Davone SHANNON further said he had known Duante FALLS a.k.a. "Doodoo," for the past year and a half and met him in the DBs. According to Davone SHANNON, Duante FALLS runs the "Undertaker" heroin line within the DBs. Davone SHANNON explained that he was a heroin runner for Duante FALLS and had been for the past few months, during which time he had made

102

approximately three heroin runs a week. Davone SHANNON said Duante FALLS would "chirp" him, meaning Duante FALLS would utilize a PTT communication device, to indicate that it was time to meet Duante FALLS at a gas station at the intersection of Division Street and Damen Avenue to pick up the packages of heroin to transport. Davone SHANNON said he would be paid $100.00 for each heroin trip he made. Davone SHANNON said his SUV did not have a hidden compartment (*i.e.*, a trap) and he would put the heroin packages in the console of the vehicle.

174.    In regard to the events of earlier that day, Davone SHANNON said Duante FALLS told him to drop off the heroin at a hotel on 39th and Michigan Avenue, the location of the Amber Inn. Davone SHANNON said he did not have a key to the hotel room but had met Duante FALLS at the Amber Inn on previous heroin runs. Davone SHANNON further said he sat in his SUV waiting for Duante FALLS outside the Amber Inn and subsequently exited his SUV and went to room number 222 to visit his female cousin. According to Davone SHANNON, a short time later, he walked to room number 230, where Duante FALLS had been staying, and a black female opened the door. Davone SHANNON said at that time he put the heroin pack in the top drawer of an end table next to the bed.

103

## 11. Defendant Penorris BROWNRIDGE

### a. Recovery of Heroin from BROWNRIDGE

175.    On September 4, 2003, CPD officers responded to a tip that an individual was selling narcotics in the area of 2910 South Dearborn and was armed with a handgun. The source further said this individual typically ran into apartment 403 whenever police arrived. Upon arrival, the officers proceeded to apartment 403 and were let inside by the lease holder. Upon entering the apartment, law enforcement observed an individual standing in the hallway, who matched the description provided by the source of information. For their safety, the responding officers conducted a protective pat down of this individual, later identified as Penorris BROWNRIDGE, and discovered a large object in the front of his pants. The officers asked BROWNRIDGE what the object was, and BROWNRIDGE responded that it was his "work," which the officers knew was a street term for narcotics. The officers then recovered two sandwich baggies from BROWNRIDGE's pants. One sandwich bag contained 68 smaller green and black tinted baggies, and the second sandwich baggie contained 104 small green and black tinted baggies. Each tinted baggie contained a white powder, which was suspect heroin. The bags were subsequently sent to the Illinois State Police Lab for analysis. Testing revealed that the substance was heroin and weighed 83.4 grams. The officers also recovered $1,832 from BROWNRIDGE's front pants pocket.    At the time of his arrest, BROWNRIDGE admitted that he was a member of the Mickey Cobras street gang.

176.   On October 4, 2004, CPD officers, while conducting surveillance inside 2940 South State, observed a heavy flow of people entering the building and exiting a short time later. The officers also could hear male voices yelling "Blows, Blows," which affiant knows to be a street term for heroin. The officers then relocated into the North stairwell of the building, where they knew drugs were commonly sold. At this time, the officers radioed to other officers who were in the vicinity of the building to rush the building. Shortly thereafter, Penorris BROWNRIDGE came running up the stairwell. An officer then announced his office, at which time BROWNRIDGE dropped from his hand a clear plastic bag with green objects inside. BROWNRIDGE then proceeded to run back down the stairwell, where he ran into another officer who stopped and detained him. BROWNRIDGE's bag was recovered from the ground and found to contain 40 green tinted bags containing a white powder substance, which was suspected to be heroin. The substance in BROWNRIDGE's bags was subsequently sent to the Illinois State Police Lab for analysis. Testing revealed that the substance was heroin and weighed 9.9 grams.

### b.   Recovery of BROWNRIDGE's Fingerprints on Drug Packaging

177.   As described in paragraphs 98-103, on April 25, 2006, CPD officers and DEA agents arrested Jerome JOHNSON, a.k.a. "Marcus," at 2964 South Street, Apartment # 505 in the DBs. At the time of his arrest, Jerome JOHNSON was found to be in possession of approximately 49 grams of suspect heroin that was packaged in plastic bags. In addition to the suspect heroin, law enforcement seized a backpack that was

105

inside the south hall closet of the residence. The backpack contained plastic bags and staples. The plastic bags were green, blue, clear, and black in color, and some contained a beige powder residue. The item was processed into evidence and transferred to the DEA North Central Drug laboratory for analysis. The residue inside the bags tested positive for fentanyl. Additionally, the lab found positive matches for the fingerprints of Penorris BROWNRIDGE and Kevin WILLIAMS on some of the plastic bags that held the fentanyl.

### 12. Defendant Antwan PETERSON

178. In summary, Antwan PETERSON is a member of the Mickey Cobras who assists Larry SMITH in trafficking heroin in the DBs.

179. On or about May 16, 2006, CPD personnel conducted a traffic stop on a blue 2001 Dodge, Illinois registration 7998787. After the stop, officers asked the driver (later determined to be Antwan PETERSON) to produce a valid driver's license, but PETERSON could not or would not produce one. At about the same time, officers observed PETERSON make a motion with his hand towards a plastic shopping bag in the back seat of the vehicle. Officers immediately directed PETERSON and the passenger (later determined to be Mark FRANKLIN) to exit the vehicle. One of the officers who executed the stop then recovered the shopping bag that PETERSON was reaching towards and determined that the bag contained a package with a rock-like substance

inside. As officers recovered the bag, PETERSON attempted to flee from the officers. After a brief foot chase, officers were able to arrest PETERSON in the area of the DBs.

180.    As discussed in paragraphs 46-48, after he was arrested, PETERSON admitted that he formerly worked for defendant Freddie WESTMORELAND trafficking heroin until he and WESTMORELAND were arrested for possession of narcotics. PETERSON then admitted that he now assists defendants Larry SMITH and Bernard HOWARD in narcotics trafficking in the DBs. PETERSON stated that Individual H had fronted PETERSON the cocaine that officers seized from the blue Dodge, and that PETERSON was required to pay Individual H $1,250 after he (PETERSON) "rocked up the cocaine" (*i.e.*, cooked it into crack cocaine). PETERSON stated that he was going to make a profit of $400 on the fronted cocaine.

### 13. Defendant Joseph CHESS

181.    On March 6, 2004, CPD officers, while conducting a premise check in the DBs, saw Joseph CHESS on the fourth floor landing holding a large amount of cash in his right hand and two clear plastic bags containing numerous zip lock baggies in his left hand. At that point, CPD officers stopped CHESS and recovered 34 zip lock baggies, each of which contained a white powdery substance (suspect heroin), along with $600 cash. The substance inside the bags subsequently was submitted to the Illinois State Police forensic lab for analysis. Laboratory analysis revealed that the substance was heroin and had a net weight of 5.6 grams.

182.    In his post-arrest statement, CHESS said he started working as security in October of 2003 for the "Dynasty" heroin line, which was run by Individual I. CHESS further said he was paid $70 a day for the security work. Specifically, his job was to alert the narcotics sellers if the police were in the area. CHESS further said that in approximately January 2004, he began working in the narcotics sales business for Larry SMITH, a.k.a. "Lucky" or "Lujack," as discussed above in paragraphs 21-24. CHESS said he was paid $70 per day for selling heroin. CHESS also said the "Network" line of heroin is packaged in clear plastic bags with a yellow stripe. The "Max Payne" line of heroin is packaged in clear plastic bags with red stripes.

183.    CHESS further said on March 6, 2004, he was arrested after receiving heroin from "Dave," identified by CHESS through photographic identification as Robin JOHNSON. CHESS explained that prior to his arrest that day, he went to the building at 2930 South Dearborn to get a pack of heroin from Robin JOHNSON. According to CHESS, Robin JOHNSON brings the heroin into the projects and bags the heroin for both of Larry SMITH's heroin lines. CHESS said on March 6th, he began selling heroin at approximately 7:00 a.m. CHESS started selling heroin while having a total of 18 dubs of heroin and 82 dimes of heroin. Based on my training and experience, I know that "dubs" is a term for $20.00 bags of narcotics and "dimes" is a term for $10.00 bags of narcotics.

14.     **Defendant Paul HATCHETT**

        **a. Recovery of Cocaine and Drug Money from HATCHETT**

184.    On December 10, 2005, at approximately 1:30 p.m., law enforcement conducted a traffic stop on a vehicle in which Paul HATCHETT was the driver and Individual J was the passenger. A computer check revealed that Paul HATCHETT's driver's license was suspended and that he had no car insurance. Both subjects were ordered out of the vehicle, at which time Individual J reached into his right jacket pocket and told officers that he had a pack of cocaine in his pocket. Officers subsequently recovered 44 bags from Individual J, each containing a white rock substance, which the officers suspected was cocaine. The substance was subsequently sent to the Illinois State Crime Lab for analysis. Testing revealed that the substance was cocaine and weighed approximately 7 grams. A custodial search of Paul HATCHETT revealed $3,507.00 in his jacket pocket. Canine dogs subsequently gave a positive indication for the odor of narcotics on the money.

        **b.      Intercepted Calls Showing HATCHETT's and Larry SMITH's Drug Trafficking**

185.    On or about October 20, 2005, at approximately 6:35 p.m. (Call No. 14077), Larry SMITH used **Target Phone 2** to call Paul HATCHETT at (773) 272-8123.[20] In this call, Paul HATCHETT told Larry SMITH that he wanted to get some

---

[20]During the December 10 traffic stop discussed above, Paul HATCHETT was found to be in possession of a cellular telephone that utilized (773) 272-8123.

heroin, like they had talked about ("I told you, I told you I want to get with your man, tackle shit we talked about man."). Larry SMITH said he already told his brother about it, and after he (Larry SMITH) got the heroin from his brother, he (Larry SMITH) could bring it to HATCHETT ("Yeah, yeah, cause I told my bro man, I'm just waiting on this (unintelligible) to pull up man, and then I can just come bump it you man or something man, cause I ain't moved around or shit man, you know."). Paul HATCHETT asked Larry SMITH if he was waiting on his brother ("You said you waiting on your brother to come back?"). Larry SMITH confirmed and said he should be there in about thirty minutes ("Yeah, soon as he come back man, I'm a hit you back, he should be here bout thirty minutes."). Paul HATCHETT said he also had a revolver for sale if anyone needed one (Alright uh, man I got an old school too, if you know somebody that want one."). Larry SMITH said that he would pass on the word ("Ok I'll pass the word though, you know, I always do that for you, you know?").

186.  On or about October 20, 2005, at approximately 10:02 p.m. (Call No. 14206), Larry SMITH used **Target Phone 2** to call Paul HATCHETT at (773) 272-8123. In this call, Larry SMITH told Paul HATCHETT that his brother was coming to meet with him because he (Larry SMITH) did not want to ride around with narcotics in the vehicle ("Hey bro finna come hollar at you man cause it's kinda…it's kinda delicate for me man to be riding like that this late."). Larry SMITH explained that his brother would know the price for the narcotics that he (Larry SMITH) and HATCHETT had agreed

110

upon ("Yeah...yeah and he gonna, you know what I'm saying, what you all talked about, it's the same, you know whatever me and you talked about it's good you know what I'm saying."). Paul HATCHETT asked if he was ready to do something on that ("Ok, ah so you ready to do something on, on that?"). Larry SMITH said he was ready and he asked if HATCHETT was talking about the van ("Yeah. Like far as on, like what we had talked about (unintelligible) on far, on far as buying the van or something like that?"). HATCHETT asked if he was talking about the van ("Oh you ready for that?"). Larry SMITH said that he was not talking about the van but rather was talking about selling narcotics and making some money ("Naw I'm ready to do something, you know what I'm saying, what we talked about, it's like making some money type of shit."). Paul HATCHETT said making money is what he wanted to do also ("Making some money, right...that's what I'm saying."). Larry SMITH told Paul HATCHETT to meet up with his brother, who would give HATCHETT the details of the plan ("Right, right so whenever you cause uh, you can hollar at bro right quick man and then he gonna tell you something else man you know what I'm saying for me that's why you know?"). Paul HATCHETT asked Larry SMITH how much heroin he could front him and then said they would discuss how much money he would pay Larry SMITH back ("Ok so how much you wanna put up you know what I'm saying, I'll tell you what I can give you back.").

187. On or about December 5, 2005, at approximately 7:46 p.m. (Call No. 4961), Larry SMITH used **Target Phone 2** to call Paul HATCHETT at (773) 272-8123. In this

call, Larry SMITH asked Paul HATCHETT if he was okay with the heroin that he just got ("Hey what up man? You decent right?"). Paul HATCHETT said the person who delivered the heroin to him for Larry SMITH gave him an amount of heroin less than what it was supposed to be ("What up man... man, he handed me something that look like a quarter...gotta put it on the [UI] man."). Larry SMITH explained that he did not have the agreed upon amount and that he was a little short ("No that's.......that's why I was calling you and shit man, he... uh, that's like you know what I'm saying, a little off man...that's like 20, 20 and 5...hello?"). Paul HATCHETT said that he had somebody that wanted the whole agreed upon amount ("I had somebody, I'm gonna try to do the whole thing with, with...just get it off you know?"). Larry SMITH explained that HATCHETT could still make his deal, but Larry SMITH's source did not have any more heroin on him at the time. Larry SMITH went on to say that he would give HATCHETT the rest of the heroin ("They still, you still can do what, you know what I'm saying, that's what he had on him and I ain't wanna you know what I'm saying, like you know what I mean, make you wait a little, you know what I'm saying? That's when I get the others, you know what I'm saying, the little seven dollars from him, you know what I'm saying, I'll just run it to you. It's just, it's, it's like all seven, seven cent, you know what I'm saying?"). Paul HATCHETT said that he would weigh the heroin ("I'm gonna...I'm gonna check it out B.").

112

## 15. Defendant Prince COLEMAN

### a. Recovery of Marijuana from COLEMAN

188.   On October 20, 2005, Prince COLEMAN a.k.a. "Loke" was stopped by CPD officers after a license plate check of his vehicle revealed that he was driving a stolen vehicle. COLEMAN was placed under arrest, at which time COLEMAN told officers he had marijuana in his possession. A custodial check by officers revealed three bags of marijuana in his front pants pocket. At the time of his arrest, COLEMAN admitted that he was a member of the Mickey Cobras. In an effort to cooperate with law enforcement that day, in the presence of CPD officers, COLEMAN made phone calls using his cellular telephone to another individual in an attempt to obtain two firearms.

### b.      Intercepted Calls Showing Prince COLEMAN and Larry SMITH's Drug Trafficking

189.   On September 20, 2005, at approximately 5:30 p.m. (Call No. 2752), Larry SMITH received a call on **Target Phone 2** from Prince COLEMAN using PTT 316010101825502.[21] In this call, Larry SMITH and Prince COLEMAN were talking about COLEMAN owing a total of $9,000 to Larry SMITH for narcotics. COLEMAN

[21]This PTT is linked to phones (773) 494-6410 and (773) 414-6395. During COLEMAN's October 20 arrest, which is described in more detail above, the arresting officers obtained COLEMAN's cellular telephone number ((773) 494-6410) from the phone in his possession. Additionally, agents and officers at the scene of the arrest spoke with COLEMAN and a voice identification was made after monitoring this telephone call and others that utilized these phone numbers and this PTT number. Agents assigned to this investigation also have listened to all calls involving COLEMAN and have determined that he is the individual referred to as "Loke" in intercepted calls.

told SMITH that he did not have any money ("Yeah man, I [UI] got no money man."). Larry SMITH responded that COLEMAN could just give him approximately $9,000 ("Get it from [UI] B, and then when it's time to give me that, just give me, ah, 9650, I mean 8650 B."). Larry SMITH then said that he had already received $350 from COLEMAN and would give him time to come up with the rest of the $8,650 ("I just had to give up some money today man. [UI] man, just get the 350 out of whatever you got and when it's time to holler at me B just bring me the 8650.").

190. Later that day, at approximately 7:56 p.m. (Call No. 2824), Larry SMITH, a.k.a. "Lucky", received an incoming call on **Target Phone 2** from Prince COLEMAN, who was using cell phone (773) 414-6395. In this call, Prince COLEMAN told Larry SMITH that he was able to buy a firearm ("I just basically wanted them demos man. I was trying to see if you actually wanted it."). Larry SMITH asked if the firearm was basically the same as they had bought in the past ("Oh you talking about on like what we normally be getting."). Larry SMITH asked COLEMAN how much he would have to pay for the gun, and COLEMAN replied $150.00 ("A dollar and a half."). Larry SMITH then asked what kind of firearm it was, and COLEMAN replied that it was an automatic ("A M bird."). COLEMAN said there was also a magazine for the firearm ("It got the handle on it and everything man."). Larry SMITH then asked COLEMAN the capacity of the firearm ("How many times dude?"). COLEMAN replied that the firearm held eight cartridges ("Eight."). Larry SMITH told COLEMAN that he did not want to buy the gun

114

right then but would be ready in a couple of days ("Then we'll get that motherfucker in a couple of days or something G, alright.").

191.    On October 3, 2005, at approximately 11:10 p.m. (Call No. 7889), Larry SMITH placed an outgoing call on **Target Phone 2** to Prince COLEMAN at (773) 414-6395. During this call, Larry SMITH warned Prince COLEMAN that police officers were patrolling in the DBs and were watching for persons coming into the projects to purchase narcotics. Larry SMITH directed COLEMAN to be cautious when he came into the area ("Hey, uh, when you know, when you be coming through and shit, be cool. You know what I mean. Cuz Poohnannie was saying that uh, Elroys and shit just finished harassing him and shit, you know what I mean, like they watching motherfuckers coming in and out, you know what I mean."). COLEMAN said that he would be cautious ("Alright, I'll proceed with cautious.").

192.    On October 5, 2005, at approximately 4:54 p.m. (Call No. 8399), Larry SMITH received an incoming call on **Target Phone 2** from Prince COLEMAN, who was using PTT 3160010101825502. During this call, Larry SMITH said that he was going to take care of COLEMAN's narcotics order but that he was waiting on his source of supply ("Yeah, I'm going to take care of that for you in a little while man, a few hours Joe. I gotta wait on somebody to get here."). COLEMAN then asked if he could just get 50 grams ("Man, don't you got fifty or something?"). Larry SMITH replied that he had to

wait for the source and that he would be able to completely fill COLEMAN's order ("Didn't you hear what I just said. I gotta wait for somebody to get here. I got something for you. I got the whole U-Dig for you.").

### 16. Defendant Aaron SMITH

193.    On December 2, 2005, at approximately 1:03 a.m. (Call No. 4153), Duante FALLS, a.k.a. "Shitty," utilizing (773) 746-6579,[22] called Larry SMITH, a.k.a. "Lucky," on **Target Phone 2**. In this call, Larry SMITH told Duante FALLS to take something over to his brother's, Aaron SMITH's house[23] ("Take it over there with Bro man...on the fo."). Duante FALLS replied that he was not going to send anyone to Aaron SMITH's house until Aaron SMITH picked up his phone ("Hey, that's not on me man...like I keep telling you, he is not picking up B, I'm not finna send this man (unintelligible).").

194.    On December 2, 2005, at approximately 1:16 a.m., a CPD officer, while conducting surveillance, observed Aaron SMITH exit the front door of 4405 South Michigan, walk to the front driver side of a Nissan Maxima and lean into the driver's side window of the vehicle for a short period of time. At approximately 1:22 a.m., the officer

---

[22] A DEA agent has taken Duante FALLS' post-arrest statement and recognized the voice using (773) 746-6579 as Duante FALLS.

[23] On October 29, 2005, Larry SMITH was intercepted over **Target Phone 2** (Call No. 17759) speaking with Aaron SMITH, during which conversation Larry SMITH referred to Aaron SMITH as "Bro," which affiant understood to be short for brother.

116

observed Aaron SMITH walk away from the Nissan and towards the front door of 4405 South Michigan. The Nissan was observed driving southbound on Michigan and then northbound on Indiana. The Nissan began driving at a high rate of speed and then drove around and to the area of 2931 South Federal Street, where it eventually came to a stop. A Hispanic male, later identified as Individual K, exited the driver's side of the Nissan and fled on foot. As he was fleeing, an officer observed Individual K throw a clear plastic bag containing a gray powder substance onto the ground. Officers chased Individual K to the area of 2920 South State, where he was arrested and taken into custody. Officers then recovered the plastic bag containing the gray powder substance from the ground. The substance was later submitted to the North Central Lab for analysis. Testing revealed that the substance was Quinine and weighed 13.2 grams. In affiant's experience, Quinine is a cutting agent used to dilute heroin and increase the quantity of the product so more money can be made from heroin sales. The officers subsequently returned to the black Nissan that Individual K had been driving and recovered a plastic bag containing a scale, a strainer, a razor blade, and numerous zip lock packets. In affiant's experience, these packets are often used to package narcotics.

195. Later that morning, Larry SMITH, utilizing **Target Phone 2**, had several conversations with Duante FALLS and Aaron SMITH, during which they discussed Individual K's recent arrest. Specifically, at approximately 1:44 a.m. (Call No. 4154), Larry SMITH received a call on **Target Phone 2** from Duante FALLS at (773) 301-6765.

117

During the call, Duante FALLS stated to Larry SMITH, "Naw cause you know they just popped dude off."

196.    At approximately 1:45 a.m. (Call Nos. 4155 and 4156), Larry SMITH used **Target Phone 2** to call Aaron SMITH at PTT 183*701*3881.[24] During the call, Aaron SMITH and Larry SMITH continued to discuss Individual K's arrest (Larry SMITH: "Dude ain't never come, huh?"). Aaron SMITH replied that he was confident that Individual K did not see what building he came out of prior to their meeting earlier that day ("Hell, what you mean am I cool? I'm straight, yeah, he don't know where I came from, but he...he know the building...but he don't where, you know what I'm saying?").

197.    On February 7, 2005, during a post-arrest statement, Anthony SMITH stated in part that Aaron SMITH brings "bundles" of narcotics into the Dearborn homes.

### a. Intercepted Calls Between Aaron SMITH and Larry SMITH

198.    On or about November 1, 2005, at approximately 8:58 p.m. (Call No. 18744), Larry SMITH, using **Target Phone 2**, placed a call to Aaron SMITH at (773) 567-7778.[25] In this call, Larry SMITH asked Aaron SMITH if he had talked to Israel

---

[24]In several calls to Larry SMITH from this number, Larry SMITH refers to the caller as "Ace." Through voice recognition, affiant knows that the speaker in those calls is the same as the speaker in this call. During a post-arrest statement, Anthony SMITH identified Aaron SMITH by photograph and said he goes by "Ace."

[25] Affiant recognized the voice of the person Larry SMITH was calling as the same person Larry SMITH referred to as "Ace" during other intercepted phone calls.

MOORE (a.k.a. "Pretty Ricky")[26] again ("Hey, did uh…did 'Pretty Ricky' get back with you again?"). After Aaron SMITH said that he had, Larry SMITH asked Aaron SMITH how much money he gave Israel MOORE ("How much did you give him, this lick?"). Aaron SMITH stated $6700 ("67").

199.    On or about October 29, 2005, at approximately 10:41 p.m. (Call No. 17759), LARRY SMITH used **Target Phone 2** to call Aaron SMITH, a.k.a. "Ace", at (773) 567-7778. LARRY SMITH informed Aaron SMITH that they needed to purchase more heroin ("And we need some food man."). Aaron SMITH agreed. Larry SMITH then said they had $12,500 left to spend ("And if I'm not mistaken we got 125 dollars left to spend."). Aaron SMITH then said that they had between $10,000 and $10,500 ("Mmmm, 100-105."). Larry SMITH then agreed to $10,500 ("Alright, 105 then."). Aaron SMITH stated that it was $10,000 or $11,000, including something [UI], and then that it was $11,000 ("Uh uh, 100, 100,110, including short, 110."). Larry SMITH asked Aaron SMITH if he was sure and Aaron SMITH indicated that he was. Larry SMITH then asked Aaron SMITH if he had spent $3500 ("You said you spent 35, you spent 35 right? Lisa spent 35, right?"). Aaron SMITH responded by saying it was $4500 ("C'mon no, 45 man."). Larry SMITH asked Aaron SMITH if he had spent the $4500 on the line of

---

[26]On March 20, 2006, while being interviewed by DEA agents and CPD officers, Israel MOORE said one of his nicknames was "Pretty Ricky."

heroin that he refers to as "Lisa" ("Lisa spent, uh...she spent 45?"). Aaron said yes ("Ya man, that's...").

200. On or about October 22, 2005, at approximately 7:28 p.m. (Call No. 15054), Larry SMITH used **Target Phone 2** to call Aaron SMITH at (773) 567-7778. In this call, Aaron SMITH told Larry SMITH that they had $13,825.00 total, minus the rest of the money that they still had out there. Aaron SMITH said there was still $2500.00 owed to them from the "Lisa and Denise" heroin line ("Hey man, all that is uh...13825 minus everything that's out there man. It ain't came back, still got 25, it ain't came back from ole girl's momma, 25 to one."). Larry SMITH told Aaron SMITH to calm down and wanted to know if all of that money belonged to them ("Listen...listen, would you calm down for a second, Bro? Is that ours...is that our money?) Aaron SMITH informed Larry SMITH that the figure he gave him was everything but that he did not include the $8,000 that they still had out there ("That's...that's everything man...I ain't including that little 8 bucks, no."). Larry SMITH told Aaron SMITH that he had $2,000 ("Well, I got that two...hello?"). Aaron SMITH said the total amount of money in his possession was $13,825 ("Yeah, everything B...everything, everything that's whoever gave me, and I haven't got from her man 13825. And from all my paperwork...").

201. On or about November 1, 2005, at approximately 6:30 p.m. (Call No. 18723), Larry SMITH used **Target Phone 1** to call Aaron SMITH at (773) 567-7778. In

120

this call, Aaron SMITH asked Larry SMITH if Larry SMITH could give him 25 grams of heroin out of the larger bag that Larry SMITH had in his possession ("Hey, can you pour me twenty five...uh...shirts out the bag, B?"). Larry SMITH said he was busy eating ("Damn, I was eating man."). Aaron SMITH then told Larry SMITH that it was important and that the longer they waited, the more money they would lose ("Come on man, time is money, B."). Larry SMITH then agreed to comply with Aaron SMITH's request ("I understand that, but I'm saying...ah...yeah, won't you just...alright one, man.").

### 17.    Anthony SMITH

#### a.    February 2, 2006 Arrest of Anthony SMITH with 21 Bags of Cocaine in the 2930 Building in the DBs

202.    On or about February 2, 2006, CPD officers assigned to the CPD 21st District were patrolling in the DBs. As they patrolled, officers observed Anthony SMITH exiting the building in the DBs located at 2930 South Dearborn Street. Anthony SMITH was carrying a plastic bag that contained several smaller yellow tinted objects. When he saw the officers, Anthony SMITH immediately fled back into the 2930 building. Upon seeing Anthony SMITH flee, officers immediately initiated a chase of Anthony SMITH and observed him throw the plastic bag he was carrying as well as a set of keys into a garbage chute in the 2930 building. Officers recovered the items that Anthony SMITH threw into the garbage chute and ascertained that the bag contained 21 small yellow

121

plastic bags which each contained a rock-like substance that appeared to be crack cocaine. Officers also continued to investigate and determined that the keys were to Apartment 203 in the 2930 building. Next, officers discovered Anthony SMITH in Apartment 203, and placed him under arrest. After he was placed under arrest, officers sent the small yellow bags to the Illinois State Police Laboratory which concluded that the substance in the small yellow plastic bags was cocaine.

203. As discussed in paragraphs 52-56, Anthony SMITH admitted on February 7, 2006 that he was released from prison in November 2005, and that he had been selling crack cocaine in the DBs for the previous three weeks. SMITH admitted that he sold approximately $2,000.00 worth of crack cocaine per day.

### b. April 7, 2006 Stop of Robin JOHNSON and Anthony SMITH and Seizure of 282 Bags of Heroin and Confession by Anthony SMITH

204. On or about April 6, 2006, CS2 advised agents and officers assigned to this investigation that defendant Robin JOHNSON would be processing and packaging narcotics for street sales that evening. Based on this information from CS2, agents and officers initiated surveillance of Robin JOHNSON. That evening, agents and officers followed Robin JOHNSON to a building located at 5723 North Clark Street. After he arrived at the building, Robin JOHNSON exited his vehicle and entered the building. While continuing their surveillance, agents and officers observed Anthony SMITH

(whom agents recognized from previous interviews of Anthony SMITH) arrive and enter the same building. At approximately 1:34 a.m. on April 7, 2006, agents and officers observed Robin JOHNSON and Anthony SMITH exit the building at 5723 North Clark and enter Robin JOHNSON's vehicle. Officers then executed a traffic stop of Robin JOHNSON's vehicle. During a subsequent protective pat down of Anthony SMITH, officers discovered a bulge in Anthony SMITH's front left pants pocket. The officer performing the pat down of Anthony SMITH asked Anthony SMITH if he "was going to be in trouble for this," and Anthony SMITH responded: "Yes." The officer then recovered from Anthony SMITH's pocket the following items: (1) a black plastic bag that contained a white powder substance; (2) a clear plastic bag that contained approximately 150 small red plastic zip lock bags that each contained a white powder substance; and (3) one clear plastic bag that contained approximately 132 small black plastic bags that each contained a white powder substance. Officers then arrested Anthony SMITH. Officers later sent the items to the Illinois State Police Laboratory which concluded after testing a random sample of the items that the substance in the red plastic bags and the black plastic bags was heroin.

205.     After he was placed under arrest, officers interviewed Anthony SMITH. Anthony SMITH was advised of his rights and stated that he understood them and wanted to cooperate. Anthony SMITH then admitted that he sells crack cocaine in the 2920 South State Street building in the DBs. Anthony SMITH stated that he gives "Trigg,"

123

identified by Anthony SMITH and agents as defendant Bernard HOWARD. $2500 per day for permission to sell HOWARD's crack in the 2920 building. Anthony SMITH stated that he sells approximately 300 to 400 $10.00 bags of crack per day from the 2920 South State Street building in the DBs.

### 18. Defendant Anthony BINION

#### a. Recovery of Heroin from BINION

206. On October 4, 2004, CPD officers stopped Anthony BINION's vehicle in front of the DBs. An investigation revealed that BINION was driving on a suspended driver's license. BINION was then placed under arrest. A custodial search of BINION revealed one plastic bag containing suspect heroin inside BINION's coat pocket. The substance was submitted to the Illinois State Police Crime Lab for analysis. Testing revealed that the substance was heroin and weighed .2 grams.

#### b. Statements Regarding BINION's Role in Heroin Distribution

207. On or about August 31, 2005, a source provided information to CPD officers that Anthony BINION a.k.a. "BK" or "Doc" was responsible for delivering heroin to lines for Larry SMITH a.k.a. "Lucky," Bernard Howard, a.k.a. "Trigg" or "RU," and Duante FALLS a.k.a. "Doodoo" or "Shitty." The source said after BINION dropped off a shipment of heroin, he collected the money made from the previous shipment.

208.    On or about April 10, 2006, John TIGER stated in a post-arrest statement that Anthony BINION a.k.a. "BK" was responsible for re-supplying the heroin lines for Larry SMITH a.k.a. "Lucky." According to TIGER, when the heroin lines were near empty in the 2910 South Dearborn building, BINION went to Individual L's apartment and received a supply of heroin from Individual L. After receiving the heroin from Individual L, BINION walked the heroin to 2910 South Dearborn.

209.    On October 11, 2005, at the direction and under the surveillance of agents and CPD officers, CS1 purchased approximately 50 grams of heroin from Duante FALLS a.k.a. "Shitty" or "Doodoo." CS1 and FALLS agreed to meet in the area of Roosevelt and Ashland to conduct the transaction, and surveillance was subsequently set up in this area. Anthony BINION a.k.a "Doc" or "BK" was observed driving Duante FALLS to the location of the transaction in a silver Chevy Impala, bearing Illinois License Plate [license plate number], and waiting inside the car while Duante FALLS got out and met with CS1.

## c. Surveillance of BINION and Larry SMITH Meeting

210.    On December 1, 2005, DEA agents and CPD officers conducted surveillance of Aaron SMITH, Larry SMITH, Individual K, and others regarding a possible narcotics transaction. During the surveillance, at approximately 6:18 p.m., law enforcement observed Larry SMITH a.k.a. "Lucky" exit the front door of 6544 South Champlain. A silver Chevrolet Impala, Illinois registration 6601787 was parked in front

125

of the building. Anthony BINION was surveilled exiting the driver side door of the Chevrolet, and an unidentified female exited the front passenger side of the vehicle. Larry SMITH appeared to converse with BINION and the unidentified female. A short time later, Larry SMITH entered the rear passenger's side of the Chevrolet, BINION entered the front driver's side, and the unidentified female entered the front passenger's side. At approximately 6:21 p.m., the Chevrolet was observed driving northbound from 6544 South Champlain. BINION then drove the vehicle to the area of 67th and Cottage Grove and parked facing southbound by a gas station on Cottage Grove. At approximately 6:30 p.m., BINION drove the Chevrolet to the area of 71st and Cottage Grove. BINION parked the Chevrolet in a restaurant parking lot. A short time later, Larry SMITH entered the front door of the restaurant. At approximately 6:40 p.m., SMITH exited the front door of the restaurant and began talking to Israel MOORE in the parking lot. Larry SMITH and MOORE conversed, and then MOORE walked to the passenger's side of a silver Buick Park Avenue, Illinois registration 223F389. SMITH then entered the rear seat of the Chevrolet. The Buick and Chevrolet then subsequently exited the parking lot. At approximately 6:51 p.m., law enforcement observed the listed Chevrolet park in front of 6544 South Champlain. SMITH exited the rear seat of the Chevrolet and walked to the front entrance of the residence. At approximately 7:18 p.m., law enforcement observed the Chevrolet drive northbound from the residence. Surveillance attempted to follow the Chevrolet. However, the vehicle stopped in the area

of 65th and Champlain, backed up the wrong way on a one-way street, and drove eastbound on 65th Street. BINION then began temporarily stopping in the middle of the street and circling the neighborhood area. At that point, surveillance was terminated.

### d. Intercepted Calls Involving Anthony BINION

211. On or about September 16, 2005, at approximately 2:00 p.m. (Call No. 848), Larry SMITH used **Target Phone 2** to PTT FMI 183*699*1027, a phone used by Anthony BINION.[27] In this call, BINION told Larry SMITH that he had not gone by the stash house (*i.e.*, house where the heroin is mixed and stored) but that he was going there the next day and would have the finished product for Larry SMITH ("We didn't go by the warehouse. I'm going there tomorrow. I'll have them for you tomorrow."). Larry SMITH then asked BINION if BINION could drop off a line of heroin ("Denise") at the DBs ("Hey you think a motherfucker could you drop, can you drop my daughter off tonight? Denise."). BINION confirmed that he could and asked what time ("Yeah, what time?").

212. On or about December 2, 2005, at approximately 11:31 a.m. (Call No. 4198), Anthony BINION used PTT IMSI 316010101808946 to call Larry SMITH on

---

[27] Anthony BINION's identity in this call was established based on, among other things, Larry SMITH referring to BINION in this call by BINION's alias "BK." Through photographic identification, CS2 has identified Anthony BINION and confirmed that he goes by "BK." Additionally on December 8, 2005, a DEA agent participated in taking BINION's post arrest statement. This agent has reviewed the call and confirmed that he recognizes the caller as BINION.

**Target Phone 2.** [28] In this call, BINION asked Larry SMITH what he needed for the mixing of the heroin, namely mixing agent, mixer, and utensils ("Ok Quincy, aspirins, spoon, scraper."). Larry SMITH responded that he did not need the mixing agent, just a scale ("I don need the aspirins B I got aspirin, I need a scale."). BINION then corrected Larry SMITH on the code word for scale ("Ok calculator."). Larry SMITH laughed and BINION told Larry SMITH that he messed up the code words ("Cmon man dis me man."). Larry SMITH said he forgot the code words ("Yeah I know B I forgot the word for that mutha fucka."). Larry SMITH then told BINION that he needed some zip lock packets ("And uh I'm goin need some staplers some staples I need everything except a mutha fuckin umm aspirins BK and some shirts."). BINION said OK and asked what color packets he needed ("Ok some jackets, what color jackets you want?"). Larry SMITH responded that he wanted black packets ("Gimme uhh black...you heard me?"). BINION then told Larry SMITH the size of the packets ("Ok short and wide."). Larry SMITH told BINION that he probably needed to go to a store up north to get the mixer and utensils ("True dat true dat, I need you know lake I need you might have to go up north or something to take that shit for um for that mutha fuckin coffee spoon and that scraper."). BINION replied that he would probably go to 30th Street ("I'll probably go around 30 something."). Larry SMITH then told BINION that he knew where to go ("Oh

---

[28]As discussed above, on December 8, 2005, a DEA agent participated in taking BINION's post arrest statement. This agent has reviewed this call and confirmed that he recognizes the caller as BINION.

ok well you know the spots that why I turned you on to them."). Larry SMITH stated to BINION that he would call Saundra FALLS to let her know to give BINION $200 ("Alright sir, I'm a call ma to let her know to give you the 2 bucks that should be enough for everything.").[29]

213. Later on December 2, 2005, at approximately 2:13 p.m. (Call No. 4255), Anthony BINION used PTT IMSI 316010101808946 to call Larry SMITH on **Target Phone 2.** In this call, BINION told Larry SMITH that the store had no black zip lock packets and asked Larry SMITH if he wanted packets that had black designs on them ("They say they don't have no black. you want something with black designs in it?"). Larry SMITH told BINION not to worry about the packets because he still had some ("No, don't even worry about it. I got some over there."). BINION then asked Larry SMITH if he should buy a bottle of Lactose ("Ok. small bottle of lac?"). Larry SMITH told BINION to get some Lactose and to hurry up because he needed it soon ("Yeah, get some lac there, and uh, I'm waiting on you cause we on the clock."). BINION told Larry SMITH that he was going to buy the Lactose now ("Ok. I'm finna grab it now.").

---

[29]In intercepted conversations between Larry SMITH and Saundra FALLS over **Target Phone 2,** Larry SMITH refers to Saundra FALLS as "Mama."

19.     **Defendant Robbie SYKES**

    a.     **December 8, 2005 Arrest of Robbie SYKES for Possession of 208.1 Grams of Heroin and 30.3 Grams of Crack Cocaine**

214.    On or about December 8, 2005, DEA agents and CPD officers assigned to this investigation initiated surveillance on defendant Anthony BINION based on information derived from intercepted calls over **Target Phone 2** that led agents to believe that BINION was a member of the Mickey Cobras in the DBs. Agents and officers observed BINION driving a gray Chevrolet Impala bearing Illinois license plate [license plate number] with a female passenger later identified as Robbie SYKES in the area of the DBs. SYKES was sitting in the passenger side of the vehicle in the front seat. Officers observed BINION commit a traffic violation while driving southbound on State Street and pulled the Impala over in the area of 2964 South State Street in front of the DBs. BINION advised officers that he did not have a valid driver's license, and officers arrested him.

215.    After BINION was arrested, officers requested SYKES to exit the Impala and conducted a protective pat down of SYKES. Officers discovered in SYKES waist band a black plastic bag. The black bag contained the following items: 574 small, purple zip lock baggies that appeared to contain heroin and 87 smaller knotted plastic bags that appeared to contain crack cocaine. Officers transported SYKES to a CPD facility where

she was read her Miranda rights and agreed to speak with officers. SYKES then made the following statement: "It's not ours, it came from [Individual M's] yard." SYKES then advised officers that she picked up the bag from Individual M's front yard after leaving her house with BINION.

216.    Officers then sent the items they recovered from SYKES to the Illinois State Police Crime Laboratory which tested a random sample of the substance in the small bags. The laboratory concluded that the 587 purple plastic bags contained approximately 208.1 grams of heroin and the 87 clear plastic bags contained approximately 30.3 grams of crack cocaine.

217.    On December 8, 2005, BINION waived his Miranda rights and made a post-arrest statement in which he said that earlier that day, he and Robbie SYKES left Individual M's house, where BINION had observed SYKES pick up the bag containing the narcotics from Individual M's front yard.

218.    On February 6, 2006, Duante FALLS a.k.a. "Doodoo" or "Shitty" was arrested for conspiring to distribute a controlled substance. In his post-arrest statement, Duante FALLS referred to the December 8, 2005 arrest of BINION and SYKES. Specifically, Duante FALLS said prior to the arrests on December 8, he (Duante FALLS)

mixed heroin and told "BK" and "BK's" girlfriend to deliver the heroin he had mixed to the DBs.[30]

### 20.    Defendant John TIGER

#### a.    TIGER's and Rashad HAMILTON's Admissions Regarding TIGER's Drug Trafficking

219.    On April 4, 2005 CPD officers performed a street stop on John TIGER at 2961 South Dearborn and found him to be in possession of $800. During the stop, TIGER said he just started working for Larry SMITH a.k.a. "Lucky," again because he needed money to pay attorney fees for his pending possession of a controlled substance case. Specifically, TIGER said he was currently running two heroin lines in the DBs for Larry SMITH, namely lines called "Renegade" and "Fear Factor." TIGER said these lines were being sold out of 2910 South Dearborn seven days a week, 24 hours a day. TIGER said he had been working the night shift and that his hours of employment typically were from 3:00 p.m. to 9:00 p.m. TIGER further said Larry SMITH paid him $600 per day. TIGER explained that his duties included collecting the heroin lines' profits and making sure the line was always fully supplied for sales.

---

[30]Through photographic identification, CS2 has identified Anthony BINION and confirmed that he goes by "BK." During the December 8 arrest, BINION referred to SYKES as his girlfriend.

132

220.    On February 6, 2006, law enforcement arrested Rashad HAMILTON and others for conspiracy to distribute a controlled substance. During Rashad HAMILTON's post arrest statement, he stated in part that he had witnessed John TIGER purchase heroin from Duante FALLS earlier that day.

### b. Recovery of Heroin from TIGER

221.    Later that day, CPD officers stopped a 1994 Dodge Intrepid for traffic violations. The passenger of the vehicle, later identified as John TIGER, was asked to step out of the vehicle along with the driver. The officers observed TIGER continually reaching inside his waistband. An officer subsequently conducted a protective pat down of TIGER and felt a bulge just below TIGER's rear waistband, which the officer believed to be narcotics. TIGER was then transported to a nearby police station. Once they arrived at the station, an officer asked TIGER to step out of the transport vehicle, and the officer observed that TIGER had a tan powder (suspect heroin) all over his hands, jacket and seat. CPD officers also recovered a clear torn plastic bag from the area where TIGER was sitting in the transport vehicle. The officers recovered as much of the suspect heroin as possible and placed it into an inventory bag. The substance was then submitted to the Illinois State Police Forensics Laboratory for analysis. Testing revealed that the substance was heroin and weighed 1.7 grams.

133

## c. Intercepted Calls Between TIGER and Larry SMITH

222.    On or about October 29, 2005, at approximately 8:05 p.m. (Call No. 17551), Larry SMITH used **Target Phone 2** to call John TIGER at (773) 733-6796.[31] In this call, Larry SMITH asked TIGER when was he going to pay him for the heroin he bought ("Man when are you going to pay me man?"). TIGER told Larry SMITH that he had not paid him because he had not seen him ("I haven't seen you nigger, you been out of town nigger."). Larry SMITH then told TIGER that not seeing him was not an excuse and asked TIGER when he was going to pay him because he needed the money ("That don't mean shit man, when are you going to pay me some of my money, I'm broke."). TIGER told Larry SMITH that he was going to pay him that week ("Soon nigger, real soon this week, how have you been doing?"). Larry SMITH then told TIGER that TIGER lied to him ("You spin me nigger, you spin me man, you know what the fuck you did."). TIGER replied that he did not lie ("No I didn't B, B no I didn't, B now we don't."). Larry SMITH again asked TIGER when TIGER was going to give him some money ("When are you going to give me some of that crust man, I'm [UI] . . . Man fuck you in person."). TIGER said that he wanted to talk in person ("I want to talk in person."). Larry SMITH asked TIGER when they could meet because he needed the money ("OK, ask me a question, answer the question, when I see you, when can I see you in person

---

[31]Telephone number (773) 733-6796 is subscribed to John Tiger, 12110 South Lasalle. Additionally, after John TIGER's arrest on February 6, 2006, TIGER gave law enforcement permission to look at his phone and view his phone list. The review of the phone showed that TIGER's cell phone number was (773) 733-6796.

cause I need some money man."). TIGER said they could meet in the middle of the week and he would have some money for Larry SMITH at that time ("About the middle of this week, I'll have something for you B."). Larry SMITH then asked how much money TIGER was going to give him ("How much?"). TIGER told Larry SMITH that he did not want to say how much because he did not want to give an amount and then not have it ("I can't, I don't want to say and then don't have it, but I have."). TIGER then told Larry SMITH that he would have about $3,000 ("About three."). Larry SMITH asked TIGER if he was sure about the amount ("That sounds like. That at the least, now you hear what you saying, right."). TIGER told Larry SMITH that he would have $2,000 for sure ("Two, two, I'm going to make sure two."). Larry SMITH asked when he would have the money ("Two, what day B?"). TIGER told Larry SMITH about Wednesday or Thursday ("About Wednesday or Thursday B, that's what I said B."). Larry SMITH asked TIGER if he was sure ("You sure?"). TIGER responded that he was sure ("I'm positive B."). Larry SMITH said he was tired of not being paid ("Fuck you, I tired of being pop and it's time for every motherfucker to check in man."). TIGER then told Larry SMITH that he understood ("Yea, I understand it."). Larry SMITH then told TIGER that he was not going to worry about what TIGER owed him because the amount was not much but he needed his money. ("I ain't finning lay it out on you cause your shit small, you know what I'm saying, you ain't a big fish but I just need my crust, you know [UI], coming up.").

135

TIGER told Larry SMITH that he knew that Larry SMITH needed the money ("I know Christmas coming up B.").

### 21. Defendant Joseph BOONE

223.    On May 4, 2006, CS2 met with Joseph BOONE for the purpose of obtaining a heroin sample. Prior to the meeting, law enforcement searched CS2 and CS2's vehicle with negative results for contraband. CS2 was then equipped with equipment to record the meeting. Law enforcement personnel established surveillance at the predetermined meeting place. During the meeting, Joseph BOONE provided CS2 with a free sample of suspect heroin in a clear plastic baggie. The sample was subsequently sent to the DEA Lab for analysis. The substance was heroin and weighed two grams.

224.    During the debriefing after the meeting, CS2 said BOONE arrived at their designated meeting location driving a silver Ford Expedition and subsequently entered CS2's vehicle. According to CS2, during the meeting, BOONE told him/her that he (BOONE) was selling heroin in Peoria, Illinois and that he had to be more competitive in the Peoria area. BOONE further said he was trying to move heroin "in weight," meaning 50 – 100 grams at a time. CS2 further said BOONE told him/her about an unknown female, who he referred to as "the girl," and said that she was providing him with yellow capsules called Mylan 5050, and in return, wanted a cut of his profits. In affiant's experience, Mylan 5050 is used as a mixing agent. CS2 said he/she told BOONE to offer $3,000 for 100 grams of yellow capsules. According to CS2, BOONE also said that he

136

(BOONE) did not know how many times to "step on" his heroin, which affiant understood to mean that BOONE questioned how much mixing agent to use. BOONE also said he would sell CS2 100 grams of heroin for $8,500.00.

225.    On May 17, 2006, CS2 met with Joseph BOONE for the purpose of making a controlled purchase of 100 grams of heroin from Joseph BOONE a.k.a. "Little Maurice." Arrangements were made for CS2 to meet with BOONE at a bar and grill in Chicago, and surveillance was initiated in the area. CS2 was given money to make the purchase and fitted with a personal recording device. At approximately 8:26 p.m., officers observed CS2 exit his/her vehicle and enter the bar. At approximately 8:31 p.m., a CPD officer observed CS2 and BOONE exit the bar and enter CS2's vehicle. At approximately 8:56 p.m., law enforcement observed BOONE exit CS2's vehicle and walk to the front of the bar. BOONE retrieved a set of car keys from an unidentified female and walked to a Pontiac Torrent. Law enforcement then observed BOONE retrieve an object from the Pontiac Torrent. At approximately 8:58 p.m., BOONE walked back to and entered CS2's vehicle. At approximately 9:01 p.m., law enforcement observed CS2 and BOONE exit CS2's vehicle and enter the bar. At approximately 9:51 p.m., CS2 was surveilled exiting the bar and entering his/her vehicle. CS2 was followed back to the meet location by a special agent, at which time the agent recovered the personal recording device from CS2. The agent also recovered a chunk of a brown compressed substance wrapped in plastic, which BOONE had given to CS2. The substance was subsequently

137

sent to the DEA Lab for analysis. Testing revealed that the substance was heroin and weighed 99.2 grams.

226.    On May 24, 2006, CS2 met with Joseph BOONE for the purpose of obtaining a free sample of heroin from BOONE. CS2 said he/she met with BOONE inside the same bar and grill referenced above and discussed the purchase of heroin from BOONE. CS2 told BOONE that he/she wished to purchase some of the heroin with the special mix that BOONE was getting from "the girl." BOONE told CS2 that he was going to get in touch with "the girl" and would let CS2 know when it was a good time to meet. CS2 said BOONE told him the nickname of "the girl". CS2 said BOONE asked him/her about opening a heroin line in the DBs. CS2 said he/she could help BOONE with this. BOONE then handed CS2 a clear plastic bag containing a rock-like substance. BOONE asked CS2 how long it would take him/her to move 500 grams of heroin, meaning to sell the heroin in the DBs. According to CS2, BOONE again indicated that he did not know how many times to step on his heroin and asked CS2 how many times the CS2 could step on the heroin and end up with the same purity as the sample he had just provided CS2. The substance that BOONE provided to CS2 was subsequently sent to the DEA Lab for analysis. Testing revealed that the substance was heroin and weighed .73 grams.

227.    On May 16, 2006, CPD officers arrested Antwan PETERSON for possession of cocaine. During his post-arrest statement, PETERSON related in part that

Joseph BOONE, a.k.a. "Little Maurice," was the supplier of heroin for "Trigg" (Bernard HOWARD) and "Lucky" (Larry SMITH).[32]

### F. Defendant Lukas MCGEE

#### 1. Seizure from McGEE of 431 Bags of Fentanyl Packaged for Street Sale in the 2910 Building of the DBs

228.    On or about January 25, 2006, CPD officers were on patrol in the area of the 2910 South Dearborn Street building in the DBs because officers were aware that the Mickey Cobras street gang was actively selling heroin from the building. At that time, one of the officers observed defendant Lukas McGEE walk into the lobby area of the 2910 building carrying a large plastic bag. Immediately upon observing McGEE with the plastic bag, the officer approached McGEE, advised McGEE that he was a police officer, and directed McGEE to stop so that he could speak with him. McGEE immediately dropped the plastic bag he was carrying and fled up the stairwell of the 2910 building. The officer immediately picked up the bag that McGEE dropped and initiated a chase of McGEE. The officer reached McGEE on the fifth floor of the building as he unsuccessfully attempted to unlock the door of Apartment 502. At that time, the officer attempted to arrest McGEE at the door of the apartment, but he resisted arrest and fled back down the stairs. As he was fleeing, McGEE, who was wearing oversized pants, tripped on his pants as they fell below his waist. McGEE then fell into the wall of the

---

[32]On October 23, 2001, during a post-arrest statement, Andre HASTINGS, identified "Lucky" as Larry SMITH through photographic identification. CS1 has identified Bernard HOWARD as "Trigg" and "RU" from photographic identification.

stairwell as the officer chased him. McGEE was able to make it to the bottom of the stairwell and run toward an adjacent building in the DBs, the 2930 South Dearborn Street building. As he entered the 2930 building with the first officer in pursuit, another officer was able to stop McGEE, and the two officers detained him.

229.    After McGEE was arrested, officers inventoried the plastic bag McGEE was carrying and determined that it contained (1) nine smaller plastic bags that contained a total of 431 small zip lock bags, each containing white powder, and (2) one knotted plastic bag that contained a white powdery substance. Officers then sent these items for testing to the Illinois State Police Laboratory. The Illinois State Police Laboratory tested a random sample of the substance in 129 of the 431 small zip lock bags and determined that the substance was fentanyl, a Schedule II controlled substance. The Laboratory also tested the substance in the knotted plastic bag and determined that it was also fentanyl. The total amount of fentanyl seized from McGEE amounted to approximately 119.7 grams.

## G. Defendant Antonio STIDHUM

### 1.    April 13, 2006 Arrest of Antonio STIDHUM for Felon in Possession of a Firearm and Confession by STIDHUM

230.    In summary, Antonio STIDHUM is a high ranking member of the Mickey Cobras and he owns and controls a heroin line in the DBs. As discussed in paragraphs 25-30 and 68-73 of this affidavit, Sean WINN and Individual C each stated that defendant

140

Antonio STIDHUM is a member of the Mickey Cobras and owns and controls his own heroin line in the DBs.

231.    On or about April 13, 2006, CS2 advised law enforcement that defendant Antonio STIDHUM, a member of the Mickey Cobras, was walking around the DBs carrying a handgun in his waistband and then described the handgun. Law enforcement initiated surveillance in the DBs and observed STIDHUM in front of the building located at 2964 South State Street. Law enforcement then observed STIDHUM engaging in brief conversations with other individuals, and on two occasions, STIDHUM lifted the front of his shirt to exhibit the chrome plated handgun protruding from his waistband.

232.    Officers then observed STIDHUM enter the front passenger side door of a purple Buick Skylark, Illinois registration 8341210, which was parked in front of the 2964 South State Street building. After STIDHUM got into the vehicle, officers observed it drive southbound on State Street. Officers then observed the Buick Skylark make a left turn (east) into a parking lot as they attempted to stop the vehicle. Officers approached the Buick, announced that they were the police, and directed the driver and STIDHUM to raise their hands in the air. STIDHUM then opened the passenger side door and ran northbound through the parking lot towards the DBs while the officers chased him. Shortly after he started to run away from the officers, other CPD officers apprehended STIDHUM. Law enforcement then recovered a Lorcin, 9 millimeter, chrome plated,

semi-automatic handgun, serial L081587 from a holster in STIDHUM's waistband. The handgun contained seven rounds of ammunition.

233.    As discussed in paragraphs 61-69, after he was arrested, STIDHUM provided a complete confession about his heroin trafficking activities in the DBs. In summary, STIDHUM stated that he has supported himself by selling narcotics in the DBs for the last several years. STIDHUM stated that he operates a heroin line in the DBs called "Fear Factor" which is packaged and sold in small peach-colored bags. STIDHUM stated that he has purchased heroin from defendant Larry SMITH, a.k.a. "Lucky," for the past eight months to supply the "Fear Factor" line.

## H.  Defendant Bernard HOWARD

### 1.    Intercepted Calls Showing that Larry SMITH and Bernard HOWARD Engage in Narcotics Transactions

234.    In summary, Bernard HOWARD, a.k.a. "Trigg," is a Mickey Cobra who sells heroin in the DBs and owns and controls his own heroin line. HOWARD and defendant Larry SMITH also engage in narcotics transactions that are described in subsequent paragraphs.

235.    On or about October 24, 2005, at approximately 1:06 p.m. (Call No. 15797), Larry SMITH used **Target Phone 2** to call 183*699*7770, used by HOWARD. In this call, Larry SMITH tells HOWARD that HOWARD owes Larry SMITH money ("You ain't ready yet?" "You know you 95 right?"). HOWARD then asked Larry SMITH why HOWARD owes that much, and Larry SMITH tells HOWARD that HOWARD did

not give the full amount last time Larry SMITH collected money ("Cuz that what the fuck it goes, you didn't give up the last 5 last rip b."). HOWARD then tells Larry SMITH that HOWARD should get a reduced price for the narcotics because the last time Larry SMITH provided them to HOWARD they were no good and it affected the sales on the heroin line HOWARD is controlling ("Man you should have gave us a discount cuz you gave us the bullshit and fucked up our lines.").

236.    On or about October 24, 2005, at approximately 5:54 p.m. (Call No. 16013) Larry SMITH used **Target Phone 2** to call 183*699*7770, used by HOWARD. In this call, Larry SMITH asked HOWARD to provide some heroin for some of Larry SMITH's customers ("Hey can you make sure it's something decent, cause he you know, they want something decent for him?"). HOWARD agreed but said that he (HOWARD) could only get forty grams and that they did not belong to HOWARD ("Alright but I, I only got what [Individual N] gave me, and I already owe him, I can't give his shit away, and it's a 40, and I don't even have them.") Larry SMITH then told HOWARD to try and find something else or it would cost Larry SMITH more money ("I know man, but you got, you got something else then B, cause you know, if we you don't, you know it's gonna cost me way more than what it'll cost me for that B.")

237.    On or about October 24, 2005, at approximately 6:07 p.m. (Call No. 16051), Larry SMITH used **Target Phone 2** to call 183*699*7770, used by HOWARD. During this call, HOWARD told Larry SMITH that HOWARD only had thirty-two grams

143

of heroin. Larry SMITH then told HOWARD that that was not enough heroin ("Man that ain't gonna work man."). HOWARD then told Larry SMITH that HOWARD had twenty-five grams as well as the thirty-two ("And a 25 shit.").

238. On or about October 24, 2006, at approximately 6:14 p.m. (Call No. 16058), Larry SMITH used **Target Phone 2** to call 183*699*7770, used by HOWARD. In this call, Larry SMITH asked HOWARD if HOWARD's guy had the heroin in his possession. HOWARD then told Larry SMITH that he had twenty grams and another twenty-five grams of heroin on him (HOWARD), but had to get the extra thirty-two grams. HOWARD then told Larry SMITH to have his (SMITH's) customer come over ("Naw, I got to tell, I got to get, I , he got that twenty, he got the twenty-five, and I got to get the uh, thirty-two, tell Marcus [Joseph BOONE] to bring it".) Larry SMITH then told HOWARD that he (SMITH) had sent forty grams of heroin down to that location ("Cause I got a forty coming down there man.") HOWARD then asked Larry SMITH how much more his (SMITH'S) customers wanted. Larry SMITH told HOWARD that they wanted the thirty-two grams, the additional twenty-five grams, plus forty more grams of heroin ("No, they just want them three, cause he said they didn't want nothing else, I told him what it is, a thirty-two, twenty-five and the forty.) HOWARD told Larry SMITH that HOWARD did not have the thirty-two grams of heroin on him (HOWARD) ( "Naw, I didn't have the thirty-two on hand, that's what I just said mother fucker, you ain't want a listen, I said once that's ok, I could get it.").

144

2. **Recorded Conversation Between CS2 and Robin JOHNSON in Which JOHNSON States that He is Mixing for Bernard HOWARD's Heroin Lines**

239. On or about April 24, 2006, agents and officers assigned to this investigation conducted surveillance on a meeting between CS2 and defendant Robin JOHNSON. Prior to the meeting, agents searched CS2 and CS2's vehicle for contraband with negative results. Agents and officers then equipped CS2 with recording equipment.

240. According to CS2, Robin JOHNSON picked up CS2 and drove to the Four Seasons, a shop that sells narcotics mixing equipment and packaging equipment at 31st and Ashland Avenue. CS2 stated they entered the Four Seasons and purchased two six-packs of Dormin, $200.00 worth of Quinine, and two bundles of small red and black baggies. CS2 stated that JOHNSON spent approximately $320.00 for the listed heroin mixing and packing materials. Additionally, in a recorded conversation Robin JOHNSON advised CS2 that he (Robin JOHNSON) was currently mixing for Bernard HOWARD's heroin line. According to Robin JOHNSON, HOWARD's lines are called "Renegade."

**I. Defendant Lynn BARKSDALE and His Trafficking Associates**

241. As discussed in paragraphs 2-81, CD1, Joseph CHESS, Individual C, Cynthia THOMAS, Robin JOHNSON, Duante FALLS, Anthony SMITH, Antonio STIDHUM, and Sean WINN stated that Lynn BARKSDALE is a high ranking member of the Mickey Cobras in the DBs who owns and controls heroin lines in the DBs. In addition to the

information provided by confidential sources and the statements by various defendants in this case, additional information described below reflects that Lynn BARKSDALE is high ranking member of the Mickey Cobras in the DBs and trafficks narcotics in the DBs.

### 1. Lynn BARKSDALE sells 50 Grams of Heroin to a Cooperating Defendant on January 27, 2006

242. On or about January 27, 2006, at approximately 2:08 p.m., CD2 acting at the direction of DEA made a consensually recorded telephone call to Lynn BARKSDALE at **Target Phone 8**. During this call, CD2 and BARKSDALE arranged a meeting in which CD2 would purchase 50 grams of heroin from BARKSDALE. Specifically, CD2 and BARKSDALE agreed to meet at a barber shop in the area of Chicago Avenue and Austin Avenue (CD2: "My little buddy and them here, they want to shop snippy-snap." BARKSDALE: "Right, right."). BARKSDALE and CD2 also discussed a price for the heroin, and then they agreed on a price that defendant Rasheed KESHIRO (who had originally provided cocaine to BARKSDALE) had previously set (CD2: "What's the phone number on that?" BARKSDALE: "Ahm, he told me he told you a number so you could get you something earlier.")

243. After this telephone call, agents prepared CD2 to meet BARKSDALE and complete the purchase of heroin they had discussed. Agents searched CD2 and CD2's vehicle for contraband with negative results. Agents then equipped CD2 with a personal recording device and provided CD2 with $4,250 in pre-recorded funds.

244. At approximately 5:27 p.m., agents observed CD2 enter Adams Barber Shop located in the area of Chicago Avenue and Austin Avenue. Approximately 28 minutes later, at approximately 5:55 p.m., agents observed CD2 and BARKSDALE exit the Barber Shop and enter BARKSDALE's vehicle. Approximately 3 minutes later, agents observed CD2 exit BARKSDALE's vehicle, and BARKSDALE drove away. Agents then observed CD2 enter his vehicle and drive to a pre-arranged location to meet with agents

245. At the pre-arranged location, agents met with CD2 and he gave them a plastic bag containing a tan powdery substance which field tested positive for the presence of heroin. Agents then searched CD2 and CD2's vehicle for contraband with negative results and began debriefing CD2. CD2 explained to agents that BARKSDALE told CD2 that he had received a kilogram of heroin from defendant KESHIRO that he was trying to sell and that no other members of the Mickey Cobras knew about the heroin. BARKSDALE also told CD2 that BARKSDALE would sell CD2 as much as CD2 wanted for the same price, but not in the Dearborn Homes because it was too hot (I interpreted to mean too much police pressure.). The recording of the conversation between BARKSDALE and CD2 captured on the personal recording device corroborated CD2's account of the conversation. Specifically, CD2 stated: "Dude been coming in from out of town looking for a little dope. so I said let me call my guy." BARKSDALE responded: "Your man [KESHIRO], he been hooking me up right. The shit he gave me,

147

he gave me a lot of it. He gave me over a book, this is me and you talking. Cause I was moving it, but it got hot in the PJs. So, I'm moving whatever I can, so you can buy it for what he's charging. I just want to get those people they money back. Any one you know, charge them what you want, I'll just charge you what he's charging you." (I believe that "a book" in this context means one kilogram of heroin.)

### 2. Intercepted Calls Show BARKSDALE's Drug Trafficking and Concern About Surveillance by Federal Agents

246. Pursuant to court authorizations, DEA intercepted communications over **Target Phone 8**, used by Lynn BARKSDALE. Below are examples of intercepted communications and other facts learned in the investigation.

247. On or about March 7, 2006, at approximately 10:22 p.m. (Call No. 115), agents intercepted an outgoing call from BARKSDALE on **Target Phone 8** to a UM using (773) 934-7201. BARKSDALE advised the UM that he was going to obtain 900 grams of heroin ("But look though, right . . . dude got nine bucks. . . . just for me.") Additionally, the UM told BARKSDALE about possible surveillance by federal agents ("Man, just shook me dude . . .dude look like them people . . . I came back to the car like I'm up . . . I rolled around the block and found my man . . . I'm like, I'm gone Joe, this mark look like he the motherfucking Feds, he don't look like he finna shake no move."). BARKSDALE then questioned: "You say he was in a van?" The UM responded: "Naw, the nigga in the van look like Moe . . . it's a silver LeSabre or something." BARKSDALE

148

then asked: "Back there?" The UM responded: "It was sitting on the other side under
the other part, the other building under the tracks . . ."

248.   On or about March 9, 2006, at approximately 2:26 p.m. (Call No. 232),
agents intercepted an outgoing call from BARKSDALE on **Target Phone 8** to a UM.
BARKSDALE advised the UM that he wanted to purchase narcotics for further resale
("Yea man, I'm trying to go to that other side of the street, you know what I'm sayin',
because I got people."). The UM responded: "I don't know which one though, I'm
confused on the side you tryin' to get on." BARKSDALE answered: "The side we was
talkin' about." The UM then asked: "The, my cigarettes?" BARKSDALE answered:
"No, hell no." The UM then asked: "The side we started out on?" BARKSDALE
answered that he was attempting to purchase nine ounces of cocaine from the UM
(BARKSDALE: "Thirteen, three, the three if you was saying thirteen, three, to somebody,
just the three, not the thirteen." UM: "You tryin' to get in the middle of one, or a whole
one?" BARKSDALE: "Probably, like I was tryin' to go on the ninth, on the nine."). (I
believe based on my training and experience that the word "three" is code for "cocaine"
because "C" is the third letter in the alphabet.)

249.   On or about March 11, 2006, at approximately 5:49 p.m. (Call No. 348),
agents intercepted an outgoing call from BARKSDALE on **Target Phone 8** to defendant
Rasheed KESHIRO. During this call, KESHIRO advised BARKSDALE that he had a
quantity of narcotics (most likely heroin) available for BARKSDALE to purchase

149

(KESHIRO: "I was gonna ask you man, see if you, you know, what if you got something, you know what I'm saying? . . . Cause man, you know, we doing something in a couple of days, this man been here for three days now.").

### 3. Intercepted Calls Corroborate Information that BARKSDALE and Individual A are High Ranking Members of the Mickey Cobras ¯

250.    As discussed in paragraphs 2-8,18-33, and 61-69 earlier in this affidavit, CD1, CS2, Joseph CHESS, Individual C, Cynthia THOMAS, Anthony SMITH, and Antonio STIDHUM said BARKSDALE and Individual A are high ranking Mickey Cobras who own and operate heroin lines in the DBs. In addition to the information provided by confidential sources and the statements by various defendants in this case, additional information described below reflects that Individual A is a close associate of James AUSTIN and assists the Mickey Cobras in trafficking heroin in the DBs.

251.    On April 27, 2006 at approximately 9:01 p.m., an outgoing call from **Target Phone 8** to Individual A at (773) 369-9490 was intercepted (Call No. 5140).[33] During the call, Individual A and BARKSDALE were joking about their gang affiliation and the fact that they were Micky Cobras and not members of the Gangster Disciples (Individual A: "I could have been a GD and ran the world."). Later in the conversation,

---

[33]The identification of Individual A as the individual on telephone (773) 369-9490 is based on, among other things, the following: in a call on April 28, 2006, at approximately 4:38 p.m. (Call No. 5257), BARKSDALE advised Individual A that there was an investigative alert that had issued for "you, me, and Jaymo." As described in paragraph 263, officers caused a phony investigative alert to issue for BARKSDALE, Individual A, and James AUSTIN, aka "Jaymo" for the purpose of furthering the investigation.

Lynn BARKSDALE and Individual A talked about a murder that had occurred in the DBs and the likelihood of a federal investigation into it (BARKSDALE: "You killed that one nigger man, always your boy." Individual A: "That's gonna come out one day cause somebody gonna tell the feds and they gonna investigate."). Individual A said he would not discuss the murder with police ("No sir, ain't nothing about [Individual A] telling today everybody knew he ain't gonna do no telling."). The two men then discussed the fact that they believed Mickey Cobra King James AUSTIN ordered the murder (Individual A: "Man, big Jaymo, I don't know who killed him but I heard they had something to do with it. . . . Jaymo. The little old nigger." BARKSDALE: "Oh yeah, I heard that too, standing on 27th and the Dearborn Homes. Yeah, they call him JJ? Oh yeah, he ordered that hit.").

### 4. Tashika SLEDGE's Assistance of BARKSDALE's Drug Trafficking

252. Tashika SLEDGE is a Chicago Police Officer who has aided and abetted members of the Mickey Cobras in their drug trafficking activities, sometimes using her position as a CPD officer knowingly to further the objectives of the conspiracy. CPD records show that throughout the time period of the conspiracy, SLEDGE was assigned to CPD's 21st District, the CPD police district that encompasses the DBs and in which the Mickey Cobras are known to conduct much of its drug trafficking.

### a. SLEDGE's Relationship With BARKSDALE

253.    SLEDGE has a personal relationship with Mickey Cobras board member Lynn BARKSDALE. On more than five occasions, law enforcement officers conducting surveillance as part of this investigation have observed BARKSDALE driving a 2005 GMC Envoy that, according to Secretary of State records, is registered to SLEDGE. Interception of **Target Phone 8** showed SLEDGE's daily communications with BARKSDALE through her cellular telephone, (773) 491-2415, a number she has listed on CPD personnel records. Physical surveillance of BARKSDALE and SLEDGE confirmed that BARKSDALE is a frequent guest and resident at SLEDGE's residence, 12101 South Elizabeth Ave., and on March 26, 2006, law enforcement observed BARSKDALE using SLEDGE's GMC Envoy to drive SLEDGE to her work at the 21st District Police Station.

### b. SLEDGE's Availability as Drug Distributor

254.    On April 1, 2006 at approximately 12:50 p.m., BARKSDALE used **Target Phone 8** to call Individual O at (574) 217-5100. (Call No. 2651) During this call, BARKSDALE gave Individual O directions to Tashika SLEDGE'S residence so that Individual O could come there and pick up marijuana from BARKSDALE. BARKSDALE informed Individual O that he had 2 pounds of marijuana for him, and if BARKSDALE was not at home, his girl (SLEDGE) would give him the marijuana. Individual O: "I want to call you give me the house number." BARKSDALE: "My fault,

152

my fault, it's on 121st and Elizabeth." Individual O: "I know [Individual X] had told me the address. He didn't know which house. I'm like damn. shit don't just cut out." BARKSDALE: "Last one on the block." Individual O: "By the alley or something?" BARKSDALE: "12104" Individual O: "I gotta find somebody to watch my shit real quick and I'll probably cut out." BARKSDALE: "Alright. if I don't be here, my girl will be here. She gonna be here. same difference." Individual O: "Huh?" BARKSDALE: "I said if I don't be here, my girl be here. It's the same difference." Individual O: "What you said you had like 2, 3?" BARKSDALE: "It's two of em here." Individual O: "Call you, let you know when I'm leaving."

### c.   **SLEDGE Assists BARKSDALE in Meeting Drug Associate**

255.   Further intercepted calls show that BARKSDALE and Individual O changed their plans and instead arranged for BARKSDALE to travel to meet Individual O for the delivery of marijuana. At approximately 2:25 p.m. on April 1, 2006, (Call No. 2718), BARKSDALE (using **Target Phone 8**) asked SLEDGE ((773) 491-2415) for directions to a location in Gary, Indiana. Surveillance officers then observed BARKSDALE leave SLEDGE's residence while carrying a package. The agents followed BARKSDALE as he drove SLEDGE's Envoy from SLEDGE'S residence to Gary, Indiana, and shortly after 3:00 p.m., the agents observed BARKSDALE deliver the same package to an individual now know as Individual O. After Individual O drove away from the meet. law enforcement officers intercepted a call at approximately 3:14 p.m.

153

(Call No. 2738) between Individual O and BARKSDALE. During the call, officers effected a traffic stop of Individual O in Gary, Indiana. In the beginning of the call, Individual O and BARKSDALE discussed the strong smell of the marijuana and their efforts to conceal the smell (BARKSDALE: "Smell coming out of there. . . . Yeah, you know what I am saying I'm like damn how the fuck is it coming out of this. I tried everything you know what I am saying I doubled them up and everything this shit crazy."). BARKSDALE answered: "Get the fuck out of here." BARKSDALE then asked: "You got it put up?" Individual O responded: "Yeah it's in the trunk." The two men then discussed the fact that Individual O was being pulled over by law enforcement ("Mother fucking, ahh, Police pulling me over. . . ."). During the traffic stop of Individual O, officers recovered the package that BARKSDALE had given to Individual O, and found the package to contain approximately two pounds of marijuana. A fully loaded .45 caliber handgun was also recovered from Individual O. The officers then arrested Individual O.

256. Minutes after Individual O was pulled over, at approximately 3:17 p.m., BARKSDALE used **Target Phone 8** to call SLEDGE at (773) 491-2415 (Call No. 2738). During this call, BARKSDALE and SLEDGE discussed the traffic stop and arrest of Individual O, and BARKSDALE expressed his concern that law enforcement may have observed his meeting with Individual O. BARKSDALE said to SLEDGE, "Man you ain't fin to believe this." SLEDGE replied, "What?" BARKSDALE responded, "This

154

nigger just got pulled over after he left me." SLEDGE asked, "He was on the highway and he got pulled over?" Later in the conversation, BARKSDALE said, "Ain't that some shit? All the time I'm like, 'man, Joe, I hope nobody watching that place we just met at.'" SLEDGE asked, "You think so?" BARKSDALE replied, "If they was, they would have come straight, they would have to grab both of us right?" SLEDGE replied, "Yeah, really. You didn't see nobody around there?" BARKSDALE then described his meeting with Individual O in a manner consistent with what the surveillance officers had observed, and he told SLEDGE how he left the two pounds of marijuana on the floor of Individual O's vehicle ("So I was chillin' in the car with him and then when I got out of the car with the stuff I was like, 'You can look on the front seat, on the floor, on the floor of the front seat,' and, like, I went back into the restaurant and got the food, told him I'll holler at him later. He put it in his trunk so what reason would they have to go in his trunk?"). SLEDGE responded, "Um-hum."

### d. SLEDGE Hides Drug Paraphernalia for BARKSDALE

257.    On April 26, 2006, SLEDGE assisted BARKSDALE's activities by hiding narcotics paraphernalia so that law enforcement officers would not discover them if they searched her residence. Specifically, interception of **Target Phone 8** showed that at approximately 5:11 p.m. on April 26, 2006, BARKSDALE called SLEDGE (Call No. 4927) to alert her that he had been stopped by the police while driving her GMC Envoy. He also told her that the police had found her police badge in the car, and he expressed

155

his concern that law enforcement might search her house on Elizabeth Ave., where he had been residing. BARKSDALE said, "They had no right to pull me out of the car, then I see they had your badge. I didn't ever know your badge was in here." SLEDGE told BARKSDALE that he should have stayed in the car, telling him, "You could have said, 'Why am I getting out of the car? Why is the car stolen if I got keys?'" Later in the conversation, BARKSDALE asked SLEDGE to remove from her residence a black bag and discard it where law enforcement would not find it during a search. BARKSDALE said, "The black bag, you'll see you gotta search the black bag. Why don't you take that and throw it in the garbage down the street from us." SLEDGE replied, "Okay." BARKSDALE said, "They didn't ever write down the address that I know of. They were searching a lot, so I'm being on the safe side." At approximately 8:39 p.m., officers observed SLEDGE exit her residence on Elizabeth Ave. carrying a white plastic garbage bag. SLEDGE walked to an alley at 12100 South Racine, one block from her residence, and dropped the bag next to a garbage can. Officers then observed SLEDGE look up and down the alley, pick up the bag again, and place it into a garbage can at the rear of the residence at 12100 South Racine. Officers maintained observation of the garbage can while SLEDGE left the area, and the officers then recovered the white bag from the garbage can and found that it contained a smaller black plastic bag containing several small zip-lock "dime bags" of the type that I know to be commonly used for packaging marijuana.

156

e.   **SLEDGE Uses Police Powers to Leak Law Enforcement Information**

### i.  Use of CPD Databases for Antonio SHANNON

258.   On or about April 13, 2006, officers conducted a search of Antonio

SHANNON's residence at 7307 South Emerald in Chicago, Illinois, as more fully

discussed in Paragraph 114. During the search, law enforcement officers found CPD

computer-generated photographs and documents pertaining to two individuals currently

incarcerated on narcotics charges, and NCIC/LEADS printouts on the same two

individuals. Officers also found a .9 millimeter handgun and narcotics packaging

materials. I know from my experience as a CPD officer that these CPD and

NCIC/LEADS photographs and documents contained information from a CPD database

and were printed using a CPD computer and printer. Use of the CPD database and printer

requires the computer user to enter into the computer his or her specific CPD user name

and password. CPD departmental records show that Tashika SLEDGE's user name and

password were used to print the CPD photographs and documents recovered during the

search.

259.   A court-authorized interception of a May 1, 2006 telephone call (Call No.

3857) between Antonio SHANNON using (**Target Phone 10**) and BARSKDALE (using

**Target Phone 8**) confirms that SLEDGE printed and disseminated this information to

Antonio SHANNON. The call occurred on the day that SLEDGE was relieved of her

police powers and badge and told that she was being investigated internally by CPD for

157

misuse of her CPD computer. During the call. BARKSDALE asked Antonio SHANNON if Antonio SHANNON had destroyed the police documents that SLEDGE had given to BARKSDALE and BARKSDALE had given to Antonio SHANNON ("Hey man you, you didn't do what I asked you to do with that little piece of paper?"). Antonio SHANNON said. "Yeah. why do you say that?" BARKSDALE said that SLEDGE's supervisors had confronted SLEDGE about SLEDGE giving out confidential police reports ("Cause uhh. her superiors came to see her, say she gave police information out."). Antonio SHANNON replied that he had definitely destroyed the documents ("I definitely did that. Hell yeah.....Heck yeah, I did that. Straight did it [UI] straight in the uhh sink and water and everything."). BARKSDALE said, "Okay, uhh, [UI] you know, the only ones that know that is me and, me you and dude right?" Antonio SHANNON said, "Yep." BARKSDALE replied, "Alright, that's good."

### ii. Use of CPD Database and NCIC/LEADS to Check Status of Mickey Cobras

260. A check of CPD records shows that SLEDGE has used the CPD databases and NCIC/LEADS databases at various times to determine the law enforcement status, including outstanding warrants, of members of the Mickey Cobras. For instance, SLEDGE has used the databases to check law enforcement records pertaining to Lynn BARKSDALE, Johnny SHANNON, and James AUSTIN. CPD records also show that on March 4. 2006. SLEDGE used CPD databases to check records pertaining to 120 individuals. many of whom are members or associates of the Mickey Cobras, including

158

BARKSDALE, Johnny SHANNON, James AUSTIN, Saudra FALLS, Antonio SHANNON, Tyrone WALLACE, and Individual A.

### iii. Use of CPD Database to Conduct Countersurveillance

261.    On April 23, 2006, SLEDGE used her position as a police officer to assist the Mickey Cobras by helping BARKSDALE identify a vehicle that had been following him. Specifically, law enforcement interception of **Target Phone 8** shows that at approximately 9:58 p.m. (Call No. 4583), SLEDGE called BARKSDALE at **Target Phone 8** using her cellular telephone (773) 491-2415. During the call, BARKSDALE expressed concern to SLEDGE that he was being followed by a van, and provided SLEDGE with the license plate number of the van. SLEDGE, while in police uniform and on police duty, used police resources to trace the registration of the van's license plates. Unbeknownst to BARKSDALE or SLEDGE, the van was occupied by an undercover CPD officer who was conducting surveillance on BARKSDALE. During the call, BARKSDALE told SLEDGE, "I wanna try come fuck with this, ah, van. I wanna know who in there." SLEDGE responded, "It don't give a name." BARKSDALE then asked SLEDGE to drive over in her police vehicle and stop the van: "You can't come around and – man, you look suspicious – step out?" SLEDGE asked BARKSDALE where the van was and, after BARKSDALE provided the location, SLEDGE agreed to come stop the van, although she would have to leave her assigned police district to do so. SLEDGE asked, "Where is it at?" BARKSDALE answered, "On 33rd, right off King

159

Drive, that building 400 East 33ʳᵈ Street." SLEDGE responded, "That's the second

district." BARKSDALE asked, "Who gonna know?" SLEDGE answered, "Nobody

going to know. It gonna take me a minute to get over there 'cause I be at Hyde Park.

Give me about 20 minutes and I could check it." SLEDGE then told BARKSDALE to

follow the van, saying, " Follow them now." BARKSDALE said, "Alright, let me catch

them, where you at?" SLEDGE responded, "We had a job, that's why we're on 53ʳᵈ, I got

paper." Agents monitoring the conversations called and alerted the CPD officer that

BARKSDALE was trying to follow him/her in the van. Surveillance was terminated and

the officer left the area. At the end of the conversation, SLEDGE again told

BARKSDALE to whom the vehicle was registered, and BARKSDALE expressed his

concern that the van might be occupied by law enforcement. BARKSDALE said, "You

say it's company owned?" SLEDGE responded with the name under which the van was

registered, noting that there was only a post office box listed for the address.

BARKSDALE said, "Man, that could be...you know who that could be, huh?" SLEDGE

responded, "At first I was thinking construction company, but since you said that, now I

don't know."

262. Similarly, on a second occasion, on or about April 27, 2006, SLEDGE used

CPD resources to determine the identity of a car that BARKSDALE believed was

watching him while he was walking in the area of SLEDGE's residence. The SUV was

in fact an undercover police surveillance SUV. The officers in the SUV noticed that

BARKSDALE looked in the direction of the SUV several times. CPD records show that SLEDGE, while on duty that day, checked a number through CPD databases, which license plate was one digit different from the SUV's license plate number. Court authorized interception of **Target Phone 8** (Call No. 5091) shows that at the same time that SLEDGE was running the license plate through the database, she was discussing it with BARKSDALE and expressing her surprise that the license plate belonged to a residential couple rather than law enforcement. Specifically, at 5:59 p.m., BARKSDALE used **Target Phone 8** to call SLEDGE. SLEDGE asked BARKSDALE to repeat the numbers of the license plate ("Hey, what's that plate again?") BARKSDALE read off the license plate number to SLEDGE ([license plate number]). SLEDGE told BARKSDALE that she had the results of the computer inquiry and that the license plate came back to a Toyota ("That's coming back to a different car. That can't be right... It's coming back to a Toyota."). SLEDGE read off the plate number again to BARKSDALE to confirm the plate number ("You said [license plate number]). BARKSDALE was concerned about the fact that the plate was registered to a Toyota rather than the vehicle he saw with that plate ("That's crazy right. That's what it was. What you think? It's coming back to a Toyota?"). SLEDGE told BARKSDALE that the plate was registered to a husband and wife ("Yeah, to a husband and wife."). BARKSDALE wanted to know where the plate was registered ("Where at?"). SLEDGE went back to the computer and pulled up the registration again and read the registration to BARKSDALE ("Let me pull it back up.

161

Okay. [license plate number]. The area code is 62035. Whatever that is."). SLEDGE

then read the first and last names of the individuals to whom the license plate was in fact

registered. BARKSDALE said that somebody had taken the plates from another vehicle

("I'm, I'm on to that type of shit."). SLEDGE gave BARKSDALE the name of the town

where the plate was registered ("Godvrey, I guess it's Godfrey, Illinois."). BARKSDALE

was still unsure of the plate registration ("Yeah, that's crazy."). SLEDGE said that she

thought that someone had stolen another person's plates (They probably just took

somebody's plates."). BARKSDALE wondered who could have done that ("yeah, but

who is they?"). SLEDGE offered an opinion as to how the plates wound up on the

vehicle ("They probably was found, a husband or wife or something. It was found,

somebody or they was meeting somebody and they didn't show. Why?"). BARKSDALE

was still concerned about the registration ("No, I was just asking Shit, I don't know.

Sounds like shit to me."). SLEDGE agreed with BARKSDALE that the registration on

the plate was suspicious because the registration was not similar to other license plates

which she had run for BARKSDALE ("That's what I think cuz they ain't come back like

the other ones did....These the actual real ones."). BARKSDALE believed that the

persons in the van may have been looking at other persons but he would keep a lookout

for that vehicle in case he saw it again ("Right. So shit, they probably on some bullshit

with somebody but hey. I just be what I'll do is, I'll be checking it out like if they pop up

again one day. So I just stick around and see if they pop up one day. You know what I'm saying?"). SLEDGE agreed with BARKSDALE.

### iv. SLEDGE Reveals Investigative Alert

263. On April 28, 2006, SLEDGE used her position as a police officer to provide information to BARKSDALE, James AUSTIN, and Individual A, concerning a CPD investigation of a murder related to the Mickey Cobras. That day, SLEDGE was working the afternoon shift in CPD's 21st District, when the CPD watch commander for SLEDGE's shift informed the officers on duty that Lynn BARKSDALE, James AUSTIN, and Individual A were the subjects of a CPD investigative alert: they were wanted for questioning pertaining to an old murder investigation. (In reality, the investigative alert was phony and had been arranged by agents and officers participating in this investigation.) Interception of **Target Phone 8** showed that minutes after being informed of the investigative alert, SLEDGE called BARKSDALE and relayed the information to him. Specifically, at approximately 4:03 p.m. and 4:04 p.m. that day (Calls 5236 and 5237), two calls were intercepted between SLEDGE and BARKSDALE over **Target Phone 8** and (773) 491-2415. SLEDGE said, "Call me back in like fifteen minutes cause we about to have roll call." BARKSDALE asked, "Is it important, real important?" SLEDGE responded, "Yes." BARKSDALE called SLEDGE a short time later, during which conversation SLEDGE said, "I'm gonna have to tell you. You got an investigative alert." BARKSDALE asked, "Who?" SLEDGE responded, "You and, ah, what's that

163

guy? The one with the braids?" BARKSDALE the referenced James AUSTIN, asking, "The one with the 'J'?" SLEDGE responded, "Yeah." BARKSDALE asked, "Why?" SLEDGE said, "They want to, you don't have a warrant, it's just that they want to ask you about some murder." BARKSDALE said, "Oh fuck, man." SLEDGE said, "So it's like, whatever they stop you for, like if you get stopped for anything, they have to ask you to come in 'cause you don't have a warrant. But they can lock you up for anything and then they can make you go in." BARKSDALE responded, "Oh, wow, okay, alright."

264.    At approximately 4:20 p.m. that same day in another intercepted call (Call No. 5245 on **Target Phone 8**), SLEDGE called BARKSDALE and provided further information on the investigative alert. She told him the date that the investigative alert had been issued ("Hey, it's been out since the 26th of April."). When BARKSDALE asked for which murder the investigative alert had been issued ("Do they say which one it for?"), SLEDGE responded, "I can go look." BARKSDALE then said, "Check, man," and SLEDGE responded, "Alright. Give me a second. I'm trying to get it. It's in the station." BARKSDALE then said that he was going to hang up and call SLEDGE using a different phone ("I'm gonna call your phone from a different number.").

265.    On April 28, 2006, at approximately 4:38 p.m. (Call No. 5257), agents intercepted an outgoing call from **Target Phone 8** to Individual A at (773) 369-9490. During this call, BARKSDALE stated: "Worst news in the world for you man." Individual A: "What?" BARKSDALE responded: "This shit is so fucked up. I'm tired

of this shit, man. I swear." Individual A: "What's wrong?" BARKSDALE: "Nigger, we

got investigative alerts for murder on us, man." Individual A: "What?" BARKSDALE:

"Right here another one. I don't even know nothing about it. They saying they got an

investigative alert for me, you and Jaymo." Individual A: "Murder who?"

BARKSDALE: "I have no idea." Later in the call, Individual A asked BARKSDALE if

James AUSTIN knew about the alert ("Hey, do dude know?"). BARKSDALE said he

would call Johnny SHANNON to find out if James AUSTIN knew ("No, I'm fittin' to call

and see. I don't know his number. I'm gonna call Boo and see.").

266.    On May 1, 2006, the day that SLEDGE was relieved of her police powers

and badge by the Internal Affairs Division ("IAD") and told that she was being

investigated for misuse of her CPD computer, agents intercepted an outgoing call from

**Target Phone 8** to Individual A at (773) 369-9490 (Call No. 6012). During this call,

BARKSDALE discussed SLEDGE's visit from IAD: "Man, motherfucking um . . . IAD

came to see Shorty, man. . . . Internal Affairs." Individual A stated: "Yeah?"

BARKSDALE responded: "They say for leaking information." Individual A then stated:

"Damn, aw man, the fucked up part is they gone be watching tip." BARKSDALE

responded: "I already know."

165

### 6. BARKSDALE's Trafficking Activities with Arthur HEARON

#### a. Seizure of Heroin from HEARON

267.     On May 9, 2003, Chicago Police Officers were in the Dearborn Homes building at 2910 South Dearborn. At that time, the officers observed a man, later identified as HEARON, in the stairwell. The officers saw that HEARON was holding a clear plastic bag which contained numerous smaller plastic bags. Upon making eye contact with the officers, HEARON fled. The officers were able to stop HEARON and recover the plastic bag. They found it to contain 23 individual bags of a substance believed to be heroin. Twelve of the bags were tested by the Illinois State Police Division of Forensic Services and found to contain a total of 5.3 grams of heroin. The remaining bags were not tested.

#### b. Individual C Confirms HEARON's Role

268.     On March 9, 2004, Individual C gave a post-arrest statement to police in which he said that "Lil Art" (whom he later identified through photographs as HEARON) assisted "Montana" and "RaRa" in the operation of heroin lines named "Weewee" and "Enterprise". Through photographs shown to him, Individual C identified "Montana" as Antonio SHANNON, and "RaRa" as Individual P. Individual C said that HEARON "ran bundles" for the heroin lines, which in my experience means that HEARON would pick up packets of prepared heroin and take those packets from the point of manufacture to the locations of distribution and sales.

166

### c. Intercepted Calls between HEARON and BARKSDALE Concerning Sale of Heroin

269. Interception of **Target Phone 8** showed that from on or about March 3,
2006 through May 2, 2006, Lynn BARKSDALE and HEARON communicated by
telephone, with BARKSDALE using **Target Phone 8** and HEARON using telephone
numbers (312) 949-1724, (312) 954-5004 and (773) 354-7532. Agents identified
HEARON as the participant in these phone calls through the subscriber information for
(773) 354-7532, which is in HEARON's name, and through HEARON identifying
himself on (312) 949-1724 and (312) 954-5004. It is clear from listening to the voice on
the recordings that one person (HEARON) is using all three phones. Additionally, CS2,
who is familiar with HEARON's voice, has identified HEARON's voice on other
recordings.

270. On April 14, 2006, BARKSDALE called HEARON on (312) 949-1724
(Call No. 3121), and told HEARON how much cut or mix to add to the heroin prior to
sale. During the conversation, the two used a code to discuss the mixing proportions.
BARKSDALE asked HEARON how the mixing of the drugs was proceeding ("...what
address they was talking about?") and HEARON told him they were just beginning to mix
the drugs ("Madison and State"). BARKSDALE directed HEARON to dilute the heroin
with the mix to increase the amount to be put on the street for sale ("Ok, so take 15th
Street then" and "That should be able to go on 20th right?"). BARKSDALE then told
HEARON that he should put more mix into the heroin because they needed to make more

167

money from the heroin that they had ("Put them out there on 4th street." "Don't go on 3rd like you was. go on 4th street cause we need it."). After talking about putting the drugs out for sale, BARKSDALE requested payment for the heroin ("Well then send me some money."). He told HEARON to come and deliver some of the owed payment before he (HEARON) put the drugs on the street for sale ("Why don't you hit me before you even go out there man, like send me like 250.") By asking for "250". BARKSDALE was demanding payment of $2500.00. He then told HEARON that he really needed about $3000.00 for what he would continue to supply. ("Really, really yeah. cause it's going to cost to send it, really I need like three.") $2500.00 or $3000.00 is within the range of market prices for approximately 25-30 grams of heroin.

271.     On or about April 18, 2006, BARKSDALE called HEARON at (773) 354-7532 (Call No. 3645). In this call BARKSDALE instructed HEARON to collect money owed to BARKSDALE. BARKSDALE said, "Yeah, hey, why don't you put together whatever you got ready for me?" and "How long is it gonna be before you get to do it?" HEARON replied, "I can do it right before I go to school." BARKSDALE asked. "What time do you go to school?" HEARON replied, "Two-thirty," and added. "But I can ...start now though. Just give me like ten minutes."

272.     On or about April 28, 2006, BARKSDALE used **Target Phone 8** (Call No. 5362) to call HEARON. In this call, HEARON told BARKSDALE that he (HEARON) needed additional cut for the heroin (HEARON: "Hey, but ahh, I fittin to tell you if I use

168

you bleach to wash my shoes, won't be none left to wash the ahh, god damn floor."
BARKSDALE: "Oh, yeah." HEARON: "Remember what I was telling you about and
shit." BARKSDALE: "Yeah, yeah, ok, just ahh, ahh the first."). BARKSDALE then
said that he would get more cut for HEARON ("On first you what, what I am saying, then
just go get some of that tomorrow, go get you more bleach tomorrow.").

273. On or about April 29, 2006, BARKSDALE called HEARON (Call No.
5563) regarding HEARON picking up packets of heroin from another individual.
BARKSDALE questioned why HEARON wasn't following his directions ("Why don't
you be listening to me man?"). BARKSDALE later asked HEARON if HEARON knew
where the individual with the heroin was ("You know where he at?"). HEARON replied
that he had previously visited the individual ("Had to go over there this morning
anyway."). HEARON then told BARKSDALE that he went to the individual to get the
heroin ("Yeah, had to get that dish detergent."). BARKSDALE again questioned whether
HEARON had met the individual ("You did that though right?"). HEARON replied,
"This morning." BARKSDALE again questioned HEARON ("Right, that what I am
saying, you didn't holler at him."). HEARON replied, "No." BARKSDALE then told
HEARON that HEARON had to be more reliable ("You need to be right on it little bro.
Man, if all us gone, then what? Something happen to you, nigger, we dead. He don't
know nothing about nothing."). HEARON said, "Right, alright."

169

### d.     Seizure of Gun from HEARON

274.    On February 7, 2003, Chicago Police Officers were on patrol in the vicinity of 2347 South Michigan Ave. when they observed a group of men fighting and saw a black male, later identified as Arthur HEARON, display a handgun. The officers approached HEARON, who fled, initially on foot and then in a 1992 Dodge car on 24th Street. Officers kept the car in sight and stopped the vehicle at 24th and Indiana Ave., at which point HEARON was identified and searched.

275.    Officers secured and searched the Dodge shortly thereafter. Underneath the front passenger seat, the officers found a Beretta 9 millimeter semi-automatic pistol bearing serial number DAA315614. The pistol was loaded with a magazine containing seven 32 caliber cartridges. A search of law enforcement records showed that the pistol had previously been reported stolen.

### 7.     BARKSDALE's Trafficking Activities with Frank HARRIS

### a. Seizure of Heroin from Frank HARRIS

276.    On August 4, 2003, at approximately 10:15 a.m., CPD officers wearing plainclothes entered a Dearborn Homes building at 2930 South Dearborn. Upon entering, the officers saw a black male, now known as Frank HARRIS, standing in the hallway and holding a clear plastic bag in his hand, which bag contained numerous smaller baggies. Frank HARRIS asked the officers, "What do you need?" at which point the officers announced their office, arrested Frank HARRIS, and took custody of the clear plastic bag.

170

Illinois State Police laboratory analysis of the bag revealed that it contained 10 grams of powder in small plastic baggies. 5.6 grams were analyzed and found to be heroin. The remaining 4.4 grams were not analyzed.

### b. Surveillance of BARKSDALE and HARRIS

277. At approximately 6:01 p.m. on or about March 27, 2006, CPD officers initiated surveillance of Lynn BARKSDALE at the McDonald's parking lot at 3501 South Indiana. BARKSDALE was driving the GMC Envoy registered to Tashika SLEDGE. Officers observed BARKSDALE conversing with a man who was driving a Pontiac bearing Illinois plates 610675. The man in the Pontiac drove away from the McDonald's, and officers followed him back to the parking lot at 2964 South State, in the Dearborn Homes. Officers stopped the Pontiac, and the driver identified himself as Frank HARRIS.

### c. Intercepted Calls Involving BARKSDALE and HARRIS

278. The court-authorized interception of **Target Phone 8** revealed communications between Frank HARRIS and Lynn BARKSDALE, including the following conversations.

279. On March 10, 2006, BARKSDALE received a call on **Target Phone 8** (Call No. 290) from telephone number (773) 641-4573. HARRIS identified himself as "Knuckles", and told BARKSDALE that he had a new telephone with a new telephone number ("This is my new number too, man.").

171

280.    On or about March 22, 2006, BARKSDALE used **Target Phone 8** to call

HARRIS at (773) 641-4573 (Call No. 1143). During this call, BARKSDALE instructed

HARRIS to have a package of heroin ready for him and to stand on the street and be

ready to drop the heroin into his (BARKSDALE's) car.

| | |
|---|---|
| BARKSDALE: | "You got it? You been over here?" |
| HARRIS: | "Hell no." |
| BARKSDALE: | "Oh, shit." |
| HARRIS: | "Tried to go man, I'm trying though. I can't find a ride." |
| BARKSDALE: | "Where you at? The crib? You in the crib?" |

Later in the conversation, the following occurred:

| | |
|---|---|
| BARKSDALE: | "Alright, I'm right here on 35th, man. This is what I'm going to do, right. I'm gonna flip around. Can you be on the bus stop or have somebody on the bus stop with it?" |
| HARRIS: | "On the bus stop?" |
| BARKSDALE: | "Yeah. All you gotta do is throw it in the window. I'm going to let the window down. They could just drop it in the window. I'm going to be gone." |

281.    On March 27, 2006, BARKSDALE used **Target Phone 8** to call HARRIS

(Call No. 1625). Surveillance of HARRIS by police officers on this day supports the

identification of HARRIS as the recipient of the call. During this call BARKSDALE

instructed HARRIS to meet him at the McDonalds on 35th Street ("Probably meet me,

hmm, at McDonalds on 35th... I'm finna, uh, I'll be that way in like fifteen minutes, twenty

minutes tops. I'll be there.").

172

282. On March 30, 2006, BARKSDALE used **Target Phone 8** to call HARRIS (Call No. 2357). During the conversation, BARKSDALE asked HARRIS questions about going to South Bend, Indiana, to obtain heroin.

| | |
|---|---|
| BARKSDALE: | "I'm trying to see. Trying to catch when you wasn't doing nothing, know what I'm saying?" |
| HARRIS: | "Shit, probably tomorrow. Hopefully tomorrow." |
| BARKSDALE: | "Yeah, what you want me to do? Uh, you want me do it or you want to take care of it yourself?" |
| HARRIS: | "It don't matter. It don't matter. But you, I'll do it. Cause you say, you don't really know how to do it like that." |
| BARKSDALE: | "Right, you know what I'm saying. I'm going to say man, you know what I'm saying, cause I could sit down and try that with, you know I could let one my uncles do it. I could get you, you do it, it's all good with me." |
| HARRIS: | "Yeah." |
| BARKSDALE: | "My little cousin, I'm going to let my little cousin go to South Bend, and he going to sit down. I'm, I'm going to go with him and he going to check it out and see what's to that too. I'm going to watch him do it, you know what I'm saying. You go on ahead and do what you do. I ain't, you know, your man." |

Based on my experience and this investigation, BARKSDALE and HARRIS are discussing whether one of them should go to South Bend for heroin. HARRIS tells BARKSDALE that he (BARKSDALE) does not possess knowledge on cutting heroin. BARKSDALE replies that he can learn by watching another person do it.

## J. Defendant Demetrius BROWNRIDGE

283. On or about September 14, 2004, CPD officers were conducting surveillance in a Dearborn Homes building at 2940 South State. Officers secreted inside the building observed numerous people enter and exit the building in a short time frame

and suspected that drug sales were occurring. The surveillance officers contacted uniformed enforcement officers who then entered the building. As the officers entered, an unknown male yelled, "Clean up!" I know that "Clean up!" is a term often used in the Dearborn Homes to alert drug sellers to police presence. The surveillance officers began descending the east stairwell of the building and observed a black male (later identified as Demetrius BROWNRIDGE) running up the stairs carrying a clear plastic bag. Upon seeing the officers, Demetrius BROWNRIDGE dropped the bag and attempted to flee. Officers detained him and recovered the bag, which contained 54 smaller bags of suspected narcotics. Demetrius BROWNRIDGE was arrested and the recovered bag was sent to the Illinois State Police Laboratory to be analyzed. The analysis determined that 31 of the bags contained cocaine (estimated 7.8 grams) and the other 23 bags contained heroin (estimated 13.8 grams). Specifically, of the 31 bags that appeared to contain cocaine, 5.3 grams were analyzed and found to be cocaine, while the remaining 2.5 grams were not analyzed. Similarly, of the 23 bags that appeared to contain heroin, 5.4 grams were analyzed and found to be heroin, while the remaining 8.4 grams were not analyzed.

284. On or about March 26, 2004, Cynthia THOMAS stated during a post-arrest interview with DEA agents, that she was aware that "Mickey," whom she identified through an arrest photo as Demetrius BROWNRIDGE, sold a line of heroin called "Peno" out of the Dearborn Homes building located at 2940 South State. THOMAS stated that

Demetrius BROWNRIDGE delivered the heroin to his (Demetrius BROWNRIDGE's) workers each day.

285.    On or about May 19, 2006, CS2 told agents that "Mickey," identified through an arrest photo as Demetrius BROWNRIDGE, was a member of the Mickey Cobras and was currently operating a heroin line called "Pipeline" out of the Dearborn Homes. CS2 said that Demetrius BROWNRIDGE often frequented Dearborn Homes building 2961 South Dearborn, Apartment # 705, and stored narcotics and money from narcotics sales in the apartment. CS2 further said that Demetrius BROWNRIDGE had also stockpiled numerous weapons in the building.

### K.    Defendant Cynthia THOMAS

286.    On or about March 26, 2004, Cynthia THOMAS was arrested by CPD at 2930 South Dearborn after officers, conducting surveillance, observed her throw a plastic bag containing six zip-lock baggies to the ground. Agents retrieved the baggies, and Illinois State Police laboratory testing showed that the baggies contained heroin in the amount of 1.3 grams form 4 bags tested and .6 grams of powder from 2 bags not tested. At the time of Cynthia THOMAS's arrest, agents searched her and recovered from her person 5 zip-lock baggies, which, according to subsequent laboratory testing, contained cocaine in the amount of .1 gram from 1 bag tested and .3 grams of a substance from 4 bags not tested. Cynthia THOMAS then gave the post-arrest statement described in paragraphs 31-33.

175

**L. Defendant Freddie WESTMORELAND and his Drug Trafficking Associates**

287. According to CS1, WESTMORELAND, a.k.a. "Stokes", is a long-standing active member of the Mickey Cobras street gang, whom CS1 has known for many years. CS1 identified WESTMORELAND by description and through an arrest photo. CS1 told agents that in or about 1999, WESTMORELAND introduced CS1 to James AUSTIN, a.k.a "Jaymo," whom CS1 knew to be the "King" of the Mickey Cobras in the Dearborn Homes. CS1 said that at the time of the introduction, WESTMORELAND told CS1 that James AUSTIN and Larry SMITH, a.k.a "Lucky", controlled Mickey Cobra operations in the DBs, including the sale of narcotics from the DBs.

**1. November 21, 2003 Controlled Purchase of Heroin with WESTMORELAND and Mark FRANKLIN**

288. On November 21, 2003 at approximately 1:15 p.m., agents received a telephone call from CS1. CS1 said that WESTMORELAND called him/her and asked for a ride to pick up heroin to supply his (WESTMORELAND'S) heroin line in the Dearborn Homes. CS1 related that WESTMORELAND gave CS1 $4,000.00 to hold. Agents then began surveillance in the area of 3100 South State Street.

289. After searching CS1 and his car to ensure that no contraband was present, agents began surveillance of CS1 driving CS1's vehicle. CS1 drove to pick up WESTMORELAND, and at approximately 2:00 p.m., agents familiar with WESTMORELAND's appearance observed WESTMORELAND seated in the passenger

176

seat of CS1's vehicle. Agents continued surveillance, and at approximately 4:15 p.m., observed CS1's vehicle driving in the area of 61st Street and Homan Avenue. WESTMORELAND was in the front passenger seat. Another individual, identified at the time of his arrest by agents as Mark FRANKLIN, was seated in the back seat of CS1's vehicle.

290. At approximately 4:25 p.m., agents observed CS1 park his car in the North alley of 3311 West 61st Street. Agents observed WESTMORELAND exit the passenger seat and walk to a gate behind a residence. Agents then observed WESTMORELAND engage in conversation with a male Hispanic individual (Individual Q) for a short time. WESTMORELAND and Individual Q walked to the rear of the residence, and shortly thereafter, WESTMORELAND walked back to CS1's vehicle. CS1's vehicle then drove away, while officers maintained surveillance.

291. At approximately 4:35 p.m., CPD officers stopped CS1's vehicle. During the stop, officers recovered a clear plastic bag containing a white powder that appeared to be heroin from under the passenger seat where Freddie WESTMORELAND had been seated. From Mark FRANKLIN's left shoe, officers recovered another clear plastic bag of white powder that appeared to be heroin. WESTMORELAND and Mark FRANKLIN were arrested. Illinois State Police forensic laboratory analysis confirmed that the two bags containing white powder did in fact contain heroin: the bag recovered from under

Freddie WESTMORELAND'S seat contained 26.2 grams of heroin, and the bag
recovered from Mark FRANKLIN contained 6.2 grams of heroin.

292.  In his post-arrest statement on November 21, 2003, further described in
paragraphs 77-82, WESTMORELAND admitted his nickname ("Stokes"), his cell phone
number ((773) 617-1750), and his membership in the Mickey Cobras.  He said that he has
been selling narcotics in the Dearborn Homes for numerous years.  He then admitted his
purchase of heroin that day from Individual Q, which purchase he made with "Marco,"
whom he identified through photograph as Mark FRANKLIN.[34]  WESTMORELAND
said that Mark FRANKLIN mixes heroin at a house located in the area of 60th and
Winchester.  Regarding the November 21 purchase, WESTMORELAND said that Larry
SMITH had directed him to pick up two packages of heroin that were going to two
different places, and to give the packages to Mark FRANKLIN after purchasing them.
WESTMORELAND said that he had given both packages to Mark FRANKLIN in the
car, prior to being stopped by the police.

### 2.  March 19, 2004, Controlled Purchase of Heroin from WESTMORELAND and FROEHLIG

293.  On March 19, 2004, CS1 made a controlled purchase of heroin from
WESTMORELAND and Nicole FROEHLIG.  The meeting between CS1 and
WESTMORELAND was consensually recorded and surveilled by agents.

[34]On December 4, 2003, Mark FRANKLIN was arrested at Dearborn Homes
building 2971 South Federal for possession of over 15 grams of heroin.  He was
convicted and sentenced to 24 months' probation.

178

294. The purchase was arranged when CS1 called WESTMORELAND at (773) 842-2623 and asked WESTMORELAND what CS1 would have to pay WESTMORELAND for 25 grams of heroin. WESTMORELAND replied "S35," which I understand to mean that the cost would be $3,500 for 25 grams of heroin. CS1 told WESTMORELAND that his guy only had "$2,800... I don't want to owe you any money." WESTMORELAND then told CS1 to meet with "Nicole". CS1 identified "Nicole" as Nicole FROEHLIG through an arrest photograph and told agents that he personally knew FROEHLIG to be one of WESTMORELAND's girlfriends who lived with WESTMORELAND's mother at 2951 South Dearborn. CS1 told agents that he had firsthand knowledge through conversations with WESTMORELAND and observations that FROEHLIG assisted WESTMORELAND's narcotics trafficking by holding narcotics and distributing them at the direction of WESTMORELAND.

295. While wearing a recording device, CS1 drove to the area of 2951 South Dearborn Street for the scheduled meet with FROEHLIG. Before CS1 drove to the meet, agents searched CS1 and his car for narcotics and found none. When CS1 reached 2951 South Dearborn Street, agents observed FROEHLIG exit the building and enter into the passenger side of CS1's vehicle. A short time later, FROEHLIG exited CS1's vehicle and entered the building. CS1 drove away and agents maintained surveillance until they were able to meet with him. At that time, CS1 handed agents a clear plastic bag containing a substance that laboratory analysis showed to be 22.5 grams of heroin.

179

296.    WESTMORELAND then contacted CS1 and told him to come to the area

of 53rd and Blackstone. It was CS1's understanding (and the agents' understanding as

well, based upon experience in this investigation) that CS1 was to meet

WESTMORELAND there to pay for the heroin he had just received from FROEHLIG.

Agents surveilled CS1 as he drove to 53rd and Blackstone and met with

WESTMORELAND. Agents observed WESTMORELAND enter the passenger side of

CS1's vehicle and then get out. CS1 then told agents (and CS1's body recorder

confirmed) that CS1 had paid WESTMORELAND $2,800 in recorded funds.

### 3.    March 22, 2005, Controlled Purchase of Heroin from WESTMORELAND

297.    On or about March 22, 2005, CS1 made a controlled purchase of 50 grams

of heroin from WESTMORELAND. The purchase was arranged when, at approximately

1:07 p.m. that day, CS1 made a consensually recorded call to WESTMORELAND, a.k.a.

"Stokes", at (773) 557-5320. CS1 told WESTMORELAND that CS1's guy had "15"

(meaning $1,500) and needed CS1 to pick up another "stack" (meaning $1,000). CS1

then asked WESTMORELAND if "it" (the heroin) was "a quarter" (meaning worth

$2,500). WESTMORELAND responded, "Hell yea, it's a quarter." CS1 and

WESTMORLAND agreed to meet at 83rd and South Chicago in the parking lot of

Kentucky Fried Chicken. At approximately 5:31 p.m., CS1 and an undercover officer

(UC) arrived at the meet site. CS1 and his car were searched prior to the meet and no

contraband was found. Agents maintained surveillance throughout the meeting. At

approximately 5:34 p.m., CS1 drove to the west side of the street and parked in the lot. Agents saw WESTMORELAND exit the driver side of a white Honda bearing Illinois registration 453832, walk to CS1's car, and get into the rear passenger side. CS1 and UC reported and audio surveillance showed that once in the car, WESTMORELAND handed UC one clear baggie containing heroin and said, "This is the new stuff. Let me know how you like it." From my experience in this investigation, I interpret this to mean that WESTMORELAND obtained the heroin from a new source of supply and wanted UC's feedback on the quality of the heroin. UC then handed WESTMORELAND $2,500 in recorded funds to pay for the heroin. At approximately 5:37 p.m., agents observed WESTMORELAND exit CS1's car, get back into the Honda, and drive to the area of 82nd and Essex. Laboratory analysis confirmed that the substance WESTMORELAND gave UC was approximately 50 grams of heroin.

### 4. WESTMORELAND's Drug Trafficking With Charles HAMPTON

#### a. Defendant Charles HAMPTON

298. Charles HAMPTON, a.k.a "Mo Money", has two prior narcotics-related convictions for conduct in the Dearborn Homes: an April 27, 1999 conviction for delivery of cocaine at 2961 South Dearborn, and an October 25, 2000 conviction for delivery of cocaine at 2971 South Dearborn.

299.    According to CS2. Charles HAMPTON is a long-standing active member
of the Dearborn Homes Mickey Cobras and runs the heroin line known as "TKO" in the
Dearborn Homes.

### b.    Controlled Purchase of Heroin from WESTMORELAND and HAMPTON

300.    On or about June 15, 2004, CS1 and a UC made a controlled purchase of 50
grams of heroin from WESTMORELAND and Charles HAMPTON. At approximately
9:16 p.m., CS1 placed a consensual recorded outgoing call to WESTMORELAND at
(773) 392-2951, during which CS1 and WESTMORELAND agreed to meet so that CS1
could purchase 50 grams of heroin from WESTMORELAND. CS1 agreed to pay $100.00
per gram. CS1 told WESTMORELAND that they (CS1 and UC) were waiting in the
parking lot of the Dominick's in the area of 71st and Jeffery.

At approximately 9:52 p.m., agents observed CS1 and UC arrive at the Dominick's
parking lot. At approximately 10:13 p.m., agents observed WESTMORELAND drive a
white Honda, Illinois registration 4538032, into the Dominick's parking lot.
WESTMORELAND parked the car, got out, and then walked over to CS1's car and began
to talk to UC. At approximately 10:20 p.m., agents saw a white Chrysler Concorde
driven by a man that agents visually identified as Charles HAMPTON, with a passenger
that agents visually identified as Nicole FROEHLIG. The vehicle parked north of the
Honda. According to UC and CS1, UC handed WESTMORELAND $5000.00 in
recorded funds, WESTMORELAND then directed HAMPTON to deliver the heroin to

182

UC. and HAMPTON handed UC a clear plastic bag containing heroin. Agents then saw

WESTMORELAND give FROEHLIG the money and tell FROEHLIG to meet him at the

"crib." Laboratory analysis of the substance in the plastic bag confirmed that the bag

contained approximately 51.1 grams of heroin.

### c. Intercepted Calls between WESTMORELAND and Charles HAMPTON

301. Pursuant to court authorized interceptions over **Target Phone 4** (which

voice identification and surveillance confirmed was used by WESTMORELAND). agents

obtained the following information:

302. On or about November 27, 2005, Charles HAMPTON called

WESTMORELAND using the PTT feature. Charles HAMPTON was identified as the

caller by agents familiar with HAMPTON's voice. (Call No. 7127)

| | |
|---|---|
| WESTMORELAND: | "I'm gonna come over there." |
| HAMPTON: | "I'll be there." |
| WESTMORELAND: | "Hey, uh, where you at, at the crib?" |
| HAMPTON: | "Yeah." |
| WESTMORELAND: | "Hey... [UI]...called me the last two days, B. He talking about man if you don't start paying them guys doing the superman, man they gonna boycott you out the building." |
| HAMPTON: | "You say, you say grudge." |
| WESTMORELAND: | "I say, red, say you don't start paying them superman people they gonna boycott you out the building." |
| HAMPTON: | "Red...I pay them superman people." |
| WESTMORELAND: | "Hey, he called me last night and he called me the night before that, I told them man I ain't got shit to do with that, man, call dude. Man, I know you gonna get in touch with him, I know your gonna see him, man...I said all right, man, if I see him I relay the message, |

183

|                 |                                                                                                                                                                                                                                 |
|-----------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                 | man. but you need to call him.....I calling him and his phone is off.....its ru ru this ru ru that. I told, uh, if his phone is off I can't get in touch with him neither, man, so he just told me to relay that message, man." |
| HAMPTON:        | "Yeah, whatever, he lucky I let him stay in the building."                                                                                                                                                                      |
| WESTMORELAND:   | "All right...I'm.... [UI].....B."                                                                                                                                                                                                |

Based on my experience and this investigation, WESTMORELAND is telling Charles

HAMPTON that if HAMPTON doesn't start paying his taxes to the Mickey Cobras

leadership, HAMPTON will no longer be permitted to sell heroin in Dearborn Homes.

303.   On December 3, 2005, received an incoming call on **Target Phone 4** from

two unknown males (Call No. 9381).

| WESTMORELAND: | "What up man?"                                                                                                                                              |
|---------------|------------------------------------------------------------------------------------------------------------------------------------------------------------|
| UM1:          | "What up, what up?  Boy, I got something for you, boy. I got something for you, man. My little men, right, my little men they just tore off an ugly lick, Joe." |
| WESTMORELAND: | "Yeah."                                                                                                                                                     |
| UM1:          | "They just tore off, they got so much motherfucking heroin, man, I'm talking for real. I'm talking about they got the GGS, the motherfucking eggs boy. They got them eggs for real." |
| WESTMORELAND: | "Straight up."                                                                                                                                              |
| UM1:          | "Man, I ain't playing no motherfucking game."                                                                                                               |
| WESTMORELAND: | "I know you ain't just calling."                                                                                                                            |
| UM1:          | "I ain't playing, no games man. I'm telling you."                                                                                                           |
| WESTMORELAND: | "What's the move?"                                                                                                                                          |
| UM1:          | "I'm talking about a hundred for seven."                                                                                                                     |
| WESTMORELAND: | "That sounds good but I gonna ain't gonna be able you know what I'm saying. I ain't reach to touch no nothing big till Monday. I need for you to hold me down." |

Based on my experience in this investigation, UM1 has heroin to sell and is giving

WESTMORELAND an opportunity to purchase some heroin for the price of seven

thousand dollars for one hundred grams. WESTMORELAND told UM1 that he is interested but cannot pay until Monday.

### 5. Recovery of $3,275.00 from WESTMORELAND

304. On December 1, 2005, CPD officers patrolling the Dearborn Homes saw WESTMORELAND driving a silver Honda Pilot bearing Illinois 4538032. WESTMORELAND made an illegal u-turn at approximately 2951 South Federal, and officers stopped the vehicle. WESTMORELAND identified himself as the driver and his 2-year-old son as the passenger. WESTMORELAND consented to a search of the vehicle, and officers then searched and recovered $1,000.00 from his wallet, $275.00 from his front pocket and $2,000.00 from his son's jacket pocket. Officers seized the money and took it to the police station, where a specially trained police canine sniffed the money and indicated that the money had been in close proximity to narcotics.

### 6. Andre HASTINGS' Trafficking For WESTMORELAND

305. On or about January 23, 2003, a man later identified as Andre HASTINGS was observed by CPD officers in the stairwell of the Dearborn Homes building located at 2951 South Federal. HASTINGS was holding a plastic bag containing numerous small packets of what appeared to be heroin packaged for sale. HASTINGS looked in the direction of the CPD officers and began to flee on foot. Officers apprehended, identified, and arrested HASTINGS and recovered the suspected heroin. Laboratory analysis revealed that the plastic bag contained less than 15 grams of both heroin and cocaine.

Based upon charges stemming from this arrest. HASTINGS was convicted of possession
of heroin and cocaine and sentenced to 1 year in the Illinois Department of corrections.

306. While in custody and awaiting trial after an arrest for Possession of Heroin
on or about May 21, 2001. HASTINGS was interviewed by agents on October 23, 2001.
HASTINGS' privately retained attorney was present for questioning. HASTINGS was
advised of his rights and told that no promises could or would be made to him in
exchange for his cooperation and that what he said would be brought to the attention of
the United States Attorney's Office. HASTINGS stated he understood his rights and
wanted to cooperate with the agents. HASTINGS stated that after his release from prison
in June of 2000, he (HASTINGS) went to work selling heroin for a Mickey Cobra gang
member named "Stokes," subsequently identified by agents as Freddie
WESTMORELAND. (On November 21, 2003, WESTMORELAND stated that his
nickname was "Stokes" during a post arrest statement to DEA agents.) HASTINGS said
that WESTMORELAND sold a line of heroin called "Demon" out of the Dearborn
Homes building located at 2961 South Dearborn, and that HASTINGS helped
WESTMORELAND mix the heroin with Dormin (a brand of sleeping powder) and
package it for street sales. HASTINGS stated that on occasion he (HASTINGS) would
mix the heroin at his own apartment at 2971 South Federal Apt 602. HASTINGS also
said that he and WESTMORELAND would package the mixed heroin into blue-tinted
plastic bags called "Dimes" and "Dubs". The "Dimes" were sold for $10.00 each and the

186

"Dubs" were sold for $20.00. HASTINGS stated he worked for WESTMORELAND for
approximately six to eight months mixing approximately 15 grams of heroin in his
apartment three to four times a week. For this work, WESTMORELAND paid
HASTINGS $150.00 per week. HASTINGS said that during this time, he was aware that
WESTMORELAND had numerous other workers selling "Demon" out of the building at
2961 South Dearborn.

### M. Defendants Rasheed KESHIRO and Stephen AKINGBA, a.k.a. "David"

307. Rasheed KESHIRO and Stephen AKINGBA are suppliers of heroin to
members of the Mickey Cobras, including Barksdale and CS2. Intercepted phone calls
from **Target Phone 8** reveal numerous conversations between BARKSDALE and
KESHIRO relating to the sale of heroin. See, e.g., paragraphs 242 and 249. Furthermore,
a series of controlled purchases of heroin and deliveries of money show KESHIRO's and
AKINGBA's role as suppliers to CS2 as well as their drug trafficking partnership with
one another.

308. On or about March 15, 2006, CS2 conducted a controlled purchase of
heroin from Rasheed KESHIRO. According to CS2, CS2 contacted KESHIRO on March
15, 2006 by calling (312) 402-0112 and told KESHIRO that CS2 had a cousin that was in
town who was coming by to talk to KESHIRO about doing what they had previously
talked about. Telephone number (312) 402-0112 is subscribed to Rasheed KESHIRO,
1545 South State Street, Apt 310. According to CS2, that meant that the cousin wanted to

187

purchase heroin from KESHIRO. This call was not recorded.

309.     At approximately 3:29 p.m. that day, after agents searched CS2 and CS2s' vehicle and ensured that there was no contraband present, agents gave CS2 $10,500 in recorded funds to purchase the heroin from KESHIRO. CS2 was then equipped with an audio recording device and agents maintained surveillance of him/her while he she drove to KESHIRO's residence at 1545 South State Street, and picked up KESHIRO. Agents had previously presented CS2 with an Illinois driver's license database photograph of Rasheed KESHIRO and CS2 identified the person as KESHIRO. According to CS2 and the audio and visual surveillance, KESHIRO instructed CS2 to drive to the area of Campbell Ave. and Devon Ave. According to CS2, Individual R entered CS2's car and KESHIRO handed Individual R approximately $8,000.00 - $8,500.00 in recorded funds. This transaction was confirmed by the audio recording. According to CS2, Individual R handed a clear plastic bag containing heroin to KESHIRO, who later handed it to CS2. Surveillance was maintained on CS2's vehicle until CS2 met with agents, who searched CS2 and the vehicle and recovered the bag of heroin. Laboratory analysis revealed that the bag contained 100.1 grams of heroin.

310.     According to CS2, on or about March 26, 2006, at approximately 9:00 a.m., CS2 received an unrecorded telephone call from KESHIRO at telephone number (312) 376-5489 and KESHIRO asked where CS2 was. CS2 told KESHIRO that CS2 was at the gym near Foster Park.

311.    According to CS2, at approximately 10:30 a.m. that day, KESHIRO and

Stephen AKINGBA, a.k.a. "David" arrived at the gym near Foster Park and KESHIRO

entered CS2's vehicle. Agents had previously presented CS2 with an Illinois driver's

license database photograph of Stephen AKINGBA and CS2 identified that to be

"David". KESHIRO then provided CS2 with approximately 300 grams of heroin, which

CS2 agreed to take with the understanding that he would pay KESHIRO for the heroin at

a later date. CS2 immediately notified agents, who retrieved the heroin from CS2.

Laboratory analysis showed the amount of heroin to be 294.7 grams.

312.    On or about March 28, 2006, at approximately 4:30 p.m., after agents

searched CS2 and CS2's car and ensured no contraband was present, agents gave CS2

$8,000.00 in recorded funds for partial payment for the heroin that was 'fronted' to CS2

from KESHIRO on March 26, 2006. While under surveillance and equipped with audio

recording equipment, CS2 drove to the area of 2200 block of South State Street to meet

with KESHIRO.

313.    At approximately 4:41 p.m., according to CS2 and observed by

surveillance, CS2 exited his/her vehicle and entered a Chrysler 300 with Nevada license

plates driven by KESHIRO. KESHIRO then drove around the block and parked on 22nd

Pl. and Wentworth.

314.    According to CS2 and observed by surveillance, CS2 exited the vehicle

along with KESHIRO and two small children. They then walked northbound on

189

Wentworth towards 22nd Street and met another black male identified as Stephen AKINGBA. At approximately 4:53 p.m. CS2, KESHIRO, and AKINGBA, along with the two children were then observed entering a tan colored Mercedes.

315.    According to CS2 and the consensual recordings from the body recorder worn by CS2, he/she provided AKINGBA with $8000.00 and said it was partial payment for the 300 grams of heroin fronted to him/her on March 26, 2006. AKINGBA then handed CS2 a white plastic bag containing 100 grams of heroin and stated it was his way of showing his gratitude for CS2 paying the debt. The CS2 spoke to AKINGBA about the smell of the heroin, and AKINGBA related that it was because the heroin was from Colombia and not Pakistan.  CS2 exited the vehicle and walked to his/her vehicle. Agents maintained visual surveillance of CS2 until they were able to meet with CS2 and retrieve the white plastic bag containing the heroin.  Laboratory analysis revealed that the bag contained 100.4 grams of heroin.

316.    On or about April 21, 2006, CS2 conducted a controlled payment of $15,000 in recorded funds to KESHIRO and AKINGBA, for the remaining debt owed for heroin that KESHIRO and AKINGBA previously 'fronted' to CS2, and only partially paid for, as set forth in paragraph 311.  At approximately 2:47 p.m., CS2 placed a consensually recorded telephone call to Rasheed KESHIRO at telephone number (312) 376-5489. During this call CS2 requested additional time before the meet.

317.    CS2 and CS2s' vehicle were searched for contraband with negative results.

190

CS2 was then given $15,000.00 in recorded funds, which was prepared to appear to be $24,000.00, the full debt owed for the 'fronted' heroin, contained within a blue shoe box within a yellow plastic bag. At approximately 5:42 p.m., according to CS2 and observed by video surveillance, KESHIRO entered CS2s' vehicle driven by CS2.

318.    According to CS2, KESHIRO instructed him/her to drive to the area of Oak Street to meet with AKINGBA. During the drive, CS2's vehicle was observed partially by surveillance, but due to heavy traffic there was not constant surveillance; a federally authorized tracking device on CS2's vehicle, however, was constantly monitored. According to CS2 he/she and KESHIRO parked in the area of 102 East Oak Street. According to CS2 and surveillance, a tan Mercedes Benz was observed in the area, a vehicle commonly driven by AKINGBA.

319.    According to CS2, when he/she arrived on Oak St. he/she parked near AKINGBA's tan Mercedes Benz. CS2 related that he/she opened the trunk of his/her vehicle and AKINGBA removed the $15,000.00 in recorded funds contained within the blue shoe box within the yellow plastic bag. CS2 related that AKINGBA put the yellow plastic bag containing the blue shoebox containing the $15,000.00 in recorded funds in the trunk of the tan Mercedes Benz. According to CS2, he/she told AKINGBA there was $24,000.00 in the shoebox.

320.    According to CS2, KESHIRO, AKINGBA, and he/she entered the Dolce and Gabbana store located on Oak St. KESHIRO then asked AKINGBA, "where is my

191

$300.00 at?" CS2 related that AKINGBA departed the store and went to the trunk of the tan Mercedes Benz and removed the yellow plastic bag containing the blue shoebox and entered the backseat of the vehicle. CS2 related that AKINGBA re-entered the store and provided KESHIRO with an undetermined amount of money.

321.    Surveillance observed AKINGBA enter the driver's side of the tan Mercedes Benz and drive westbound on Oak Street and then make an illegal U-turn and head east on Oak Street. DEA directed CPD personnel to conduct a traffic stop on AKINGBA and during the stop the yellow plastic bag containing the blue shoe box that had contained the $15,000.00 in recorded funds was seized from inside the vehicle AKINGBA occupied. CPD personnel met with DEA agents and turned over the recorded funds contained in the blue shoe box within the yellow plastic bag.

322.    DEA counted the recorded funds and found approximately $13,401.00, which accounted for the $15,000 minus the amount paid by AKINGBA to KESHIRO.

### N.    Defendant Israel MOORE

#### 1.  Seizure of $2,180 from MOORE

323.    On January 3, 2006, CPD officers stopped a vehicle for a traffic violation, and the driver identified himself as Israel MOORE. MOORE emptied his pockets in an apparent attempt to find an identification card, and officers noticed that MOORE had removed a large amount of currency from his pockets. MOORE claimed that the money was from his construction job but was unable to provide routine details of his job. The

officers counted the currency, which totaled $2,180, and told MOORE that they were going to have a CPD canine, specialized in the detection of narcotics, sniff the currency. At that point, MOORE said, "The dog's probably going to smell drugs on the money 'cause I was smoking weed earlier." A CPD canine trained in the detection of narcotics sniffed the currency and indicated that the money had been in close proximity to narcotics. In response, MOORE said, "I knew he would."

### 2.    Search of MOORE's Residence Reveals Gun And Heroin

324.    On February 21, 2006, MOORE was arrested by DEA agents and CPD officers assigned to this investigation. MOORE waived his rights and gave verbal and written consent to search his second floor apartment at 735 East 88th. During the search of MOORE's apartment, agents recovered a Hi Point 9 millimeter semi-automatic pistol from underneath MOORE's mattress. When asked about the pistol, MOORE told agents that he bought the gun on the street and kept it for protection from people who might try to steal his narcotics or narcotics proceeds. In the kitchen, agents found a bag containing a small white bottle that contained a brown powder that appeared to be heroin, grinder cups, strainer and miscellaneous items commonly used for mixing heroin. All of the items were encrusted with a tan powder that field tested positive for the presence of heroin.

### 3. MOORE's Post Arrest Statement

325.    Shortly after his arrest, agents interviewed MOORE. MOORE said that he

193

had been supplying heroin to members of the Mickey Cobra street gang for over a year, and that during this time period he would supply Larry SMITH with 100 grams of heroin for $8,000 at least twice a week. MOORE said that if Larry SMITH did not personally pick up the heroin, Duante FALLS or Larry SMITH's brother Aaron SMITH, a.k.a. "Ace," would pick it up for Larry SMITH. MOORE stated that on one occasion he (MOORE) sent Davarius SEATON to pick up from Larry SMITH the $8,000 owed for heroin supplied by MOORE. On that occasion, according to MOORE, SEATON was stopped by the police and the $8,000 was seized. MOORE stated that he frequently paid SEATON to deliver MOORE's heroin and pick up the money proceeds from the heroin sales. MOORE also admitted to regularly supplying heroin to a Gangster Disciple known to MOORE as "Ray," and MOORE said that "Ray" redistributed the heroin in the Ida B. Wells housing project complex. MOORE also said that on more than ten occasions he had supplied Joseph PEARSON with 50 grams of heroin.

326.    MOORE said he obtained some of his heroin from Kevin THOMAS (referenced in paragraphs 355-364), whom MOORE knew to be a member of the Mickey Cobras and whom MOORE knew to use the nickname "Money C". MOORE provided additional details about Kevin THOMAS' role in the Mickey Cobras and MOORE narcotics trafficking activities with Kevin THOMAS, as set forth in paragraph 356.

327.    MOORE said that although he has purchased heroin from Larry SMITH in the past, he has been using a variety of heroin sources and had curtailed his purchases of

194

heroin from Larry SMITH because of a disagreement about money. Among the heroin sources MOORE mentioned was a Mickey Cobra named "Dino", identified by agents through surveillance pursuant to intercepted phone calls and through post arrest identifications as Derrick CAMPBELL. MOORE stated that he bought up to 100 grams of heroin at a time from CAMPBELL but couldn't mix much cut into the heroin because the quality was not good.

### 4. MOORE's Drug Trafficking with Derrick CAMPBELL

328. As discussed in paragraphs 46-48 and 79-81, defendant Israel MOORE and Antwan PETERSON advised agents in post-arrest statements that defendant Derrick CAMPBELL is a member of the Fuller Park faction of the Mickey Cobras.[35] According to MOORE in his February 21, 2006 statement, CAMPBELL supplied MOORE with heroin which he resold to other Mickey Cobras.

329. Pursuant to court authorizations, DEA intercepted communications over Target Phone 5, used by Israel MOORE.[36] Below are examples of intercepted

---

[35]On or about January 19, 1999, Derrick CAMPBELL was convicted for Possession of a Controlled Substance and sentenced to one year in IDOC for conduct that occurred approximately two blocks away from Fuller Park. On or about January 1999, CAMPBELL was convicted of Carrying a Firearm in Public and sentenced to one year in IDOC for conduct that occurred approximately one block away from Fuller Park. Based on my training and experience as a CPD Detective assigned to the Fuller Park area, I know that the Fuller Park set of the Mickey Cobras have controlled narcotics sales in this area for at least the last ten years.

[36]The identity of MOORE as the user of Target Phone 5 was established based on, among other things, the following: As discussed in paragraphs 78-91, on or about February 21, 2006, agents stopped MOORE and MOORE confessed to his involvement in trafficking narcotics. Officers who listened to intercepted calls over Target Phone 5 participated in that interview and determined that the person on the calls on Target Phone 5 was the same person that they interviewed on February 21, 2006.

communications and other facts learned in the investigation.

330. On December 27, 2005, at 1:17 p.m. (Call No. 8982), MOORE placed an outgoing telephone call from **Target Phone 5** to a then-unidentified male at telephone number (773) 596-8520, **Target Phone 7**. Agents later identified the user of **Target Phone 7** as Derrick CAMPBELL.[37] During the call, MOORE was speaking with the individual believed to be Derrick CAMPBELL about drug trafficking. In particular, MOORE asked CAMPBELL if CAMPBELL was available to re-supply MOORE with narcotics ("What down, what down, B. Hey shit, you still chewing?"), and CAMPBELL answered affirmatively ("Yep."). MOORE then advised CAMPBELL that he (MOORE) wanted to pick up narcotics from CAMPBELL soon ("Okay, look, I'm on, I'm out here by the house, I'm finna come out there, I need to holler at you alright?"). CAMPBELL then agreed to meet MOORE to provide the narcotics ("Alright man, I was trying to holler at you on man, what those niggas was on when I seen't you . . . We'll blow when I see you.").

---

[37]Agents identified CAMPBELL as the individual on this and subsequent calls in the following way: On or about December 27, 2005, after a brief meeting between MOORE and CAMPBELL described in the following paragraph, officers executed a traffic stop on CAMPBELL's vehicle and spoke with a unidentified black male (CAMPBELL) who met with MOORE. During the traffic stop, the previously unidentified black male identified himself to officers as Derrick CAMPBELL and produced an Illinois Secretary of State identification document with the name Derrick CAMPBELL. In addition to CAMPBELL, a female and another male were in the car with CAMPBELL. After CAMPBELL identified himself, officers initiated a search of CAMPBELL and the vehicle. As the search started, the female became aggressive and started abusing the officers. Because the officers who initiated the traffic stop were not accompanied by a female officer, they discontinued their efforts and released CAMPBELL and the other two individuals

331. A few hours later on that same day, December 27, 2005, at 4:12 p.m. (Call No. 9056), MOORE received an incoming telephone call on **Target Phone 5** from the individual believed to be Derrick CAMPBELL using **Target Phone 7**. During the call, MOORE answered: "Yeah, what up, B?" CAMPBELL stated: "Yah, what's up B, I'm like on Racine. . . . By the store." MOORE then asked: "You say, you on Racine?" CAMPBELL replied: "I'll be pulling up in like three minutes." MOORE then stated: "Okay, look I ain't right here by Athlete's, I'm right there by the other side, by the . . . [Unintelligible] . . . little thing." CAMPBELL then asked: "What you say, B?" MOORE responded: "Just look . . . when you come in, come like you come into Mike's, but just keep straight and then you'll see me right there, right past Athletic Foot, alright?" CAMPBELL answered: "Alright." After agents intercepted this call, agents followed MOORE who was driving a black Lincoln to a mall located on 55th Street near the Dan Ryan Expressway. The mall has an Athlete's Foot shoe store. At the mall near the Athlete's Foot shoe store, agents observed an unidentified black male (later identified as Derrick CAMPBELL) exit a gold vehicle and enter MOORE's black Lincoln where the two men had a short meeting.

332. Approximately 67 minutes later, on December 27, 2005, at 5:19 p.m. (Call No. 9080), MOORE utilized **Target Phone 5** to call DERRICK CAMPBELL again on **Target Phone 7**. During the call, MOORE and DERRICK CAMPBELL were discussing drug trafficking. In particular, MOORE advised CAMPBELL that MOORE was waiting

197

for another individual to provide MOORE with money to pay for narcotics ("Ah. shit. I am sitting over here now, B. Ahh. she said pull up in another twenty minutes. okay. yeah. I forgot about that. I am that right now though. okay."). CAMPBELL then acknowledged that MOORE was waiting to receive money and advised MOORE he needed the money as soon as possible ("Alright, I need that like ASAP, B . . . Just hit me."). MOORE then advised CAMPBELL that he would get CAMPBELL the money quickly ("Yeah. I hit you as soon pull up. I got that for ya.").

333. Approximately 39 minutes later, on December 27, 2005, at 5:58 p.m. (Call No. 9102), MOORE utilized **Target Phone 5** to call CAMPBELL again on **Target Phone 7**. During the call, MOORE and CAMPBELL agreed to meet to conduct a narcotics transaction, and they used coded language to disguise the location where they planned to meet ("right down the P . . . right down the P-nine and shit . . . I don't like, like, where you, where you coming downtown way?").

334. Approximately 23 minutes later, on December 27, 2005, at 6:21 p.m. (Call No. 9112), MOORE utilized **Target Phone 5** to call CAMPBELL again on **Target Phone 7**. During the call, MOORE and CAMPBELL discussed the exact location where they would meet to conduct the narcotics transaction ("Yeah, I ain't here yet . . . I said, I am in here.").

335. On January 1, 2006, at 7:34 p.m. (Call No. 10874), MOORE received an incoming call on **Target Phone 5** from Derrick CAMPBELL using **Target Phone 7**.

198

During the call, MOORE said that he wasn't ready to meet yet, ("...I ain't come out yet.") and he was waiting on one of his workers to finish selling his narcotics and deliver the proceeds to him ("I got my little man out here. I'm waiting on my old lady to pull up. She want to drop off..."). MOORE then stated that he would be ready to purchase more narcotics and would contact CAMPBELL at that time. ("Then I'm gonna go down to the business. I'm gonna hit you right up.") MOORE responded that the plan was acceptable to him ("Alright. OK.").

336. On January 3, 2006, at 4:42 p.m. (Call No. 11460), MOORE utilized **Target Phone 5** to call Derrick CAMPBELL on **Target Phone 7**. During the call, MOORE and CAMPBELL discussed drug trafficking in this call. In particular, MOORE told CAMPBELL that he was waiting for another Mickey Cobra gang member outside a "building," likely one of the buildings in the DBs where the Mickey Cobras control drug distribution operations ("We just waiting . . . to pull up. He, ah, went to the building to grab them few . . . [Unintelligible]."). MOORE advised CAMPBELL to wait in the area of the DBs so that he and the other individual could meet with CAMPBELL to provide CAMPBELL with narcotics ("Yeah, just hang in the hood and we'll be by. . . . I say, just uh, . . . I just seeing what you got out there and shit. I'm here. . . . Okay, okay, yeah. Hang in the hood though, so I can go on and, you know, holla at you. . . . Alright, I'm in the hood. I'm in the hood, B.").

337. On January 11, 2006, at 1:01 p.m. (Call No. 63), MOORE utilized **Target**

199

Phone 5 to call DERRICK CAMPBELL on **Target Phone 7**. During the call, MOORE and CAMPBELL agreed to meet to conduct a drug transaction ("Shit, ahh, meet me by gas station where we met at last time about 2:30. . . . About 2:30? . . . Yeah.").

338. Approximately 97 minutes later, on January 11, 2006, at 2:38 p.m. (Call No. 76), MOORE utilized **Target Phone 5** to call DERRICK CAMPBELL on **Target Phone 7**. During the call, MOORE and CAMPBELL discussed their plans to meet to conduct a drug transaction ("You can't get this way real quick?" . . . Yeah.").

339. Approximately 36 minutes later, on January 11, 2006, at 3:14 p.m. (Call No. 91), MOORE utilized **Target Phone 5** to call DERRICK CAMPBELL on **Target Phone 7**. During the call, (". . . want to go back in the mall. . . . Yeah, yeah, the mall would be better.").

340. Approximately 14 minutes later, on January 11, 2006, at 3:28 p.m. (Call No. 98), MOORE utilized **Target Phone 5** to call DERRICK CAMPBELL on **Target Phone 7**. During the call, MOORE and CAMPBELL continued to discuss their plans to meet to conduct a drug transaction ("What's happening, B? . . . Alright, I'm on c-way, I'll be right there.").

341. Approximately 6 minutes later, on January 11, 2006, at 3:34 p.m. (Call No. 100), MOORE utilized **Target Phone 5** to call DERRICK CAMPBELL on **Target Phone 7**. During the call, MOORE and CAMPBELL finalized their plans to meet to conduct a drug transaction ("Where you at, B? . . . I'm at, . . . by the collections. . . .

Alright. . . . I'll do it.").

### 5.    MOORE's Drug Trafficking with Joseph PEARSON

#### a. Intercepted Calls Between PEARSON and MOORE

342.    On or about December 9th, 2005, at approximately 10:43 a.m. (Call No. 1758) MOORE used **Target Phone 5** to call (773) 858-3566, a phone used by Joseph PEARSON, according to surveillance and PEARSON's own post-arrest admissions. In this call, PEARSON told MOORE that one of his (PEARSON'S) guys wanted to purchase 100 grams of heroin from MOORE ("He wants two 50 cent CD's."). MOORE then told PEARSON that he (MOORE) did not have it and he (MOORE) needed to call his (MOORE'S) supplier ("Use pay phone and see what there deal is man."). MOORE then told PEARSON to stall his (PEARSON'S) guy until 11:00 a.m. when MOORE could get the heroin ("Hold them down stall them out call you back give me about 11 o'clock.").

343.    On or about December 9, 2005, at approximately 4:45 p.m. (Call No. 1898) PEARSON used (773) 858-3566 to call MOORE on **Target Phone 5**. In this call, MOORE told PEARSON that he (MOORE) had not called because he (MOORE) did not have the heroin and would not have it until between five and six o'clock ("I ain't called and checked you know what I'm saying, checking on you know, but it's same style as uh, I, I told him, he said like about five, in between five or six though."). MOORE then told PEARSON to stall his (PEARSON'S) guy  because he (MOORE) did not have the heroin ( "Stall them out though B, as much as you can, you know what I mean?").

201

344. On or about January 11, 2006, at approximately 3:02 p.m. (Call No. 87),
MOORE used **Target Phone 5**, to call PEARSON at phone number (773) 858-3566.
MOORE asked PEARSON if his (PEARSON'S) customers were ready ("Hey did, did
you, you said your, your guys and shit was here, dude and them was here?"). PEARSON
then told MOORE that the customers were ready and MOORE asked PEARSON how
many grams of heroin they wanted to purchase ("What they was trying to do?").
PEARSON told MOORE that they wanted to purchase fifty grams of heroin from
MOORE. MOORE then told PEARSON that MOORE could sell them the fifty grams
("Alright you, you, you can tell them that, you know what I'm saying we can take care of
that."). PEARSON then asked MOORE if he (PEARSON) should just show his
(PEARSON'S) guys his (PEARSON'S) heroin supply so the customers think they really
had it ("Alright, what you want me just show them mine so they won't think I'm on no
bullshit?"). MOORE told PEARSON to show the customers his (PEARSON'S) heroin
and that MOORE would call PEARSON back ("Yeah, yeah, yeah, yeah, yeah, I'm a be
hitting you back in one second alright.").

345. On or about January 11, 2006, at approximately 9:40 p.m. (Call No. 251),
PEARSON used a phone with number (773) 858-3566, to call **Target Phone 5**, used by
MOORE. In this call, PEARSON told MOORE that he (PEARSON) had $1,000.00 to
give to MOORE and proceeded to ask MOORE if he (MOORE) wanted it now ("Yeah, I
got, I got U/I finna come outside, I'm a have a stack for you in a few minute, you want it

now?"). MOORE then told PEARSON that he (MOORE) was going to come and get the

money in a few minutes ("Ok uh. well I'm a just finna, finna come that way.").

PEARSON then told MOORE that he (PEARSON) would be waiting for MOORE ("I'm

waiting on you.").

346.　On January 13, 2006, MOORE (using **Target Phone 5**) received a call from

Joseph PEARSON (using (773) 858-3566) (Call No. 757). MOORE and PEARSON

discussed the quality of the heroin they are selling:

| | |
|---|---|
| PEARSON: | "Same black." |
| MOORE: | "Don't look the same, B." |
| PEARSON: | "You know what." |
| MOORE: | "Don't the same.  Got some lactose or something with it, man." |
| PEARSON: | "Some lactose?" |
| MOORE: | "Yeah, I got 15 of the grills that I gave you still right here, fitting to put them together and yours looks like a motherfucker got that lactose form on it man." |
| PEARSON: | "How, how many is there?  How many add up to?" |
| MOORE: | "In your pack?" |
| PEARSON: | "Yeah." |
| MOORE: | "Ahh, 15." |
| PEARSON: | "Okay, well that must be you must got the ones, you must got the ones that I had already, G.  I got your blue pill in there." |

Based on my experience and this investigation, MOORE is concerned that there is too

much cut in the heroin because the lactose shows up too prominently.

### b.　PEARSON's Purchase of Heroin from MOORE on January 30, 2006

347.　On or about January 30, 2006, at approximately 3:23 p.m. (Call No. 4574)

MOORE used **Target Phone 5**, to call PEARSON at phone number (773) 858-3566.  In

this call, MOORE and PEARSON agreed to meet at "Leon's" on 59th and Racine.

348.   At approximately 6:36 p.m. (Call No. 4653) MOORE used **Target Phone 5**, to call PEARSON at phone number (773) 858-3566. In this call, PEARSON told MOORE, "I'm coming down 59th now, I'm right here on 59th and Justine." PEARSON then asked MOORE, "You want me to meet you at Leon's right?" MOORE then told PEARSON that he (MOORE) had to leave from Leon's because the police were there ("Yeah but I had to pull out man, five-o was right there B."). MOORE then told PEARSON to meet at 71st near the freeway. PEARSON replied that his (PEARSON'S) customer had money with him and was ready to purchase heroin ("He want to grab, so he just cashed his taxes, you know what I'm saying, and I don't want to lose him, you know what I'm saying?") and that this was the reason why he (PEARSON) had previously told MOORE to bring fifty grams of heroin ("That's why I was telling you, I was told you to bring me a fifty cent CD."). PEARSON then told MOORE that his (PEARSON'S) customer had the money on him and was following PEARSON to the meet location ("I um, I'm haring him follow me up there then. . . And he got, he got, he just cashed his, his just cashed, he just put his check in the bank and he just got his money back today, he got his money on him so, I ain't trying, you know what I'm saying, lose or nothing.").

349.   At approximately 6:53 p.m. MOORE received a call on **Target Phone 5** from (773) 858-3566, which is used by PEARSON. PEARSON asked MOORE, "I thought you was up here?" MOORE replied, "At Leon's?" PEARSON stated, "I don't

204

know where that's at. I though you said a gas station on 71st." MOORE said. "Alright here I come right now." PEARSON then told MOORE not to forget the fifty grams of heroin: "Don't forget to bring the CD."

350. At approximately 7:00 p.m., CPD officers established surveillance at the BP Gas Station at 7101 South State Street. At approximately 7:02 p.m. officers observed a man later identified as PEARSON drive a gold minivan into the lot. At approximately 7:25 p.m.. officers watched PEARSON drive out of the lot. but at 7:28 p.m., they saw him drive back into the lot. At approximately 7:30 p.m. officers saw a man they recognized as MOORE in the lot. in a silver Pontiac Bonneville. Officers observed PEARSON exit the minivan and enter the Bonneville, returning shortly thereafter to the minivan. Officers then saw MOORE exit the lot. They then saw PEARSON exit the parking lot. Officers followed PEARSON and ultimately stopped him for a traffic violation. During the traffic stop. officers conducted a protective pat-down of PEARSON and at that time observed a clear plastic bag fall out of PEARSON'S left inside pant leg. Officers saw that the bag contained a brown powdery substance, which subsequent laboratory analysis showed to be 50 grams of heroin.

351. In a post-arrest statement made after waiving his Miranda rights on January 30. 2006, Pearson admitted to purchasing the heroin found on him during the traffic stop. Later that night, after PEARSON had been released from custody, PEARSON used (773) 858-3566 to call **Target Phone 5**. PEARSON told MOORE of PEARSON's arrest: "Ay

law man, them mother fuckers got me. G." MOORE asked PEARSON. "Who got you?"

PEARSON said. "The police, G...."

352.   On February 3, 2006, Israel MOORE received a call on **Target Phone 5**

from Joseph PEARSON, using phone (773) 858-3566. PEARSON was identified as the

caller through subscriber information for the phone.

```
PEARSON:   " It's dangerous G."
MOORE:     " No"
PEARSON:   " No, I'm talking about good dangerous."
MOORE:     " Oh yeah, hell yeah."
PEARSON:   " I'm bleeding like a motherfucker G."
MOORE:     " Yeah, you just got to get used to it though."
PEARSON:   " Man, my knuckles bleeding, my finger, everything bleeding."
MOORE:     " Yeah, you got to get used to it, but I'm talking about, it's "
PEARSON:   "I know it. I know G. Thanks but a motherfucker know that, and G,
           someone told something."
MOORE:     "No doubt... and it's so serious you can have it on the window, soon
           as the pull on the other half, it on line out. They pull up then I tuck
           real quick. See, I'm used to it. I'm quick with it though."
PEARSON:   "Yeah, you real good."
MOORE:     "I'm talking about. They jumping out, I can tuck and tail. I'm
           decent."
PEARSON:   "That's good move G."
MOORE:     "Yeah, keep that one between us. We don't want nobody know about
           that."
```

Based on my experience, this investigation, and the interview of Joseph PEARSON by

DEA Agents and Chicago Police Officers, MOORE and PEARSON were talking about

PEARSON's vehicle being equipped with a trap in which he would conceal narcotics,

firearms and cash. PEARSON stated that he scraped his fingers and knuckles accessing

the remote opener. MOORE said how good he (MOORE) is at using the trap in his car,

206

saying that he is fast enough with his trap that he can put items in the trap as the police are walking up to him. PEARSON and MOORE agreed with each other that no one else should know about the existence of traps in their cars.

### c. PEARSON Implicates MOORE

353. On February 26, 2006, Joseph PEARSON made a voluntary statement to CPD officers concerning the whereabouts of Israel MOORE. PEARSON said that MOORE had fled to Texas because he was involved in a federal narcotics case. PEARSON said that MOORE holds the rank of "Prince" in the Mickey Cobras and is well protected by gang associates in the Fuller Park area. PEARSON said that MOORE has a high enough position in the Mickey Cobras to enable him to order shootings and even murders. PEARSON also told officers that when he (PEARSON) was arrested for heroin possession on January 30, 2006 and agreed to give officers two firearms, he then obtained two firearms from Israel MOORE and supplied the firearms to the police.

354. PEARSON was interviewed again on February 27, 2006, at which time he described his role within the Mickey Cobras, saying that he "shakes," which I know to mean that he mixes and processes drugs for street sales. PEARSON said that he "shakes" heroin for "Lawrence," whom he identified through an arrest photo as Israel MOORE. PEARSON said MOORE gives PEARSON heroin so that PEARSON can get the heroin ready for distribution by diluting it with lactose. PEARSON said that he typically mixes high quality heroin with 5 grams of lactose per gram of heroin, and that he typically mixes

lower quality heroin with 3 grams of lactose per gram of heroin.

### 6. Kevin THOMAS's Role of Heroin Supplier to MOORE

355.    Kevin THOMAS, a.k.a "Money C", is a regular supplier of heroin to the Mickey Cobras, through redistributors such as Israel MOORE. Arrest photos and descriptions show that Kevin THOMAS has several tattoos: "MC" on his right arm, "Money" on his right arm, and a 5-point star on his left chest. I know from this investigation that "MC" and the 5-point star indicate membership in the Mickey Cobras, and "Money" is part of Kevin THOMAS' nickname.

### a.    MOORE's Description of Kevin THOMAS' role

356.    In his February, 21, 2006, post-arrest statement, after waiving his rights, MOORE told agents that Kevin THOMAS is a member of the Mickey Cobras who is also known by the nickname "Money C". MOORE said that Kevin THOMAS regularly supplies him with heroin and that on a number of occasions, Kevin THOMAS has sent the heroin into Chicago via courier. MOORE said that Kevin THOMAS obtains at least some of the heroin from a Hispanic man (Individual S) from a Chicago suburb. According to MOORE, Kevin THOMAS usually calls him (MOORE) and tells him when Individual S has the heroin ready for delivery. MOORE then gathers his money and meets Individual S, or sends someone to meet Individual S, at the Congress Hotel in downtown Chicago. MOORE said that on more than five occasions he has picked up 300 grams of heroin from Individual S pursuant to Kevin THOMAS' arrangements.

208

### b. Traffic Stop Confirms Kevin THOMAS' Relationship With MOORE

357. On January 25, 2005, CPD officers stopped MOORE's vehicle and found that MOORE was driving and Kevin THOMAS was his passenger. Kevin THOMAS produced identification which established his identity. Kevin THOMAS was in possession of $3,200.

### c. Intercepted Calls Between Kevin THOMAS and MOORE

358. On December 29, 2005, MOORE received an incoming call on **Target Phone 5** from Kevin THOMAS, using phone (281) 796-7618. Kevin THOMAS' identity as the caller was shown by the subscriber records for the phone number, which are in Kevin THOMAS's name, and Israel MOORE's post-arrest statement. In the call, Kevin THOMAS told MOORE that he (Kevin THOMAS) needed $4,500 because he had a person who was going to sell him heroin for $4,500 (Kevin THOMAS: "I need about, uhh. shit. forty-five dollars, big dollars, around forty-five hundred." MOORE: "Forty-five hundred?" Kevin THOMAS: "Yeah, hell yeah, my man calling, yeah, he say he going to make a deal for me, you know.").

359. On January 2, 2006, Kevin THOMAS used (281) 796-7618 to call MOORE on **Target Phone 5**. During the conversation, Kevin THOMAS told MOORE that he (Kevin THOMAS) had an opportunity for a large narcotics transaction with a person he had dealt with on previous occasions. ("Man, B, we on a whole new page here. I ain't even lying to you. B. We on a whole new page. This is never going to happen again like

209

this. B. He know, though, he know me. Been dealing with me for a while. Like, it ain't much but I got something, bro, cool, cool, bro, cool. Get that, tell me what that is, work something out with the other one. Payment plan shit, you feel me."). Kevin THOMAS replied that they can negotiate with this person on the price. Kevin THOMAS then told MOORE that he (MOORE) is going to supply the narcotics (U-Dig) and that the deal will happen in thirty minutes ("And then hit you back up for that U-Dig. Still got holler at the mother fucker right quick. It will be about thirty minutes, man.").

360. Later that day, MOORE called Kevin THOMAS on (281) 796-7618. MOORE told Kevin THOMAS that the person with whom they were to make the deal with is having a problem getting his money together ("Man, I just hollered at dude, man. Ahh, shit need more than a couple of hours feeling try to squeeze. Say he fucked all the way up."). Kevin THOMAS then told MOORE to get together with the third party and arrive at some dollar amount that is satisfactory for all three ("Yeah, yeah, but ahh, you got to put together a number, man, and call me and let me know what's cracking."). MOORE agreed and Kevin THOMAS replied, "I can go from there, but you got to let me know something. I can try to do something."

361. On Feburary 15, 2006, Kevin THOMAS (using (281) 796-7618) called MOORE. During this call, Kevin THOMAS told MOORE that he (Kevin THOMAS) had tried to make a narcotics deal with a person ("Shit, just flipping. I'm on my way back to the studio. Tried to bust a move."). MOORE asked Kevin THOMAS where he (Kevin

210

THOMAS) was getting his heroin, and Kevin THOMAS told MOORE that he (Kevin THOMAS) had moved some narcotics that he already had and that his workers went out and obtained a gun for him ("Oh, hell, man. I'll bust your head. No, I bust a move on some merch I had. You feel me? I ain't even lying to you. I got, shit, my peeps went and grabbed a motherfucking U-Dig for me today."). MOORE replied that his crew had also obtained a gun for him ("Oh yeah, my peeps have one man.").

### d. Kevin THOMAS Arrested With Heroin and Money

362. On April 2, 2003, Calumet Park police arrested Kevin THOMAS and Individual T in a room at a Super 8 Motel in Calumet Park, Illinois. At the time of Kevin THOMAS' arrest he was in possession of ten tablets of Ecstasy, a plastic bag containing a substance that field-tested positive for marijuana, a digital scale with white powder residue that field-tested positive for heroin, and $8,743. The $8,743 was seized after a police canine indicated that the currency had been in close proximity to narcotics.

363. In the motel room, the officers found five Western Union wire transfer receipts sent by someone using the name "Ivan Jones". The recipients and amounts are as follows:

| Money Transfer Control Number | Amount | Payout Location |
|---|---|---|
| 3936123691 | $700 | Colombia |
| 3934186564 | $700 | Colombia |
| 3934186739 | $700 | Colombia |

| 3934213761 | S700 | Colombia |
| 3930485605 | S700 | Colombia |

### e. Kevin THOMAS' Use of "Ivan Jones" as an Alias

364.    After her arrest with Kevin THOMAS at the Super 8 on April 2, 2003,
Individual T waived her rights and agreed to be interviewed by agents. Individual T said
she has known Kevin THOMAS since childhood, that she calls him "Money C," and that
he is a heroin trafficker. She further said that, in their Super 8 room that day, she had
observed a meeting between Kevin THOMAS and another man, during which time Kevin
THOMAS counted out S1,400 and handed it to the man. She said that she also observed
Kevin THOMAS make a telephone call during which he identified himself as "Ivan
Jones" and read names from a small stack of Western Union receipts.

## III. CONCLUSION

Based on evidence described in this affidavit and my experience and training, I believe there is probable cause to believe that from in or about 1999 through the present, the defendants listed in paragraph 3 did conspire with each other and with others known and unknown to the United States to knowingly and intentionally distribute and posses with intent to distribute controlled substances, namely, in excess of 1 kilogram of heroin, 50 grams of mixtures containing cocaine base in the form of crack cocaine, mixtures containing cocaine, marijuana, and fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21 United States Code, Section 846.

William SVILAR, Task Force Officer

Sworn to before me and subscribed in my presence
this 20th day of June 2006

Martin C. Ashman
United States Magistrate Judge

213

Exhibit A